**07 C 6593**

**JUDGE GOTTSCHALL**
**MAGISTRATE JUDGE KEYS**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| MARGARET GOLDBERG, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 06 CH 24682 |
| ASTOR PLAZA CONDOMINIUM | ) | |
| ASSOCIATION, DANIEL G. MOHEN, | ) | |
| TRAVIS W. COCHRAN, GEETA | ) | |
| KRISHNAMURTHI, and WILLIAM | ) | |
| S. LODER, | ) | |
| | ) | |
|     Defendants. | ) | |

## FIRST AMENDED COMPLAINT IN CHANCERY

MARGARET GOLDBERG, by her undersigned attorneys, and complaining of

Defendants ASTOR PLAZA CONDOMINIUM ASSOCIATION ("Astor Plaza"), DANIEL G.

MOHEN, TRAVIS W. COCHRAN, GEETA KRISHNAMURTHI, and WILLIAM S. LODER,

in their capacities as unit owners and Board Members of Astor Plaza, hereby states and alleges as

follows:

### BACKGROUND

1.     This action arises because Goldberg has experienced oppression as a minority

owner, by the actions and proposed actions of the Astor Plaza Condominium Association Board

of Directors, in a number of ways:

- Pursuing funding for a renovation which is prohibited under the Governing Acts
  of the Astor Plaza Condominium Association.

- Failure to maintain several portions of limited common elements, which are a
  portion of the building's common elements, which affect the Goldberg unit.

- Failure to follow and enforce the applicable rules and failure to maintain

1

EXHIBIT

B

reasonable procedures and processes, including the minimum procedures and process required by law, in Board and Association activities, including failure to take, distribute and approve minutes, failure to provide meeting notifications, failure to abide by or enforce rules contained both in the governing documents and as adopted, and selective enforcement which favors the majority (or those who vote in their favor) as against the minority; and

- Pursuance of activities which are specifically prohibited under the Governing Documents of the Astor Plaza Condominium Association; and enforcement of activities in such a way as to oppress Goldberg as a minority owner.

## A.    The Parties.

2.    MARGARET GOLDBERG ("Goldberg") was at all times relevant hereto, as she remains, an Illinois resident living in Unit 4E of the Astor Plaza condominium located at 39 East Schiller in Chicago, Illinois (P.I.N. 17-03-105-020-1004). The record owner of the unit is a Trust over which Goldberg has the power of direction.

3.    ASTOR PLAZA CONDOMINIUM ASSOCIATION ("Astor Plaza") is a Condominium Association organized under the laws of the State of Illinois, which serves as the association for the condominium located at 39 East Schiller in Chicago, Illinois.

4.    Defendant DANIEL G. MOHEN ("Mohen") was at all times relevant hereto, as he remains, an Illinois resident living in Unit 2E of the Astor Plaza condominium located at 39 East Schiller in Chicago, Illinois. Mohen is the record owner of said unit (P.I.N. 17-03-105-020-1002).

5.    Defendant TRAVIS W. COCHRAN ("Cochran") was at all times relevant hereto, as he remains, an Illinois resident living in Unit 1W of the Astor Plaza condominium located at 39 East Schiller in Chicago, Illinois. Cochran is the record owner of said unit (P.I.N. 17-03-105-020-1005).

6.    Defendant GEETA KRISHNAMURTHI ("Krishnamurthi") was at all times relevant hereto, as she remains, an Illinois resident living in Unit 3W of the Astor Plaza condominium located at 39 East Schiller in Chicago, Illinois. The Krishnamurthis are the record owners of said unit (P.I.N. 17-03-105-020-1007).

7.    Defendant WILLIAM S. LODER ("Loder") was at all times relevant hereto, as he remains, an Illinois resident living in Unit 4W of the Astor Plaza condominium located at 39 East Schiller in Chicago, Illinois. Loder is one of the record owners of said unit (P.I.N. 17-03-105-020-1008).

8.    Defendants Loder, Cochran, Krishnamurthi, and Mohen are serving as members of the Board for Astor Plaza (although, despite her repeated requests, Goldberg is not in possession of minutes reflecting such an election).

**B.    Astor Plaza's Governing Documents.**

9.    Astor Plaza is governed by its declaration and by-laws (Ex. 1)

10.    These governing documents address the handling of common and limited common elements, and impose a number of limitations on unit owners with regard to their use of the property.

11.    Written rules and regulations are also required under the governing documents and are to be distributed to unit owners.

**C.    The Association's History With Regard to Goldbergs' Interests.**

12.    Over the course of the last five-six years, since most of the new unit owners first moved into the condominium, Goldberg has found it increasingly difficult to get responses to even the simplest of her concerns with regard to the building.

13.    On or about October 8, 2005, Goldberg was compelled to retain counsel because, despite her repeated requests, the Association had continued to disregard her interests as a minority owner and was failing to complete work that was to have been done with regard to a number of common elements affecting her property including the roof, window frames (which had been damaged from prior roof leaks) and other common elements.

14.    Her concerns at the time were summarized in a letter from her counsel to the Association in which she requested that the Board meet to address a number of specific concerns. (Ex. 2)

15.    Although it had ignored prior requests, in late October, 2005, the Board responded to Goldberg's letter, acknowledging her concerns and agreeing to the scheduling of a meeting for November, 2005.

16.    At the time, Goldberg's counsel advised the Board that, to date, she had not received copies of minutes from the most recent meetings, at which the current Association Board had ostensibly been elected, and at which a change to the By-Laws had supposedly been agreed upon which changed the make-up of the Board to include any unit owners who "want to be on the board." *See also* 765 ILCS 605/19 (requiring that minutes be made available). Indeed, Goldberg is not aware of any meetings at which prior notes from meetings have been adopted or approved as minutes.

17.    The unit owners (including anyone purporting to be on the Association Board) met in November, 2005. Goldberg's counsel then confirmed with the building manager and those in attendance on or about December 7, 2005, what Goldberg's understanding was coming out of the meeting. (Ex. 3)

18.     At the meeting, the unit owners agreed to review the situation with regard to the various issues raised by Goldberg and to address those problems, and agreed "to maintain the existing rules and regulations with regard to the parking space next to the building," there having been a number of disputes with regard to that space and Goldberg having requested that "people new to the building [be] apprised of these policies [so as to avoid] misunderstandings among neighbors...."

19.     Despite the promises made during the Association's meeting in November, 2005, however, the Association addressed almost none of Goldberg's concerns thereafter.

20.     Instead, over the course of the last year, the Association:

- Disregarded Goldberg's concerns with respect to the front window frame on her unit and the structural integrity of the window casings on the side of her unit. The Association ignored Goldberg's requests for work to be done that had been promised years prior and an update on building management's supposed investigation for almost another year before telling her, first, that the matter would be addressed as part of a building renovation and then, almost immediately thereafter, reneging on that commitment.

- Reneged on its commitment to repair Goldberg's exterior metal balcony (despite the fact that she had helped pay for work done to the other metal balconies at the behest of the Board, and the Board's prior acknowledgment of this inequity), saying that "the Board defines windows and balconies as limited common elements and the responsibility of each unit owner to repair, remodel, replace or maintain." (Ex. 4) The Board does not have the authority to make such a determination on a case-by-case basis but, instead, is required to follow the governing documents.

- Effectively set aside Goldberg's complaints with regard to building security. Although the Association's prior building manager did change the lock to the roof door, the Association then ignored her concerns with regard to the front door until a meeting in late 2006. At that meeting, despite her concerns with security, the Association presented a plan that would remove some security from the front of the building altogether, removing the locks from the interior front door so that anyone able to gain access to the street entrance would have access to the entire building.

- Continued to enforce building rules and regulations only on a selective and discriminatory basis. A dog which is substantially larger than allowed for by the governing documents continues to live in the building (over Goldberg's objection). And Board members continue to use the building's only parking space for extended periods of time, despite a requirement in the written rules that unit owners limit their use to three hours at a time (Goldberg, on the other hand, has been threatened with towing or other police action should she violate supposedly new rules she has never been provided with and which she was never advised were being even considered).

- Has since requested that the unit owners contribute to the payment of substantial sums in attorneys fees, without ever putting the issue to a vote of the members as required, and without regard to the fact that the fees are being designated for payment on defense costs associated with claims against defendants in their capacities as unit owners, not just claims involving the Association itself.

**D.    The 2006 Proposed Renovation.**

21.    In September, 2006, Astor Plaza scheduled a meeting to discuss a renovation plan aimed primarily at improving the overall appearance of the front lobby and building facade.

22.    The meeting was scheduled for September 12 and was to involve discussions with regard to an expenditure in excess of $400,000.

23.    Notice of the proposed plan was not provided to Goldberg, however, until the Thursday night immediately preceding the Tuesday meeting.

24.    Despite prior assurances to the contrary, the materials provided to Goldberg just before the meeting disclosed that the Board's plan did not include any work to be done on the window casing in front of her unit or with regard to the window casings on the side of her unit. Instead, the plan called for a new structure to be built over the window casing which would both make it harder to do repairs in the future and increase the cost to Goldberg should she not elect to pay for the work herself during the plan's implementation.

25.    Section V, paragraph 2, (Separate Mortgages) of the Declaration states that "No

Unit Owner shall have the right or authority to make or create or cause to be made or created any mortgage or encumbrance or other lien on or affecting the Property or any part thereof, except only to the extent of his unit and his respective ownership interest in the Common Elements."

26.     Yet, the Board proposed and the unit members then agreed at a subsequent meeting to just such funding for the proposed renovation.  In the words of the Harris Bank (from which this loan to fund the renovation was sought, September 13, 2006; email memo of Diana R. Larsen) "The collateral for this relationship/financing solution is an irrevocable assignment of all assessments...and a security agreement providing a first lein (sic) against Borrower's corporate assets."

27.     In addition to being prohibited by the Declaration, this type of financing works against the minority interests of owners and beneficiaries, like Goldberg, who have relatively small, or no, personal mortgages.  Furthermore, even if Goldberg prepays the sum required, the bank has a lien on the assessments if other owners default.

**E.      The November 2006 Meeting.**

28.     Goldberg brought the aforesaid concerns to the attention of the Board at the September meeting and the Board agreed first to designate a representative to meet with her and then, after retaining counsel, advised her that counsel would address the issues with her prior to the next meeting.

29.     The meeting was then continued from its originally scheduled date for a period of one week so that counsel could ostensibly meet with and address Goldberg's concerns.

30.     After a private and unannounced meeting with the Board, however, which the Board later acknowledged took place despite written assurances that there was not going be a

meeting that evening, counsel simply reiterated the Board's position and advised Goldberg that the Board intended to follow the rules in their proceedings.

31.     At the next meeting, the Board refused to provide any further details with regard to how the financing would be structured (other than to say that the plan had been somehow changed to correct some of its earlier deficiencies) and allowed only limited discussion with regard to the issues raised by Goldberg.

32.     At the outset of the meeting, in fact, the Board allowed unit owner David Drew time within which to tell Goldberg's proxy that he would ensure that whatever legal action they might elect to pursue would be met with a sizeable investment on his part, of what he called "FU" money, to ensure that they got a lawsuit that would "drag on forever."

33.     Once Drew was done, the Board President closed the discussion, not permitting Goldberg's proxy to say anything in response, before moving on to the next item.

34.     The Board and attending Unit Owners voted to allow an increase in the assessments (by 7-1) despite the fact that was called for by the By-Laws for such a project as was being contemplated would have been a special assessment.

35.     The defendants and others also voted, *in their capacities as unit owners,* to approve financing for the renovation plan which would involve a lien on moneys paid in by other unit owners as assessments, thus abridging the Association's rights in that property, and despite an express prohibition in the Governing Documents, and the fact that no further details were provided regarding a supposed change in the financing structure or the plan itself.

**F.     Failure to Maintain Common Elements.**

36.     The Declaration defines limited common elements as a portion of common elements (Article III, sections 2, 3, p. 5). These two types of elements differ only in that limited common elements are assigned to specific units. The maintenance, repair, and replacement of Common Elements is the responsibility of the Board, as part of the Common Expenses (Article VIII, section 1, p. 12).

37.     Goldberg has, on several occasions, contributed funds to repair limited common elements to which she has no access.

38.     Between August 2001 and December 2003, for example, she paid a special assessment of over $18,000 to repair balconies assigned as limited common elements to the west side apartments. Goldberg lives on the east side.

39.     Goldberg's special assessment was the highest in the building because of her share in the common elements. Thus, she paid more to fix balconies to which she has no access or use than any of the apartments that benefit from these limited common elements.

40.     Goldberg has three deteriorating common (including limited common) elements, however, which have not received equal consideration.          41.     Goldberg has a balcony which is substantially rusted. She is afraid to use it. There is no assurance that the problems with this balcony will be addressed in the proposed renovation.

42.     Goldberg has a deteriorating window frame in the front bay window. The problem, first pointed out in July 2004 by her painter, was verified a month later by an inspector hired by the then-employed management company. The current Board also sent out an inspector in 2006. Goldberg needs this frame, and the window enclosed in it, replaced in an imminent

manner. Despite the danger of this situation, the Board's proposed renovation does not address the situation.

43.    The Board's memorandum from September, 2006 (attached) purports to redefine what constitutes a limited common element, stating that "The Board is considering the option of having the Assoc. assume responsible (sic) for the front bay windows and define them as common elements."

44.    The side window frames are badly deteriorated in Goldberg's apartment. In fact, pictures dating from 1991, show snow piling up in the interior of her apartment, coming through the window frames.

45.    Notwithstanding a long history of discussion with regard to these window frames, however, and assurances from both the current and prior Boards, the current Board now seeks to avoid any responsibility for the window frames by summarily excluding them from the building's historical and published definition of what constitutes a common element.

46.    This disregard for Goldberg's legitimate claims constitutes an oppression of her minority interests.

47.    The Board has a duty, as set forth in the Governing Documents to tend to the "[o]peration, care, maintenance, replacement, and improvement of the common elements."

48.    The discussion at the September, 2006 meeting, however, as well as the aforesaid memorandum, reveal that cosmetic upgrades, such as applying carpentry details to hallways, are being planned at considerable expense, while the structural and functional concerns raised by Goldberg are being ignored.[1]

---

[1] Goldberg is not the sole owner suffering from such policies. Mark and Linda Karno, owners of

### G.    Failure to Provide and Communicate Reasonable Procedures.

49.    The Board has a duty to carry out policies in conformity with the Declaration, which includes the bylaws.  The Board has not performed this duty.

50.    For example, in the aforesaid memorandum, Board president, Cochran, states that "The Board defines windows and balconies as limited common elements and the responsibility of each unit owner to repair, remodel, replace, or maintain."

51.    The Governing Documents, however, provide that limited common elements are the responsibility of the association.  The Board may not change this without going through a clearly defined process, which is detailed in the Declaration, Article XIX, paragraph 5, p. 37).

52.    No such process of change has been effected by the Board.

53.    The Board does not fulfill its duties to communicate about meetings and policies.

54.    The Declaration states (Article XIV, paragraphs c and e, page 24) that Board members should include "a secretary who shall keep the minutes of all Board meetings" and "Meetings of the Board shall be open to any Unit Owner, notice of any meeting shall be mailed at least forty-eight hours prior thereto, unless a written waiver of such notice is signed by the person or persons entitled to such notice."   Board meetings are scheduled to take place four times annually on specifically designated dates, according to the Governing Documents.

55.    No minutes of meetings have been distributed by this Board, however, and repeated requests by Goldberg for such minutes have gone unheeded.

56.    Notification of Board meetings is rarely given and meetings are not held when and as required by the Governing Documents.

---

another unit, filed legal action against the Board for failure to cover plumbing expenses of the common

57.    Communication with regard to the proposed renovation and its funding has not been adequate.   For example, a complex packet describing the proposed improvement programs was dropped at Goldberg's door on Thursday night, September 7.  The meeting to vote on this improvement (totaling approximately a half-million dollars) was called for September 12.  The notice provides that "We present this to the owners, in advance of the September 12 BOD meeting so we can vote on this initiative at this meeting (p. 5)."

58.    Such notice is unreasonable.  Moreover, the proposal was vague and uninformative, particularly with respect to the common elements assigned to the Goldberg apartment.

59.    Attempts to meet with the Board, or a representative thereof, to gain information, were first put forth by a Board member at the Sept. 12 meeting.  However, when Goldberg pursued these attempts, she was first asked to put the concerns in writing, which she did, and then told  (emailed memo, October 5, 2006) "neither I nor the BOD would meet you separately with you....The purpose of the meeting on Oct. 30 is to answer these questions and then vote on the proposals."

60.    In another example of inadequate communication, a memo dated September 29, 2006, from Bryan Cagan, property manager, proposed an assessment increase. However, it was unclear whether the increase was to be a special assessment (as Goldberg believes it is), or a permanent increase.

61.    When the unit owners finally met to discuss the increase, they agreed to do it retroactively as a regular assessment, despite the fact that its admitted purpose was to fund a

---

elements, which they had to pay.

specific project (The increase was also retroactive and contrary to the Governing Documents inasmuch as those documents do not allow for a regular assessment to be levied for purposes other than those specifically set forth in the documents.)

### H.    Pursuance of Activities Specifically Prohibited under the Governing Documents.

62.    The Declaration (including bylaws) has a number of specific rules, which are being violated, often by Board members.

63.    Article XVII, paragraph 6, (page 34) specifically prohibits certain types of animals: "No animals shall be raised, bred or kept in any Unit, except for dogs which may be carried by an adult person…"

64.    Yet one Board member has, despite Goldberg's objections, had a large dog in the apartment, with no action by the Board. This situation has continued for over a year.

65.    Paragraph 5 of the same act states "Unit owners shall not cause or permit anything to be placed on the outside walls of the building and no…television antenna shall be affixed to or placed upon the exterior walls or roof or any part thereof, without the prior consent of the building.

66.    Another unit owner, once again without consequence, violated this provision in three ways: Christmas decorations hung from the roof and draped over the front of the building; lights on the roof; and a satellite dish on the roof.

67.    The storage of bicycles in common areas is specifically prohibited (paragraph 9). Yet unit owners, without penalty, continually store bicycles in such places.

68.    Article XIV, section s (p. 26) of the Declaration states that written notice of rules and regulations shall be given to all unit owners.

69.    Yet, Defendant Loder has stated, supposedly on behalf of the Board, that the house rules in effect since early 2004 have been rescinded (emailed memo, September 8, 2006) and that some new rules have been incorporated into the Bylaws (despite the fact that no meeting was ever called for this purpose and the By-laws have remained unchanged since 1999).

70.    Loder also advised Goldberg of a supposed new rule on parking, which had never been distributed.

71.    The west-side parking space represents a particular problem for Goldberg, and unit owners in general.

72.    This small space is clearly defined, in the most recently published rules, as intended for use for short periods of time by owners, as well for construction trucks during renovation and deliveries.

73.    In the past two years, however, a number of unit owners (including board members) have consistently violated this policy by using the space for their vehicles overnight.

74.    In one instance, when this was pointed out to the Loder apartment, they strongly objected, calling their inability to park overnight there (i.e., enforcement of the written house rule) an infringement of their safety, and continued to violate this rule.

75.    When Goldberg noted, in August 2006, that another vehicle was parked there almost continuously for a period of over 10 days, she called Loder who told her that the rule had been changed, and now unit owners, and only unit owners, could park there as long as they wanted.

76.    Goldberg then contacted Cochran, the association president, who told her that the car in question belonged to a friend.

77.      Cochran told her that any car, as long as it was associated with a unit owner, could park indefinitely.

78.      This verbal enunciation of the supposedly applicable rule contradicted both the written house rules of 2004 and the verbal version given by Loder.

79.      As this was apparently the rule in force (Cochran, the Board president, had parked there with the knowledge of the Board), Goldberg used this space to park her housekeeper there for a few days.

80.      On Friday, September 8, 2006, however, Diane Melton, Loder's wife, called the Goldberg household and ordered the housekeeper to move, threatening to call a towing company.

81.      Goldberg, *en route* to St. Louis, called Melton for clarification; Melton screamed at Goldberg, and finally hung up the telephone.

82.      Later that day, for the first time, Goldberg was notified by Loder that the new (unwritten) "rule," included a provision that the gate be kept closed and that only unit owner's vehicles be parked in the space.

83.      The parking rules of 2004, still the only rules, were thus continuously violated by Board Members with no consequences and they continue to informally change the rules to satisfy their own interests, at the expense of Goldberg (and possibly other unit owners).

84.      The Association's counsel, who was supposedly retained to address these concerns with the Goldbergs in October-November, 2006, confirmed that the written rules are required to be followed (with regard to the parking place), but then refused to confirm what those rules actually are.

## COUNT ONE: OPPRESSION

1-84.   Goldberg hereby incorporates Background ¶¶1-84 as ¶¶1-84 of this Count One.

85.   805 ILCS 5/112.50 provides in relevant part as follows:

A Circuit Court may dissolve a corporation:

(b)   In an action by a member entitled to vote, or a director, if it is established that: ***

(2)   The directors or those in control of the corporation have acted, are acting, or will act in a manner that is *** oppressive *** [or]

(3)   The corporate assets are being misapplied or wasted. ***

86.   805 ILCS 5/12.56, moreover (which courts have considered in the context of claims brought under 805 ILCS 5/112.50), provides that:

§ 112.55. Alternative remedies to judicial dissolution.

(a)   In either an action for dissolution pursuant to Section 112.50 of this Act or in an action which alleges the grounds for dissolution set forth in Section 112.50 of this Act but which does not seek dissolution, the Circuit Court, in lieu of dismissing the action or ordering dissolution, may retain jurisdiction and:

(1) Appoint a provisional director; or

(2) Appoint a custodian. ***

§ 112.60. Practice in actions for judicial dissolution or removal and for alternative remedies.

(a)   The practice in actions for judicial dissolution or removal shall be the same as in other civil actions except as may be otherwise provided in this Act. Every action for judicial dissolution or removal shall be commenced in the Circuit Court of the county in which either the registered office or principal office of the corporation is located. Summons shall issue and be served as in other civil actions. ***

(c)   It is not necessary to make members of the corporation sought to be judicially dissolved parties to any such action or proceeding unless relief is sought against them personally. The court, in its discretion, may order that the members be made parties.

(d)    The circuit court in an action for judicial dissolution may issue injunctions, appoint an interim receiver with such powers and duties as the court, from time to time, may direct, and take such other action as is necessary or desirable to preserve the corporate assets and carry on the affairs of the corporation until a full hearing can be had. ***

87.    In this case, the defendants have acted in a manner that is oppressive with regard to Goldberg's interest in the building, in dereliction of the obligations imposed upon them by the governing documents, in bad faith and in an arbitrary, overbearing and heavy-handed manner, and in a manner likely to result in unnecessary waste, gross over-reaching, and expense that will need to be wrongfully borne by Goldberg.

88.    Goldberg therefore respectfully requests that this Court grant her relief under §§112.50 and 12.56 (b) including the entry of an order:

- Requiring that the Board complete the work required with regard to the limited common elements adjoining the Goldberg unit, including work with regard to the window casing in front of Goldberg's unit, the side window frames, and her balcony;

- Declaring that any financing agreement which the unit members may have voted or may in the future vote to implement, pursuant to which the rights and interests of Astor Plaza would be in any way impaired or subject to a lien, is invalid and unenforceable under the governing documents and that, by virtue thereof, no such liens should be enforced as against any rights or property in which the Goldbergs (or other non-voting members) have an interest.

- Appointing a custodian or receiver to manage the business and affairs of the corporation until such time as a Board has been constituted pursuant to the governing documents which is prepared to perform its duties in accordance with the same.

77.    Goldberg also requests, to the extent necessary to demonstrate the veracity of her claims hereunder, that she be granted discovery and an opportunity to present testimony and other evidence with regard to her reasonable expectations as developed during the course of her over 20 years' involvement as a unit owner in the building.

WHEREFORE, MARGARET GOLDBERG, by her undersigned attorneys, and complaining of Defendants ASTOR PLAZA CONDOMINIUM ASSOCIATION ("Astor Plaza"), DANIEL G. MOHEN, TRAVIS W. COCHRAN, GEETA KRISHNAMURTHI, and WILLIAM S. LODER, in their capacities as unit owners and Board Members of Astor Plaza, respectfully requests that this Court enter an order, after a reasonable period of time for discovery and the conducting of an appropriate evidentiary hearing, which:

- Requires that the Board complete the work required by the Governing Documents with regard to her unit, including work with regard to the window casing, in front of Goldberg's unit, work on the side window frames, and her balcony;

- Prohibits Astor Plaza's unit owners from entering into any financing agreement that would serve to create a lien on the common elements, common fund or individual units of owners, as well as any interest or right in the Property, pursuant to the governing documents;

- Requires that Astor Plaza maintain and make available minutes which accurately reflect what takes place at meetings, which should be scheduled pursuant to the governing documents, and which are properly ratified as minutes at appropriate meetings;

- Requires that Astor Plaza's Board enforce both the rules and regulations of the Association and the obligations imposed upon unit owners by the governing documents and that appropriate fines be levied against unit owners who have violated these rules, regulations and obligations;

- Compels appropriate modifications to the governing documents so as to establish a dispute resolution procedure that would allow for individuals with minority interests, such as Goldberg, to pursue relief in such circumstances without the need for incurring costs and expenses such as those attendant to this lawsuit (i.e. a mediation or arbitration procedure);

- Appoints a custodian or receiver to manage the business and affairs of the corporation until such time as a Board has been constituted pursuant to the governing documents which is prepared to perform its duties in accordance with the same; and

Grants Goldberg her costs of suit, attorneys fees incurred and such additional relief as the Court deems just and proper or to which she is otherwise entitled as a matter of law.

## COUNT TWO: DECLARATORY RELIEF

1-84.   Goldberg hereby incorporates Background ¶¶1-84 as ¶¶1-84 of this Count One.

85.   § 2-701 (Declaratory Judgments) provides in relevant part as follows:

(a)   No action or proceeding is open to objection on the ground that a merely declaratory judgment or order is sought thereby. The court may, in cases of actual controversy, make binding declarations of rights, having the force of final judgments, whether or not any consequential relief is or could be claimed, including the determination, at the instance of anyone interested in the controversy, of the construction of any statute, municipal ordinance, or other governmental regulation, or of any deed, will, contract or other written instrument, and a declaration of the rights of the parties interested. The foregoing enumeration does not exclude other cases of actual controversy. ***

(b)   Declarations of rights, as herein provided for, may be obtained by means of a pleading seeking that relief alone, or as incident to or part of a complaint, counterclaim or other pleading seeking other relief as well, and if a declaration of rights is the only relief asked, the case may be set for early hearing as in the case of a motion.

86.   In this case, there is a concrete dispute admitting of an immediate and definitive determination of the parties' rights, the resolution of which will aid in the termination of the controversy or some part thereof.

87.   Specifically, Section V, paragraph 2 of the Declaration states that:

"No Unit Owner shall have the right or authority to make or create or cause to be made or created any mortgage or encumbrance or other lien on or affecting the Property or any part thereof, except only to the extent of his unit and his respective ownership interest in the Common Elements."

88.   The parties have an actual controversy with regard to this provision of the Declaration inasmuch as the Board construes this provision to be of no legal significance, force or effect, and Goldberg construes this provision to limit Unit Owners in their ability to pursue

19

financing that would result in encumbrances of any kind that would affect the "Property or any part thereof."

89.    As defined by the Governing Documents, the "Property or any part thereof" necessarily includes Assessments and the Association's rights and interests in any and all other property, and the Association should thus be prohibited by the terms of its Governing Documents from pursuing an agreement with a lender to finance any major project (such as that contemplated by the Board during the aforesaid meetings in 2006) and the project should therefore be funded, if at all, through special assessments paid for directly by the Unit Owners.

90.    The defendants herein, in their capacities as Board members and as Unit Owners are seeking to violate this requirement in the manner aforesaid, which would result in the impairment of the Association's resources, in which Goldberg has an interest, and there is thus a threat of injury to Goldberg's rights and interests warranting declaratory relief.

WHEREFORE, MARGARET GOLDBERG, by her undersigned attorneys, and complaining of Defendants ASTOR PLAZA CONDOMINIUM ASSOCIATION ("Astor Plaza"), DANIEL G. MOHEN, TRAVIS W. COCHRAN, GEETA KRISHNAMURTHI, and WILLIAM S. LODER, in their capacities as unit owners and Board Members of Astor Plaza, respectfully requests that this Court enter a declaratory judgment declaring the parties rights and obligations under Section V, paragraph 2 of the Declaration, including specifically a declaration to the effect that this Article serves to limit Unit Owners in their ability to pursue financing in any way, form or fashion that would be likely to result in an encumbrance of any kind that would affect the "Property or any part thereof." To the extent the Association may have already entered into such an agreement, notwithstanding the pendency of this lawsuit, Goldberg respectfully

requests that the Court find that, as a matter of law, such an agreement should be construed and/or reformed to ensure that any lien rights ostensibly granted thereunder should be limited in enforceability to the property interests of those unit owners who voted for such financing and should be construed to encumber neither the Goldberg's individual property interests or those common interests held by the Association for the benefit of the unit owners as a whole pursuant to the governing document.

Goldberg further requests that the court find, as a matter of law, that she should not be obligated to contribute to either the cost of repaying any financing agreement so entered in violation of the governing document, or to attorneys fees and costs incurred by the association in connection therewith or in defense thereof, and that her assessments should therefore be limited to those otherwise payable in the ordinary course.

Goldberg also requests that she be granted her costs of suit, attorneys fees incurred, and such additional relief as the Court deems just and proper or to which she may otherwise be entitled as a matter of law.

Respectfully submitted,

MARGARET GOLDBERG

By:_____
        One of Her Attorneys

Ted A. Donner
DONNER & COMPANY LAW OFFICES LLC
1131 Wheaton Oaks Court

Wheaton, Illinois 60187
630-588-1131
Attorney Code: 39148

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

MARGARET GOLDBERG,                    )
                                      )
            Plaintiff,                )
                                      )
v.                                    )
                                      )        No. 06 CH 24682
ASTOR PLAZA CONDOMINIUM               )
ASSOCIATION, DANIEL G. MOHEN,         )
TRAVIS W. COCHRAN, GEETA              )
KRISHNAMURTHI, and WILLIAM            )
S. LODER,                             )
                                      )
            Defendants.               )

## NOTICE OF FILING

TO:   Ms. Gabriella Comstock
      Knuckles, Keough and Moody
      101 E. Chicago Avenue
      Suite 103
      Naperville, IL 60450

**PLEASE TAKE NOTICE** that on August 27, 2007 the undersigned counsel caused the attached **SECOND AMENDED COMPLAINT**, to be filed with the Clerk of the Circuit Court of Cook County at the Richard J. Daly Center, 50 West Washington Street, Chicago, Illinois, via Federal Express on August 27th, 2007, copies of which are hereby served upon you. The undersigned further certifies that he served a copy of this notice and attached filing on counsel of record by Federal Express overnight courier this 27th day of August, 2007.

Respectfully submitted,

MARGARET GOLDBERG,

By: _____
        One of her Attorneys

Ted A. Donner
DONNER & COMPANY LAW OFFICES LLC
1125 Wheaton Oaks Court
Wheaton, Illinois 60187
630-588-1131
Attorney Code: 39148

1

EXHIBIT
C

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| MARGARET GOLDBERG, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 06 CH 24682 |
| ASTOR PLAZA CONDOMINIUM | ) | |
| ASSOCIATION, DANIEL G. MOHEN, | ) | Judge Henry |
| TRAVIS W. COCHRAN, GEETA | ) | |
| KRISHNAMURTHI, and WILLIAM | ) | |
| S. LODER, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

MARGARET GOLDBERG ("Goldberg"), by her undersigned attorneys, and complaining of Defendants ASTOR PLAZA CONDOMINIUM ASSOCIATION ("Astor Plaza"), DANIEL G. MOHEN ("Mohen"), TRAVIS W. COCHRAN ("Cochran"), GEETA KRISHNAMURTHI ("Krishnamurthi"), and WILLIAM S. LODER ("Loder"), solely in their capacities as individual unit owners and not in their capacities as members of the Astor Plaza Board, hereby states and alleges as follows:

### BACKGROUND

1.     MARGARET GOLDBERG ("Goldberg") was at all times relevant hereto, as she remains, an Illinois resident living in Unit 4E of the Astor Plaza condominium located at 39 East Schiller in Chicago, Illinois (P.I.N. 17-03-105-020-1004).  The record owner of the unit is a Trust over which Goldberg has the power of direction.

2.     Defendant ASTOR PLAZA CONDOMINIUM ASSOCIATION ("Astor Plaza") is

1

a Condominium Association organized under the laws of the State of Illinois, which serves as the association for the condominium located at 39 East Schiller in Chicago, Illinois.

3.    Defendant DANIEL G. MOHEN ("Mohen") was at all times relevant hereto, as he remains, an Illinois resident living in Unit 2E of the Astor Plaza condominium located at 39 East Schiller in Chicago, Illinois.  Mohen is the record owner of said unit (P.I.N. 17-03-105-020-1002).

4.    Defendant TRAVIS W. COCHRAN ("Cochran") was at all times relevant hereto, as he remains, an Illinois resident living in Unit 1W of the Astor Plaza condominium located at 39 East Schiller in Chicago, Illinois.  Cochran is the record owner of said unit (P.I.N. 17-03-105-020-1005).

5.    Defendant GEETA KRISHNAMURTHI ("Krishnamurthi") was at all times relevant hereto, as she remains, an Illinois resident living in Unit 3W of the Astor Plaza condominium located at 39 East Schiller in Chicago, Illinois.  The Krishnamurthis are the record owners of said unit (P.I.N. 17-03-105-020-1007).

6.    Defendant WILLIAM S. LODER ("Loder") was at all times relevant hereto, as he remains, an Illinois resident living in Unit 4W of the Astor Plaza condominium located at 39 East Schiller in Chicago, Illinois.  Loder is one of the record owners of said unit (P.I.N. 17-03-105-020-1008).

7.    Defendants Loder, Cochran, Krishnamurthi, and Mohen are individual unit owners serving, as of the date of this filing, as members of the Board for Astor Plaza.

8.    Astor Plaza is governed by its declaration and by-laws (Ex. 1)

9.    These governing documents address the handling of common and limited

2

common elements, and impose a number of limitations on unit owners with regard to their use of the property.

10.    Written rules and regulations are also required under the governing documents and are to be distributed to unit owners.

## COUNT ONE: FOR RELIEF UNDER 765 ILCS 605/19
## FOR FAILURE TO PRODUCE MINUTES OF MEETINGS
### (As Against Astor Plaza)

1-10.    Goldberg hereby incorporates Background ¶¶1-10 as ¶¶1-10 of this Count One.

11.    765 ILCS 605/19 provides in relevant part as follows:

(a)    The board of managers of every association shall keep and maintain the following records, or true and complete copies of these records, at the association's principal office: ***

(4)    minutes of all meetings of the association and its board of managers for the immediately preceding 7 years; ***

Any member who prevails in an enforcement action to compel examination of records described in subdivisions (1), (2), (3), (4), and (5) of subsection (a) of this Section shall be entitled to recover reasonable attorneys fees and costs from the association.

12.    The Declaration for Astor Plaza, Article XIV, ¶¶(c)-(e), pg. 24, provides that Board members should include "a secretary who shall keep the minutes of all Board meetings" and that "Meetings of the Board shall be open to any Unit Owner, notice of any meeting shall be mailed at least forty-eight hours prior thereto, unless a written waiver of such notice is signed by the person or persons entitled to such notice."   Board meetings are scheduled to take place four times annually on specifically designated dates, according to the Governing Documents.

13.    On or about October 8, 2005, after previous requests had gone unheeded, Goldberg was compelled to retain counsel to write to Mohen and David Drew, the only two unit

3

owners who then purported to be members of the Association's Board, requesting that she be provided with copies of minutes from prior meetings. (Ex. 2)

14.    As Goldberg's counsel pointed out in the letter, it was unclear who else, if anyone, was even on the Board as Astor Plaza had not provided her with requested copies of meeting minutes during the prior year and she had reason to question whether she had been appraised of all Board meetings. The letter provided in part as follows:

> As detailed above, several of Ms. Goldberg's communications have gone unanswered. In addition, regular minutes of meetings and decisions have not been kept. For example, Ms. Goldberg received no minutes for the board meetings of 3/15/05 or for 4/30/05 (the last two board meetings). She has also not been receiving financial statements. In such cases, it is impossible to even monitor or register concerns. (Ex. 2)

15.    On or about October 23, 2005, Drew distributed a memorandum to all of the unit owners proposing that they meet to address the concerns in the letter from Goldberg's counsel. (Ex. 3) In his letter, Drew claimed that "The By-Laws state that each Unit Owner is on the Board of Directors" and that people interested in a meeting should contact him, Goldberg, or Loder.

16.    In response to this communication, Goldberg's counsel again requested that she be provided with minutes from the prior meetings as the possibility that the By-Laws had been amended to change the Board's make up had never been included in any notice she had received and was of obvious consequence since she had no intent, herself, of serving on the Board. (See Ex. 4)

17.    Goldberg's counsel, and Goldberg, continued to ask repeatedly for minutes from meetings. They made these requests by telephone, additional correspondence and at subsequent

4

meetings of the Board and/or the Association (at least those for which Goldberg received notice). (See Ex. 5)

18.    Even after the filing of this lawsuit, however, by which Goldberg again sought copies of the minutes from Board meetings, the putative Board refused to provide Goldberg with minutes from prior meetings until May 25, 2007, when Astor Plaza's counsel provided Goldberg with copies of minutes from five prior meetings: March 6, 2006, September 12, 2006, November 6, 2006, December 18, 2006 and March 20, 2007.  (Ex. 6)

19.    The minutes tendered by the Astor Plaza's counsel were not then approved by the Board itself until late July, 2007.  The minutes approved by the Board are at best incomplete in that the Unit Owner's Association (the unit owners) have not ratified the minutes from their meetings.

20.    Even assuming the Board has now properly ratified and tendered minutes from all of the meetings held in 2006 and 2007, however, Goldberg has yet to be provided with minutes from the meetings held in 2005 (as requested) and therefore continues to request that the Court compel Astor Plaza to produce those minutes for her review.  In addition, several decisions have been made for which there are no minutes.  These include changing the management company, installing new cable TV, putting up holiday decorations and a substantial number of decisions involving current construction.

21.    Until such time as Astor Plaza produces those minutes to Goldberg, Goldberg will continue to incur attorneys fees and costs for which she requests recovery pursuant to 765 ILCS 605/19.

WHEREFORE, MARGARET GOLDBERG, by her undersigned attorneys, and complaining of Defendant ASTOR PLAZA CONDOMINIUM ASSOCIATION ("Astor Plaza"), respectfully request that this Court compel Astor Plaza to produce the minutes for meetings held from 2004 to the present, for any and all meetings held by the Board and/or its membership (the Unit Owner Association), to be available for inspection and examination, granting Goldberg her attorneys fees and costs incurred in connection therewith, pursuant to 765 ILCS 605/19, together with such additional relief as the Court deems just and proper or to which she is otherwise entitled as a matter of law.

### COUNT TWO: FOR RELIEF UNDER 765 ILCS 605/19
### FOR FAILURE TO PRODUCE APPLICABLE RULES AND REGULATIONS
### *(As Against Astor Plaza)*

1-21.   Goldberg hereby incorporates ¶¶1-21 of Count One as ¶¶1-21 of this Count Two.

22.   765 ILCS 605/19 further provides in relevant part as follows:

(a)   The board of managers of every association shall keep and maintain the following records, or true and complete copies of these records, at the association's principal office: ***

(2)   the rules and regulations of the association, if any; ***

Any member who prevails in an enforcement action to compel examination of records described in subdivisions (1), (2), (3), (4), and (5) of subsection (a) of this Section shall be entitled to recover reasonable attorneys fees and costs from the association.

23.   In addition, 765 ILCS 605/18.4(h) provides that a Board has the power and authority:

To adopt and amend rules and regulations covering the details of the operation and use of the property, after a meeting of the unit owners called for the specific purpose of discussing the proposed rules and regulations. Notice of the meeting shall contain the full text of the proposed rules and regulations....

6

24.     In the course of her aforesaid requests for minutes, Goldberg also requested that she be provided with copies of any rules and regulations that had been supposedly adopted by the Board.

25.     This request was made necessary by the fact that, on numerous occasions, she was advised by individuals, purporting to act on behalf of the Board, that the rules had been supposedly changed. (Ex. 9)

26.     Goldberg had not received notice of any meeting at which changes to the rules and regulations had been discussed or agreed upon and was therefore compelled to file this action, in part, to compel the production of any such changes.

27.     Even since the filing of this litigation, Goldberg received conflicting reports regarding what rules were in effect, including emails from Loder, correspondence from Astor Plaza's counsel, and other characterizations of the rules by the Board President, during a period of time in which no changes were distributed to the membership and Goldberg was thus entitled to rely upon the 2004 rules.

WHEREFORE, MARGARET GOLDBERG, by her undersigned attorneys, and complaining of Defendant ASTOR PLAZA CONDOMINIUM ASSOCIATION ("Astor Plaza"), respectfully request that this Court compel Astor Plaza to pay Goldberg's attorneys fees and costs incurred in connection with all actions taken by her through counsel in connection with her requests for current copies of the rules and regulations from 2005 to 2007, pursuant to 765 ILCS 605/19, together with such additional relief as the Court deems just and proper or to which she is otherwise entitled as a matter of law.