**07 C 6593**

## COUNT THREE: FOR RELIEF UNDER 805 ILCS 105/103.20
### *(As Against Loder)*

1-27.    Goldberg hereby incorporates ¶¶1-27 of Count Two as ¶¶1-27 of this Count

Three.

28.    805 ILCS 105/103.20 provides in relevant part as follows:

Unauthorized assumption of corporate powers. All persons who assume to exercise
corporate powers without authority to so do shall be jointly and severally liable for all
debts and liabilities incurred or arising as a result thereof.

29.    765 ILCS 605/2 (w) provides as follows:

"Meeting of Board of Managers or Board of Master Association" means any gathering of
a quorum of the members of the Board of Managers or Board of the Master Association
held for the purpose of conducting board business.

30.    Prior to the filing of this lawsuit, Defendant Loder repeatedly sent notices and

other communications to the Goldbergs, purporting to act on the authority of the Board, by which

he advised her of changes in the rules and decisions that had been supposedly made by the Board,

which the recently approved Board minutes confirm were never properly authorized.

31.    Loder used his ostensible authority with the Board to make promises to Goldberg

(and perhaps others) that the minutes now confirm he was without authority to make, and to

demand accommodations for himself and members of his household which were not provided for

in the applicable rules and regulations including, for example:

• Advising Goldberg in August, 2006, that the Board had agreed that her "front bay
[window frame] will be replaced at the expense of the Assoc." (Ex. 7) a
representation on which Goldberg then relied in her dealings with the Association,
leaving the window frames unrepaired pending expected Board action and
resulting in her filing this lawsuit, in part, to compel the Board to comply with the
commitment it had made according to Loder;

8

- Advising Goldberg and other unit owners that the Board had been "approached" about hanging holiday decorations from the roof of the Building and that the "BOD has agreed" upon such decorations when no such meeting had taken place, the decorations in question were poorly hung and thus dangerous. As a result thereof, Goldberg was again concerned that the Board was meeting without notice to the unit owners, compelling her to again incur attorneys fees and costs to pursue copies of notices and meeting minutes that had never been previously provided. (Ex. 8); and

- Sending unauthorized notices to unit owners, including Goldberg, that the rules and regulations had changed for the single parking space available to unit owners on the west side of the building. The supposed changes in the rules (which had never been distributed as required) limited use of the space to unit owners only and lifted a previous requirement that cars vacate the space in less than three hours. Because of these supposed changes in the rules, Goldberg's housekeeper was compelled to incur the additional cost and expense of private parking in a nearby parking lot, together with the cost of carrying groceries and other items to and from that lot, notwithstanding that no such rule was ever actually in place. (Ex. 9)

32.     By email dated September 8, 2006, Loder specifically advised Goldberg that:

[A]t the last BOD and unit owners meeting a motion was presented and past [sic] to evaluate the rules that were created at the 01/04 BOD meeting and determine what if they were needed. [sic] *** One rule, though, agreed upon by all present deals with our parking spot on the west side of the building. All agreed there would be no limitations to that spot. It is on a first come first serve basis for OWNERS ONLY. No employees, service vehicles, or guests. (Ex. 9)

33.     According to the minutes now approved by the Board, the rules were never changed in such a manner.

34.     The rule supposedly adopted at the meeting described in Loder's email was consistent with what he and his co-owner had repeatedly argued should be in place, and contrary to the rules provided for in 2004 Rules and Regulations. Since the filing of this lawsuit, defense counsel confirmed that there had been no changes in the rules and then, a few weeks ago, the

Board approved minutes showing a supposed revocation of those rules over a year ago (although no notice of such a revocation was distributed to unit owners).

35.    During this period, Goldberg was constantly harassed by the Loder household. In one instance, for example, Loder's co-owner threatened to call the police if Goldberg refused to instruct her housekeeper to move her car out of the space. The Goldbergs were thus cajoled and threatened by the Loder household in reliance on supposed changes in the parking rules, notwithstanding the fact that the rules they claimed were in force were not, in fact, the applicable rules, compelling Goldberg to pursue legal action, including the filing of this lawsuit.

36.    Loder thus used his supposed authority as a Board member to enforce rules which were contrary to those that were actually in place, resulting in the Goldbergs being denied access to common property in which they had continuing property rights (Loder not only denied Goldberg's housekeeper access to the space, he and his co-owner, like Cochran and his friends, used the space for days at a time in violation of a three-hour limitation in the actual rules, claiming the rules had been changed to allow such extended use). This caused Goldberg to incur damages in connection therewith and compelled the initiation of this law suit and resulting attorneys fees and costs.

37.    Loder should thus be held jointly and severally liable to Goldberg for any and all damages as the proofs may establish are appropriate in this case, together with any damages which his intentional interference and violations of 805 ILCS 105/103.20 and 765 ILCS 605/2(w) are shown to have caused Goldberg in connection therewith.

WHEREFORE, MARGARET GOLDBERG, by her undersigned attorneys, and complaining of Defendant WILLIAM LODER ("Loder"), respectfully requests that this Court

enter judgment in favor of Goldberg and against Loder in such amount as the trier of fact

determines is reasonably established by the proofs as damages, together with her attorneys fees

and costs incurred in connection therewith, in an amount in excess of $50,000, together with such

additional relief as the Court deems just and proper or to which she is otherwise entitled as a

matter of law.

## COUNT FOUR: FOR RELIEF UNDER 805 ILCS 105/108.21
## FOR FAILURE TO PROVIDE ACCESS AND RECORDING OF MEETINGS
### *(As Against Astor Plaza)*

1-37.    Goldberg hereby incorporates ¶¶1-37 of Count Three as ¶¶1-37 of this Count

Four.

38.     805 ILCS 105/108.21 provides in relevant part as follows:

Meetings of the board of directors of a not-for-profit homeowners association or
residential cooperative not-for-profit corporation shall be open to any member.... Any
member may record by tape, film **or other means** the proceedings at such meetings or
portions thereof required to be open by this Section.  The board may prescribe reasonable
rules and regulations to govern the right to make such recordings.  Notice of such
meetings shall be mailed or delivered at least 48 hours prior thereto, unless a written
waiver of such notice is signed by the person or persons entitled to such notice pursuant
to the articles of incorporation, bylaws, other instrument before the meeting is
convened....  For purposes of this Section, "meeting of the board of directors" means any
gathering of a quorum of the members of the board of directors held for the purpose of
discussing business of the homeowners association or cooperative (emphasis added).

39.     After her demands in 2005 and until the filing of the First Amended Complaint in

this action, to the extent Goldberg was given notice, either her husband or her attorney attended

Board or Unit Owner meetings on her behalf, in order to ensure that she had an accurate record

of what took place and that her views on issues were made known.

40.    Astor Plaza's counsel then advised Goldberg, just prior to the first scheduled meeting in 2007 at which minutes from the prior two years of meetings were to be approved, that she would not be permitted to send someone in her stead.

41.    The Board also refused to allow a meeting to be recorded by tape recorder, in violation of Section 108.21, compelling Goldberg to file a motion with this Court immediately prior to the next meeting in July, 2007. (Ex. 12)

42.    The Board continues to insist that Goldberg's counsel or representative may not attend Board meetings, notwithstanding the absence of any provision in the applicable statutes, By-laws or rules and regulations that would allow for such exclusion.  (Ex. 12)

43.    Even after the Board agreed to provide for the July, 2007 meeting to be recorded (and Goldberg thus agreed to withdraw her motion to compel), the Board failed to record the meeting in its entirety.

43.    The recording that was made shows Board members laughing as they discussed their supposed technical difficulties in getting a complete recording. (Ex. 13)

44.    Goldberg thus cannot be assured that she will have an accurate recording of what takes place at meetings without the assurance of a representative being allowed to attend on her behalf.

WHEREFORE, MARGARET GOLDBERG, by her undersigned attorneys, and complaining of Defendant ASTOR PLAZA CONDOMINIUM ASSOCIATION ("Astor Plaza"), respectfully requests that this Court declare that, under the applicable documents, Goldberg has a right to designate a representative to attend and record Board meetings on her behalf, together

12

with her attorneys fees and costs incurred in connection therewith, and such additional relief as

the Court deems just and proper or to which she is otherwise entitled as a matter of law.

## COUNT FIVE: FOR RELIEF UNDER SECTION V OF THE DECLARATION
### *(As Against All Defendants)*

1-44.    Goldberg hereby incorporates ¶¶1-44 of Count Four as ¶¶1-44 of this Count Five.

45.    In September, 2006, Astor Plaza scheduled a meeting to "discuss proposed

improvements of the building's interior and exterior appearance." (Ex. 14).

46.    Materials submitted to the members in advance of the meeting identified the

meeting as a "Board of Directors Meeting," advised unit owners that one of the reasons for the

meeting was an "apparent desire to upgrade the building...." (Ex. 15, pg. 5)

47.    These materials further advised unit owners that the Association had:

"obtained outside financing from Harris Bank at attractive rates and terms for those who
wish to finance under the Assoc. Plan.  You may also elect to pay your share in a lump
sum or obtain your own financing.  Regardless, you will need to know your intended
method of financing by Sept. 30th.  If you choose to fund, other than by the Assoc.
Arranged finance plan we need your money, for the full amount, no later than Oct. 15th,
2006.  Those that finance their share under the Assoc. Plan will have their monthly
assessments increased to the extent of their obligation to cover the monthly note. The
increase in assessments in no way changes anyone's percentage of ownership in the
common elements. (Ex. 15)

48.    Loder acknowledged at the meeting that if there were a default by one of the

owners under this financing plan, "the bank will hold the Association responsible which then has

to take measures to collect from those owners just like they have do so now if the owners do not

pay for their assessments on time." (Ex. 6, pg. 6).

49.    Goldberg objected to this plan, among other reasons, because it ran contrary to the

Astor Plaza's Declaration and By-Laws.  (See Ex. 6, pg. 6)

50.    Astor Plaza's Declaration and By-Laws provide in relevant part as follows:

The Board's powers... shall be limited in that the Board shall have no authority to acquire and pay for any structural alterations, additions to, or improvements of the Common Elements (other than for purposes of replacing or restoring portions of the Common Elements, subject to all the provisions of this Declaration), requiring an expenditure in excess of Five Thousand Dollars ($5,000.00) without in each case the prior approval of Voting Members having two-thirds (2/3) of the total vote. Astor Plaza's By-Laws, Article XIV(2)(q).

"No Unit Owner shall have the right or authority to make or create or cause to be made or created any mortgage or encumbrance or other lien on or affecting the Property or any part thereof, except only to the extent of his unit and his respective ownership interest in the Common Elements." Declaration, Section V, paragraph 2, (Separate Mortgages).

51.    The defendants then brought the matter to a vote of the Association membership which voted, on November 6, 2006, to approve a "motion to renovate interior and exterior of the building" and a "motion to increase in [sic] monthly assessments." (Ex. 6, pg. 7)

52.    Defendant Loder also said in the affidavit he signed in support of the defendants' first motion to dismiss (Ex. 16), notwithstanding, that the unit owners thus voted on and approved the financing agreement.  *See* Motion To Dismiss, Ex. A, ¶17.

53.    The defendants then executed and entered into a financing agreement which is secured by the assessments and other rights, property and interests of Astor Plaza  (Ex. 17) and which has resulted in Astor Plaza incurring debt of approximately a half million dollars ($500,000.00), most of which will not have been paid when the note matures and the final balloon payment comes due (amounting to as much as $300,000.00 or more) in roughly nine years time.

54.    The new financing agreement differs from that originally proposed to the unit owners in that it no longer provides for financing to only some unit owners but, instead, provides

14

for financing of the entire project, to be paid in part through assessments charged against all of the unit owners over the course of the note's term.

55.     The new financing agreement still violates the Declaration and By-Laws, however, in that the defendants did not have authority in their capacity as Board members to enter into a financial agreement involving "structural alterations, additions to, or improvements of the Common Elements," without unit owner approval of a Special Assessment, which the unit owners were prohibited from doing in a manner that would result in a lien on the property. Astor Plaza's By-Laws, Article XIV(2)(q).

56.     In their capacities as unit owners, the defendants did not have authority to enter into such an agreement, or grant such approval, because in that capacity they had no "right or authority to make or create or **cause to be made or created** any mortgage or encumbrance or other lien on or affecting the Property or any part thereof...." Declaration, Section V, paragraph 2 (Separate Mortgages) (emphasis added).

57.     The defendants seeks to avoid the fact that there are such limitations on their authority by recasting the nature of the project itself, from an "improvement" (as the project was first, and correctly described in the initial notice) to a "renovation" (as it was described in notices sent out after the Goldbergs first raised the issue at the meeting in September, 2006).

58.     If the project is properly characterized as an "improvement," the Board was required to seek and obtain unit owner approval of the financing plan, which the unit owners were prohibited from granting under Section V, paragraph 2 because the plan required that a mortgage or other lien be placed on Astor Plaza's "Property or any part thereof".

59.    By casting the project as one involving repair or replacement, the defendants sought to avoid the limitations in the Declaration altogether because, under 765 ILCS 605/18.4(a), a limitation such as that contained in Astor Plaza's governing documents may be unenforceable if the work in question is for "repair, replacement, or restoration of existing portions of the common elements," rather than for improvements.

60.    The statute defines "repair, replacement or restoration" as including "expenditures to deteriorated or damaged portions of the property related to the existing decorating, facilities, or structural or mechanical components, interior or exterior surfaces, or energy systems and equipment **with the functional equivalent of the original portions of such areas.**" Id. (emphasis added)   Thus, the exception provided for in the statute is irrelevant to the Astor Plaza project because this project involves improvements to the property, not "repair, replacement or restoration" as defined by the statute.

61.    Moreover, because the project was introduced as one involving an increase in the Assessments payable in 2006, and involved "additions and alterations to the common elements" it was required, by law, to be introduced as one subject to a special assessment to be approved, if at all, by the unit owners.

62.    765 ILCS 605/18 (a)(8)(I) thus provides that an Association's By-laws must provide in relevant part as follows:

> [T]hat each unit owner shall receive notice, in the same manner as is provided in this Act for membership meetings, of any meeting of the board of managers concerning the adoption of the proposed annual budget and regular assessments pursuant thereto or to adopt a separate (special) assessment, *** (v) that assessments for additions and alterations to the common elements or to association-owned property not included in the adopted annual budget, shall be separately assessed and are subject to approval of two-thirds of the total votes of all unit owners, (vi) that the board of managers may adopt

separate assessments payable over more than one fiscal year. With respect to multi-year assessments not governed by items (iv) and (v), the entire amount of the multi-year assessment shall be deemed considered and authorized in the first fiscal year in which the assessment is approved;

63.     The limitation on expenditures in Astor Plaza's governing documents is thus enforceable, in this instance, and the work should therefore have been brought to the members for consideration as a Special Assessment, to be paid pursuant to the governing documents as an expense borne by the membership, not through the use of financing which resulted in the encumbering of Astor Plaza's assets.

62.     The governing documents prohibit unit owners from "caus[ing] to be made or created any mortgage or encumbrance or other lien on or affecting the Property or any part thereof...." And the unit owners therefore did not have authority to approve this transaction in the manner in which it was executed.

63.     The defendants' failure to comply with the governing documents in the structuring of this transaction is further evidenced by their attempting to fold the project into the annual budget as part of an increase in the general assessment.

64.     The governing documents provide that:

**Any extraordinary or non-recurring common expense,** any common expense not set forth in the budget as adopted, and any increase in the assessments over the amount adopted **shall be separately assessed against all unit owners.** Article XVI, Sec. 2 (emphasis added).

65.     Thus, the amount necessary to pay for this half million dollar construction project, which was both extraordinary and non-recurring, should have been separately assessed as against the Unit Owners, rather than lumped into the general assessments as the defendants did in this case.

66.    Under the governing documents:

[The Association has the power and authority] To pay any amount necessary to discharge any mechanic's lien or other encumbrance against the entire property or any part thereof which may, in the opinion of the Board, constitute a lien against the property or against the Common Elements, rather than merely against the interests therein of particular Unit Owners.  Where one or more Unit Owners are responsible for the existence of such lien, they shall be jointly and severally liable for the cost of discharging it and any costs incurred by the Board by reason of said lien or liens shall be specially assessed to said Unit Owners. Astor Plaza By-Laws, Article XIV(2)(n).

67.    The unit owners responsible for the lien placed on the property in this case, the defendants herein, should thus be required to assume the cost of discharging that lien, including both the cost of their individual shares, any prepayment penalties, attorneys fees and costs, and any other costs and expenses arising from the creation of said lien.  See also Declarations, Article XVI, Section 2 ("All unit owners shall be personally liable for and obligated to pay their respective adjusted monthly amount.")

WHEREFORE, MARGARET GOLDBERG, by her undersigned attorneys, and complaining of Defendants ASTOR PLAZA CONDOMINIUM ASSOCIATION ("Astor Plaza"), DANIEL G. MOHEN ("Mohen"), TRAVIS W. COCHRAN ("Cochran"), GEETA KRISHNAMURTHI ("Krishnamurthi"), and WILLIAM S. LODER ("Loder"), in their capacities as unit owners, respectfully requests that this Court enter judgment in favor of Goldberg and as against said Defendants, declaring that Section V, paragraph 2 of the Declarations prohibits Astor Plaza from proceeding with a capital improvement project such as the project now underway which is funded through a loan secured against the Association's rights and property, that Astor Plaza cannot avoid the force and effect of these provisions by wrongfully attempting to

18

recharacterize a project which is, in fact, one that involves substantial improvements and an extraordinary, non-recurring expense.

Goldberg further requests that she be granted an accounting with regard to all expenditures and work done with regard to the construction project and leave to amend to the extent such an accounting should disclose or confirm the existence of a basis for additional claims, that judgment be entered against the individual defendants herein, in their capacities as unit owners, in such amount as the trier of fact determines would be necessary to discharge any lien, mortgage or other encumbrance created by the project, together with any costs and expenses incurred in connection therewith, and Goldberg's costs of suit, attorneys fees incurred, and such additional relief as the Court deems just and proper or to which Goldberg may otherwise be entitled as a matter of law.

## COUNT SIX: FOR DECLARATORY RELIEF WITH REGARD TO ASTOR PLAZA'S DUTIES AND OBLIGATIONS UNDER 765 ILCS 605/18(b)(2)
### (As Against All Defendants)

1-67.   Goldberg hereby incorporates ¶¶1-67 of Count Five as ¶¶1-67 of this Count Six.

68.   765 ILCS 605/18(b)(2)of the Act provides that "the association shall have one class of membership."

69.   In violation of this statutory duty, the individual defendants in this case have used their positions as members of the Board to establish policies and procedures which recognize the existence of a *defacto* segregation of unit owners depending on whether they are, or are not, members of the Board.

70.    By virtue of this policy, each of the defendants has realized personal benefits derived from their position and has been permitted to avoid procedural obstacles which Astor Plaza has otherwise placed in the way of Goldberg and other non-Board members.

71.    Goldberg and other non-Board members are required to submit written forms to the building manager, for example, if they have "complaints" and are required to make requests for minutes in writing.

72.    Under the auspices of these rules, even an attempt by Goldberg to advise the Board that a power saw and other electrical tools used in the construction project was posing a danger, sitting unattended in the hallway, was consciously disregarded because she had not submitted it in writing to the Building manager. (Ex. 10).

73.    In contrast, unit owners sitting on the Board have been permitted to request and obtain approval for construction projects, decorations, conduct which otherwise violates the rules, with neither written notice nor any opportunity provided to non-Board members to object.

74.    Examples of benefits realized by the defendants, but not by other unit owners as a result of this *defacto* policy, include the following:

- **Defendant Loder** has been granted access to the parking place above and beyond that provided by the rules. Loder has been permitted to bring requests that the board has considered and approved without notice (or without even conducting a meeting) including requests for changes to the rules, to hang holiday decorations from the roof, placing a pool on a roof deck without confirming sufficient support was available, and in installing a satellite dish.[1] He has also been ostensibly granted authority to act on behalf of Astor Plaza in the hiring of appraisers and engineers, and in the supervision of at least part of the construction project despite the fact that there is no record of his having been retained as a general contractor

---

[1] Paragraph 5 of Article XVII states "Unit owners shall not cause or permit anything to be placed on the outside walls of the building and no…television antenna shall be affixed to or placed upon the exterior walls or roof or any part thereof, without the prior consent of the building."

or otherwise granted such authority (and no indication that Astor Plaza has secured insurance to cover such risks);

- *Defendant Cochran* kept a friend's car in the parking space for a period over a week (in violation of the Rules) and stored his bikes in a common area of the building for extended periods of time, in violation of Article XVII, paragraph 9, with no consequence;

- *Defendant Krishnamurthi* has been permitted to keep a large dog on the premises in violation of the declaration and bylaws (Article XVII, paragraph 6) (""No animals shall be raised, bred or kept in any Unit, except for dogs which may be carried by an adult person…"); and

- *Defendant Mohen* was permitted to begin a substantial construction project in his unit, which even contemplates the construction of a new balcony, before notification of any proposal was submitted to the Board or the unit owners. In contrast, unit owner Mark Karno was required to wait for a period of months, after submitting detailed proposals and drawings, before he was granted Board approval for construction work that was necessary to his unit. Even after the project was finally approved by the building manager, Mohen insisted that Karno's project not be voted on until a subsequent meeting so that he could take a "closer look" at what was proposed.

75.    § 2-701 (Declaratory Judgments) provides in part as follows:

(a)    No action or proceeding is open to objection on the ground that a merely declaratory judgment or order is sought thereby. The court may, in cases of actual controversy, make binding declarations of rights, having the force of final judgments, whether or not any consequential relief is or could be claimed, including the determination, at the instance of anyone interested in the controversy, of the construction of any statute, municipal ordinance, or other governmental regulation, or of any deed, will, contract or other written instrument, and a declaration of the rights of the parties interested. The foregoing enumeration does not exclude other cases of actual controversy. ***

(b)    Declarations of rights, as herein provided for, may be obtained by means of a pleading seeking that relief alone, or as incident to or part of a complaint, counterclaim or other pleading seeking other relief as well, and if a declaration of rights is the only relief asked, the case may be set for early hearing as in the case of a motion.

76.    In this case, there is a concrete dispute admitting of an immediate and definitive determination of the parties' rights, the resolution of which will aid in the termination of the controversy or some part thereof.

WHEREFORE, MARGARET GOLDBERG (Goldberg"), by her undersigned attorneys and complaining of Defendants ASTOR PLAZA CONDOMINIUM ASSOCIATION ("Astor Plaza"), DANIEL G. MOHEN ("Mohen"), TRAVIS W. COCHRAN ("Cochran"), GEETA KRISHNAMURTHI ("Krishnamurthi"), and WILLIAM S. LODER ("Loder"), respectfully requests that this Court declare, as a matter of law, that the existence of a *defacto* segregation of classes is prohibited by 765 ILCS 605/18(b)(2), that the By-Laws, Declaration and applicable rules and regulations should be enforced evenly as among unit owners, regardless of whether they are seated on the Board, and that unit owners who violate the applicable rules should be obligated to pay whatever fines and penalties would otherwise be payable regardless of whether they are seated on the Board.  Goldberg further requests that each of the defendants herein who is found to have violated the applicable rules and regulations as aforesaid, or as the proofs may show, should be required to pay such fines or violations as may be provided for in the governing documents or the rules and regulations, together with an amount sufficient to cover any damages resulting therefrom, Goldberg's costs of suit and such additional relief as the Court deems just and proper or to which Goldberg is otherwise entitled as a matter of law.

## COUNT SEVEN: FAILURE TO MAINTAIN COMMON ELEMENTS
### (As Against Astor Plaza)

1-76.    Goldberg hereby incorporates ¶¶1-76 of Count Six as ¶¶1-76 of this Count Seven.

77.    765 ILCS 605/4.1.(a)(2) provides as follows:

Except to the extent otherwise provided for in the declaration or other condominium instruments: *** all portions of perimeter doors and all portions of windows in perimeter walls shall be deemed part of the common elements.

78.    The Declaration defines Limited Common Elements as Common Elements

(Article I, Section C; Article III, Sections 2-3) and further provides that:

Except as otherwise in the Declaration provided, the common elements shall consist of all portions of the Property except the units. Without limiting the generality of the foregoing, the common elements shall include *** structural parts of the building, component parts of the walls, *** Art. III., Section 1.

The Limited Common Elements shall include all portions of the Common elements set aside and allocated for the restricted use of particular Units. Without limiting the generality of the foregoing, the Limited Common Elements shall include the following, all of which are indicated as such on the plat: any terrace or balcony, direct access to which is provided from a unit and which is located outside of and adjoining such unit and patios.... Art. III., Section 3.

Maintenance, repairs and replacement of the Common Elements shall be furnished by the Board as part of the Common Expenses, subject to the Rules and Regulations of the Board.... Art. VIII, Section 1.

The powers and duties of the Board of Managers shall include, but shall not be limited to the following matters: (a) Operation, care, upkeep, maintenance, replacement, and improvement of the Common Elements.... (l) To pay for... tuckpointing, maintenance, decorating, repair and replacement of the Common Elements (but not including the windows and glass doors appurtenant to the Unit, if any.... which the Unit owners shall... decorate and repair, except if necessitated by repairs to the Common Elements). Art. XIV, sec. 2.

79.    Goldberg has a balcony which is substantially rusted, a deteriorating window frame in the front bay window, and side window frames which are badly deteriorated in Goldberg's apartment (in fact, pictures dating from 1991 show snow piling up in the interior of her apartment, coming through the window frames).

80.    Notwithstanding a long history of discussion with regard to these elements, however, and assurances from both the current and prior boards, Astor Plaza has sought to avoid

23

any responsibility for the Goldberg's balcony and window frames by summarily excluding them

from the building's historical and published definition of what constitutes a common element.

(Ex. 18)

81.     Astor Plaza claims that its determination was based on that provision of the

Declaration (Art. XIV, section 2), which limits the Board of Manager's maintenance

responsibility, and a report which supposedly supports the conclusion that "the windows in

question [have no] effect on the structural integrity of the Building.... (Ex. 18)

82.     Article XIV, Section 2 does not exclude Astor Plaza's responsibility to maintain

window frames, as opposed to the window itself (which like a "glass door" would be made of

glass) or the structure surrounding the window frame.

83.     Astor Plaza's structural report from 2006, moreover, confirms that the problem

arose from structural defects in the building itself, not the windows.  The report concludes that

joints in the metal spandrels at the top of the north elevation window bays are open and that the

flashing (between the bays and the north exterior walls) is "surface mounted on the brick veneer

with a sealant joint that appears to be fractured."  (Ex. 19)

84.     The same report concludes that the while the bays are opened for recladding

during the construction project, the window frames should be repaired, the surface mounted

flashing should be replaced, and "once the bays are opened for recladding, internal deterioration

may be uncovered." (Ex. 19)

85.     A recent inspection of the window frames and the bay structure shows that

deterioration is obvious from the roof of the building (Ex. 20), and that this deterioration is a

probable cause of the bay window frames rotting in the front of Goldberg's unit.

86.    This conclusion also appears to be consistent with a report done on behalf of a

prior Astor Plaza Board member, in which Astor Plaza was advised that "the leakage problem is

structural and not the windows." This report, which was conducted by Pella (a window

manufacturer) concluded that "[r]eplacing the windows would be a waste of money as that is

NOT the problem.... The caulking around the windows and flashing has come away leaving

obvious gaps where water can easily get in." (Ex. 21)

87.    The problems with the windows on the east side of the Goldberg, like the bay

windows, appear to have arisen because of deteriorating caulk, cracking and the like.

88.    Astor Plaza's current Board has paid for correcting such problems, even without

notice of a Board meeting, when the problems were found in the window casings of other Unit

Owners sitting on the Board. (See Ex. 22, Invoice from November 27, 2006)

89.    And Astor Plaza assessed all of the Unit Owners substantial amounts just a few

years ago to pay for the repair of balconies located on the west side of the building.  In contrast,

Goldberg's problems on the east-side balcony were ignored.

90.    Defendant Loder, purportedly acting on behalf of the Board repeatedly promised

Goldberg that the bay window frame would be repaired.  (See Ex. 7: Advising Goldberg in

August, 2006, that the Board had agreed that her "front bay [window frame] will be replaced at

the expense of the Assoc.").

91.    But despite such promises and repeated demands by Goldberg over a period of

years, Astor Plaza has failed to repair the window frames and balcony adjoining Goldberg's unit.

92.    In this case, there is a concrete dispute admitting of an immediate and definitive

determination of the parties' rights and obligations with regard to the duty to maintain these

common elements, the resolution of which will aid in the termination of the controversy or some part thereof.

WHEREFORE, MARGARET GOLDBERG (Goldberg"), by her undersigned attorneys and complaining of Defendants ASTOR PLAZA CONDOMINIUM ASSOCIATION ("Astor Plaza"), DANIEL G. MOHEN ("Mohen"), TRAVIS W. COCHRAN ("Cochran"), GEETA KRISHNAMURTHI ("Krishnamurthi"), and WILLIAM S. LODER ("Loder"), respectfully requests that this Court declare, as a matter of law, that the work necessary to repair Goldberg's balcony, east and north side window frames is the responsibility of Astor Plaza and that Astor Plaza should therefore pay for and ensure that these elements are repaired and restored with all due haste, together with an amount sufficient to cover any damages shown to have resulted from Astor Plaza's failure to provide such repair and restoration prior hereto, Goldberg's costs of suit and such additional relief as the Court deems just and proper or to which Goldberg is otherwise entitled as a matter of law.

## COUNT EIGHT: FOR RELIEF UNDER 805 ILCS 5/112.50
### (As Against Astor Plaza)

1-92.    Goldberg hereby incorporates ¶¶1-92 of Count Seven as ¶¶1-92 of this Count Eight.

93.    805 ILCS 5/112.50 provides in relevant part as follows:

A Circuit Court may dissolve a corporation:

(b)    In an action by a member entitled to vote, or a director, if it is established that: ***

(2)    The directors or those in control of the corporation have acted, are acting, or will act in a manner that is *** oppressive *** [or]

26

(3)    The corporate assets are being misapplied or wasted. ***

94.    805 ILCS 5/12.56(a), moreover (which courts have considered in the context of claims brought under 805 ILCS 5/112.50), provides that:

> In either an action for dissolution pursuant to Section 112.50 of this Act or in an action which alleges the grounds for dissolution set forth in Section 112.50 of this Act but which does not seek dissolution, the Circuit Court, in lieu of dismissing the action or ordering dissolution, may retain jurisdiction and: (1) Appoint a provisional director; or (2) Appoint a custodian. ***

95.    Section § 112.60 (Practice in actions for judicial dissolution or removal and for alternative remedies) further provides that:

> (d)    The circuit court in an action for judicial dissolution may issue injunctions, appoint an interim receiver with such powers and duties as the court, from time to time, may direct, and take such other action as is necessary or desirable to preserve the corporate assets and carry on the affairs of the corporation until a full hearing can be had. ***

96.    In this case, for the reasons aforesaid, the defendants have acted in a manner that is oppressive with regard to Goldberg's interest in the building, in dereliction of the obligations imposed upon them by the governing documents, in bad faith and in an arbitrary, overbearing and heavy-handed manner, and in a manner likely to result in unnecessary waste, gross over-reaching, and expense that will need to be wrongfully borne by Goldberg.

97.    Goldberg therefore respectfully requests that this Court grant her relief under §§112.50 and 12.56 (b), including such injunctive relief or appointment of an interim receiver as may prove just or appropriate under the circumstances of this case.

WHEREFORE, MARGARET GOLDBERG (Goldberg"), by her undersigned attorneys and complaining of Defendants ASTOR PLAZA CONDOMINIUM ASSOCIATION ("Astor Plaza"), DANIEL G. MOHEN ("Mohen"), TRAVIS W. COCHRAN ("Cochran"), GEETA

KRISHNAMURTHI ("Krishnamurthi"), and WILLIAM S. LODER ("Loder"), respectfully requests that this Court enter an order:

- Declaring, as a matter of law, that the existence of a *defacto* segregation of classes is prohibited by 765 ILCS 605/18(b)(2), that the By-Laws, Declaration and applicable rules and regulations should be enforced evenly as among unit owners, regardless of whether they are seated on the Board, and that unit owners who violate the applicable rules should be obligated to pay whatever fines and penalties would otherwise be payable regardless of whether they are seated on the Board

- Requiring that the Board complete the work required with regard to the limited common elements adjoining the Goldberg unit, including work with regard to the window casing in front of Goldberg's unit, the side window frames, and her balcony;

- Declaring the financing agreement, to the extent it impairs the Property or a portion thereof is invalid and unenforceable under the governing documents and that, by virtue thereof, no such liens should be enforced as against any rights or property in which the Goldbergs have an interest;

- Appointing a custodian or receiver to manage the business and affairs of the corporation until such time as a Board has been constituted pursuant to the governing documents which is prepared to perform its duties in accordance with the same;

- Granting Goldberg her costs of suit and such additional relief as the Court deems just and proper or to which Goldberg is otherwise entitled as a matter of law.

Respectfully submitted,

MARGARET GOLDBERG

By: _____
One of Her Attorneys

Ted A. Donner
DONNER & COMPANY LAW OFFICES LLC
1131 Wheaton Oaks Court
Wheaton, Illinois 60187
630-588-1131
Attorney Code: 39148

28

DECLARATION OF CONDOMINIUM OWNERSHIP
AND BY-LAWS, EASEMENTS, COVENANTS
AND RESTRICTIONS FOR

ASTOR PLAZA CONDOMINIUM

39 East Schiller, Chicago, Illinois

### INDEX

| ARTICLE: | | Page |
|---|---|---|
| I. | Definitions | 2 |
| II. | Units | 4 |
| III. | Common Elements | 4 |
| IV. | General Provisions As to Units and Common Elements | 6 |
| V. | Common Expenses, Mortgages, and Real Estate Taxes | 7 |
| VI. | Insurance | 8 |
| VII. | Administration and Operation | 10 |
| VIII. | Maintenance, Alterations, Decorating | 12 |
| IX. | Sale, Leasing or Other Alienation | 14 |
| X. | Damage or Destruction and Restoration of Building | 19 |
| XI. | Eminent Domain | 21 |
| XII. | Sale of the Property | 21 |
| XIII. | By-Laws | 22 |
| XIV. | Board of Managers | 22 |
| XV. | Members (Unit Owners) | 27 |
| XVI. | Assessments--Maintenance Fund | 29 |
| XVII. | Covenants and Restrictions As to Use and Occupancy | 33 |
| XVIII. | Remedies for Breach of Covenants, Restrictions and Regulations | 35 |
| XIX. | General Provisions | 36 |

EXHIBITS:

A. Plat or Plats of Survey of the Parcel and the Units

B. Legal Description of Units

DECLARATION OF CONDOMINIUM OWNERSHIP
AND BY-LAWS, EASEMENTS, COVENANTS
AND RESTRICTIONS FOR
ASTOR PLAZA CONDOMINIUM
39 East Schiller, Chicago, Illinois

THIS DECLARATION, made and entered into by the Bank of Ravenswood, not individually but as Trustee under Trust Agreement dated December 26, 1974, and known as Trust No. 1247, for convenience hereinafter referred to as the "Trustee";

WITNESSETH THAT:

WHEREAS, the Trustee is the legal title holder of the following described real estate located in the County of Cook and State of Illinois and described as:

The East 50.05 feet of the West 100.05 feet of Lot 35 in Astor's Addition to Chicago in the North Fractional quarter of Section 3, Township 39, Range 14 East of the Third Principal Meridian in Cook County, Illinois.

and

WHEREAS, it is the desire and intention of the Trustee to enable the Property (as hereinafter defined) which includes, but is not limited to, said real estate together with the building, structure, improvements, and other permanent fixtures of whatsoever kind now or hereafter thereon, and all rights and privileges belonging or in anywise pertaining thereto to be owned by Trustee and by each successor in interest of Trustee, under that certain type of method of ownership commonly known as "CONDOMINIUM," and to submit the Property to the provisions of the Condominium Property Act of the State of Illinois, as amended from time to time; and

WHEREAS, the Trustee, acting under direction of the parties authorized to direct the Trustee, has elected by this Declaration to establish, for the benefit of such Trustee and for the mutual benefit of all future Unit Owners or Occupants of the Property, or any part thereof, which shall be known as

ASTOR PLAZA CONDOMINIUM

or such other name as may be subsequently adopted pursuant to the Act by the Developer or the Board, certain easements and rights in, over, and upon said real estate and certain mutually

beneficial restrictions and obligations with respect to the proper use, conduct, and maintenance thereof; and

WHEREAS, the Trustee has further elected by this Declaration to declare that the several Unit Owners, Occupants, mortgagees, and other persons acquiring any interest in the Property shall at all times enjoy the benefits of, and shall at all times hold their interests subject to the rights, easements, privileges, and restrictions hereinafter set forth, all of which are declared to be in furtherance of a plan to promote and protect the co-operative aspect of ownership and to facilitate the proper administration of such Property and are established for the purpose of enhancing and perfecting the value, desirability, and attractiveness of the Property;

NOW, THEREFORE, the BANK OF RAVENSWOOD as Trustee aforesaid and not individually, as the legal title holder heretofore described, and for the purposes above set forth, DECLARES AS FOLLOWS:

## ARTICLE I

### DEFINITIONS

For the purpose of brevity and clarity, certain words and terms used in this Declaration are defined as follows:

(a)  "Act" means the "Condominium Property Act," as amended from time to time, of the State of Illinois.

(b)  "Building" means all structures, attached or unattached, containing one or more Units.

(c)  "Common Elements" means all portions of the Property except the Units, including Limited Common Elements unless otherwise specified.

(d)  "Common Expenses" means the proposed or actual expenses affecting the Property, including Reserves, if any, lawfully assessed by the Board of Managers of the Unit Owner's Association.

(e)  "Condominium Instruments" means all documents and authorized amendments thereto recorded pursuant to the provisions of the Act, including the Declaration, By-Laws, and Plat.

(f)  "Declaration" means the instrument by which the

Property is submitted to the provisions of the Act, as hereinafter provided, and such Declaration as from time to time amended.

(g)  "Developer" means Astor Binderton Limited Partnership, an Illinois limited partnership, its successors and assigns.

(h)  "Limited Common Elements" means a portion of the Common Elements so designated in the Declaration as being reserved for the use of a certain Unit or Units to the exclusion of other Units.

(i)  "Majority" or "Majority of the Unit Owners" means the owners of more than one-half (1/2) in the aggregate of interest in the undivided ownership of the Common Elements.  Any specified percentage of the Unit Owners means such percentage in the aggregate of interest in such undivided ownership.

(j)  "Occupant" means a Person, or persons, other than a Unit Owner, in possession of one or more Units.

(k)  "Parcel" means the parcel or tract of real estate land, described in the Declaration, submitted to the provisions of the Act.

(l)  "Person" means a natural individual, corporation, partnership, trustee or other legal entity capable of holding title to real property.

(m)  "Plat" means a plat or plats of survey of the Parcel and of all Units in the Property submitted to the provisions of this Act, which may consist of a three-dimensional horizontal and vertical delineation of all such Units.

(n)  "Property" means all the land, property and space comprising the Parcel, all improvements and structures erected, constructed or contained therein or thereon, including the Building and all easements, rights, and appurtenances belonging thereto, and all fixtures and equipment intended for the mutual use, benefit or enjoyment of the Unit Owners, submitted to the provisions of this Act.

(o)  "Purchaser" means any Person or persons other than the Developer who purchases a Unit in a bona fide transaction for value.

(p)  "Reserves" means those sums paid by Unit Owners which are separately maintained by the Board of Managers for purposes specified by the Board of Managers or the Condominium Instruments.

(q)  "Unit" means a part of the Property designed and intended for any type of independent use.

(r)  "Unit Owner" means the Person or persons whose estates or interests, individually or collectively, aggregate fee simple absolute ownership of a Unit.

(s)  "Unit Owners' Association" or "Association" means the association of all Unit Owners, acting pursuant to By-Laws through its duly elected Board of Managers.

(t) "Voting Member" means the Person entitled to exercise all voting power in respect to each Unit ownership.

## ARTICLE II

### UNITS

1.  Description.  All Units located on the Property are delineated on the survey, referred hereto as Exhibit A, and are legally described on Exhibit B attached hereto and made a part of this Declaration.

It is understood that each Unit consists of the space enclosed or bounded by the horizontal and vertical planes set forth and identified as a Unit in the delineation thereof in Exhibit A.  The legal description of each Unit shall consist of the identifying number or symbol of such Unit followed by the legal description of the Property, as shown on Exhibit A. Except as provided by the Act, no Unit Owner shall, by deed, Plat or otherwise, subdivide or in any other manner cause the Unit to be separated into any tracts or parcels different from the whole Unit as shown on Exhibit A.

2.  Certain Structures Not Constituting Part of a Unit.  No structural components of the building, and no pipes, wires, conduits, public utility lines, ducts, flues and shafts situated within a Unit and forming part of any system serving one or more other Units, nor the Common Elements, shall be deemed part of said Unit.

## ARTICLE III

### COMMON ELEMENTS

1.  Description.  Except as otherwise in the Declaration provided, the Common Elements shall consist of all portions of

the Property except the Units.  Without limiting the generality
of the foregoing, the Common Elements shall include the land,
outside walks, landscaping, elevator, stairways, entrances and
exits, halls, lobby, corridors, mechanical room, storage areas,
foundation, basement, roof, structural parts of the Building,
component parts of walls, floors and ceilings, and pipes, ducts,
flues, shafts, and public utility lines serving the Common
Elements or more than one Unit.

2.    Ownership of Common Elements.  Each Unit Owner shall
own an undivided interest in the Common Elements as a tenant in
common with all the other Unit Owners of the Property, and,
except as otherwise limited in this Declaration, shall have the
right to use the Common Elements for all purposes incident to
the use and occupancy of his Unit as a place of residence, and
such other incidental uses permitted by this Declaration, which
right shall be appurtenant to and run with his Unit.  Such right
shall extend to each Unit Owner, and the agents, servants,
tenants, family members, and invitees of each Unit Owner.  Each
Unit Owner's interest shall be expressed by a percentage amount
and, once determined, shall remain constant unless hereafter
changed by recorded amendment to this Declaration in accordance
with Article XIX, Section 7.  The Trustee has so determined each
Unit's corresponding percentage of ownership in the Common
Elements as set forth in Exhibit C attached hereto, and each
Unit Owner accepts such determination.

3.    Limited Common Elements.  Except as otherwise in
this Declaration provided, the Limited Common Elements shall
consist of all portions of the Common Elements set aside and
allocated for the restricted use of particular Units.
Without limiting the generality of the foregoing, the
Limited Common Elements shall include the following, all of
which are indicated as such on the Plat:  Any terrace or
balcony, direct access to which is provided from a Unit and
which is located outside of and adjoining such Unit and
patios, sun decks or other improvements constructed pursuant
to Article VIII, Section 2.

4.    Assignment of Limited Common Elements.  Any terrace
or balcony shall be assigned to the Unit or Units which it
adjoins and from which direct access to such terrace or
balcony is allowed.

5.    Storage Areas.  The storage areas on the ground floor
of the Building shall be part of the Common Elements and shall
be asigned and re-assigned, from time to time, to the respective
Unit Owners in such manner and subject to such rules and
regulations as the Board may prescribe.

## ARTICLE VI

### INSURANCE

1.  <u>Fire and Hazard Insurance.</u>  The Board of Managers shall acquire as a Common Expense, a policy or policies of insurance insuring the Common Elements and the Units against loss or damage from fire, lightning and other hazards contained in the customary fire and extended coverage, vandalism, and malicious mischief endorsements for the full insurable replacement value of the Common Elements and the Units written in the name of and containing a provision that the proceeds thereof shall be payable to the members of the Board, as trustees for each of the Unit Owners, in the percentages established in Exhibit C.

All said policies of insurance (i) shall contain standard mortgage clause endorsements in favor of the mortgagee or mortgagees of each Unit, if any, as their respective interest may appear, (b) shall provide that the insurance, as to the interest of the Board, shall not be invalidated by any act or neglect of any Unit Owner, (c) shall provide that notwithstanding any provision thereof which gives the insurer an election to restore damage in lieu of making a cash settlement therefor, such option shall not be exercisable in the event the Unit Owners elect to sell the Property or remove the Property from the provisions of the Act, (d) shall contain an endorsement to the effect that such policy shall not be terminated for nonpayment of premiums without at least ten (10) days' prior written notice to the mortgagee of each Unit, (e) shall contain a clause or endorsement whereby the insurer waives any right to be subrogated to any claim against the Association, its officers, members of the Board, the Trustee, the Developer, the managing agent, if any, their respective employees and agents and the Unit Owners and Occupants, and (f) shall contain a Replacement Cost Endorsement." The proceeds of such insurance shall be applied by the Board for the reconstruction of the Building or shall be otherwise disposed of, in accordance with the provisions of this Declaration and the Act; and the rights of the mortgagee of any Unit under any standard mortgage clause endorsement to such policies shall, notwithstanding anything to the contrary therein contained, at all times be subject to the provisions of the Act with respect to the application of insurance proceeds to reconstruction of the Building. The Board may engage the services of and such insurance may be payable to a bank or trust company authorized to do, execute, and accept trusts in Illinois to act as insurance trustee, or as agent or depositary as an alternative to acting as trustee, and to receive and disburse the insurance proceeds resulting from any

loss upon such terms as the Board shall determine consistent with the provisions of the Declaration. The fees of such bank or trust company shall be Common Expenses.

In the event of any loss in excess of $50,000.00 in the aggregate, at the Board's discretion or request of any Unit Owner, the Board shall solicit bids from reputable contractors.

Payment by an insurance company to the Board or to such corporate trustee or agent of the proceeds of any policy, and the receipt of release from the Board or such corporate trustee or agent of the company's liability under such policy, shall constitute a full discharge of such insurance company, and such company shall be under no obligation to inquire into the terms of any trust or agency agreement under which proceeds may be held pursuant hereto, or to take notice of any standard mortgage clause endorsement inconsistent with the provisions hereof, or see to the application of any payments of the proceeds of any policy by the Board or the corporate trustee.

Each Unit Owner shall inform the Board in writing of additions, alterations or improvements made by said Unit Owner to his Unit and the value thereof, which value shall be included in the full replacement insurable cost for insurance purposes. If a Unit Owner fails to inform the Board as provided above and a penalty is assessed in the adjustment of loss settlement, the Unit Owner shall be responsible for such penalty.

2. <u>Appraisal</u>. The full, insurable replacement cost of the Property, including the Units and Common Elements, shall be determined from time to time (but not less frequently than once in any twelve (12) month period) by the Board. The Board shall have the authority to obtain an appraisal by a reputable appraisal company as selected by the Board. The cost of such appraisal shall be a Common Expense.

3. <u>Public Liability and Property Damage Insurance</u>. The Board of Managers shall have the authority and duty to acquire, as a Common Expense, comprehensive public liability insurance against claims and liabilities arising in connection with the ownership, existence, use or management of the Property in amounts deemed sufficient in the judgment of the Board of Managers, insuring the Board of Managers, the Association, the management agent, and their respective employees, agents, and all persons acting as agents. The Developer shall be included as an additonal insured in his capacity as Unit Owner and board member. The Unit Owners shall be included as additional insureds but only with respect to that portion of the premises not reserved for their exclusive use. The insurance shall cover claims of one or more insured parties against other insured parties. The insurance shall contain a waiver of any rights to

Purchaser, mortgagee, and other Person having an interest in the Property, or any part or portion thereof. Reference in the respective deeds of conveyance, or in any mortgage or trust deed or other evidence of obligation, to the easements and rights described in this Article, or described in any other part of this Declaration, shall be sufficient to create and reserve such easements and rights to the respective grantees, mortgagees, and trustees of such Unit ownership as fully and completely as though such easements and rights were recited fully and set forth in their entirety in such documents.

## ARTICLE V

### COMMON EXPENSES, MORTGAGES, AND REAL ESTATE TAXES

1. <u>Common Expenses.</u> Each Unit Owner shall pay his proportionate share of the Common Expenses of administration, maintenance, and repair of the Common Elements and of any other expenses incurred in conformance with this Declaration and By-Laws or otherwise lawfully agreed upon. Such proportionate share of the Common Expenses for each Unit Owner shall be in the same ratio as his percentage of ownership in the Common Elements. Payment thereof shall be in such amounts and at such times as determined in the manner provided in the By-Laws. If any Unit Owner shall fail or refuse to make any such payment of the Common Expenses when due, the amount thereof shall constitute a lien on the interest of such Unit Owner in the Property as provided in the Act.

2. <u>Separate Mortgages.</u> Each Unit Owner shall have the right, subject to the provisions herein, to make a separate mortgage or encumbrance on his respective Unit together with his respective ownership interest in the Common Elements. No Unit Owner shall have the right or authority to make or create or cause to be made or created any mortgage or encumbrance or other lien on or affecting the Property or any part thereof, except only to the extent of his Unit and his respective ownership interest in the Common Elements.

3. <u>Separate Real Estate Taxes.</u> It is understood that real estate taxes are to be separately taxed to each Unit Owner for his Unit and his corresponding percentage of ownership in the Common Elements, as provided in the Act. In the event that for any year such taxes are not separately taxed to each Unit Owner, but are taxed on the Property as a whole, then each Unit Owner shall pay his proportionate share thereof in accordance with his respective percentage of ownership interest in the Common Elements.

# ARTICLE IV

## GENERAL PROVISIONS AS TO UNITS AND COMMON ELEMENTS

1.  **Submission of Property to Provisions of Act.**  The Property is hereby submitted to the provisions of the Act.

2.  **No Severance of Ownership.**  No Unit Owner shall execute any deed, mortgage, lease or other instrument affecting title to the Unit ownership without including therein both his interest in the Unit and his corresponding percentage of ownership in the Common Elements, it being the intention hereof to prevent any severance of such combined ownership.  Any such deed, mortgage, lease or other instrument purporting to affect the one without including also the other shall be deemed and taken to include the interest so omitted even though the latter is not expressly mentioned or described therein.  No Unit may be subdivided or partitioned except in accordance with Article XIX, Section 7.

3.  **Easements.**

     (a)  **Encroachments.**  If any portion of the Common Elements encroaches upon any Unit, or if any Unit encroaches upon any portion of the Common Elements or any other Unit as a result of the construction, repair, reconstruction, settlement or shifting of any building, a valid mutual easement shall exist in favor of the Owners of the Common Elements and the respective Unit Owners involved to the extent of the encroachment.  A valid easement shall not exist in favor of any Unit Owner who creates an encroachment by his intentional, willful or negligent conduct or that of his agent.

     (b)  **Utility Easements.**  The Illinois Bell Telephone Company, Commonwealth Edison Company and all other public utilities serving the Property are hereby granted the right to lay, construct, renew, operate, and maintain conduits, cables, pipes, wires, transformers, switching apparatus and other equipment related to their service to the Property, into and through the Common Elements, and the Units, where reasonably necessary for the purpose of providing utility services to the Property.

4.  **Easements and Rights to Run with Land.**  All easements and rights described herein are easements and rights running with the land, perpetually in full force and effect, and at all times shall inure to the benefit of and be binding on the Trustee, its successors and assigns, and any Unit Owner,

subrogation by the insuring company against any of the
abovenamed insured persons.

4. <u>Workmen's Compensation and Other Insurance.</u>  The Board
of Managers shall acquire, as a Common Expense, workmen's
compensation insurance as may be necessary to comply with
applicable laws and such other forms of insurance as the Board,
in its judgment, shall elect to obtain, including, but not
limited to insurance for the Association, its officers and
manager against liability from good faith actions allegedly
beyond the scope of their authority.

5. <u>Waiver.</u>  Each Unit Owner hereby waives and releases any
and all claims which he may have against any other Unit Owner,
the Association, its officers, members of the Board, the
Trustee, the Developer, the manager and managing agent of the
Building, if any, and their respective employees and agents, for
damage to the Common Elements, the Units, or to any personal
property located in the Units or Common Elements, caused by fire
or other casualty, to the extent that such damage is covered by
fire or other form of casualty insurance.

6. <u>Notice.</u>  The Board of Managers shall notify insured
persons concerning the cancellation of insurance obatined
pursuant to the terms of this Article.


<u>ARTICLE VII</u>

ADMINISTRATION AND OPERATION


1. <u>Administration.</u>  The administration of the Property
shall be vested in the Board of Managers consisting of the
number of persons, and who shall be elected in the manner,
provided in the By-Laws contained herein, as Articles XIV, XV,
XVI, XVII, and XVIII.  The Developer, after the recording of
this Declaration, shall cause to be incorporated under the laws
of the State of Illinois, a not-for-profit corporation (herein
referred to as "the Association") under the name of "ASTOR PLAZA
CONDOMINIUM ASSOCIATION," or a similar name, which corporation
shall be the governing body for all the Unit Owners for the
maintenance, repair, replacement, administration, and operation
of the Common Elements and for such other purposes as are
hereinafter provided.  The Board of Directors of the Association
shall be deemed to be the Board of Managers referred to herein
and in the Act.

2. <u>Duties and Powers of the Association.</u>  The Unit Owners'
Association is responsible for the overall administration of the

Property through its duly elected Board of Managers. The duties and powers of the Association and its Board shall be those set forth in its Articles of Incorporation, the By-Laws, and this Declaration; provided, however, that (i) the terms and provisions of the Act shall control in the event of any inconsistency between the Act, on the one hand, and this Declaration, the Articles of Incorporation and the By-Laws on the other hand, (ii) the terms and provisions of this Declaration shall control in the event of any inconsistency between this Declaration, on the one hand, and the Articles of Incorporation and the By-Laws on the other hand.

3. <u>Indemnity.</u> The members of the Board and the officers thereof or of the Association shall not be liable to the Unit Owners for any mistake of judgment, or any acts or omissions made in good faith as such members or officers on behalf of the Unit Owners or the Association unless any such contract shall have been made in bad faith or contrary to the provisions of this Declaration. The liability of any Unit Owner arising out of any contract made by such members or officers or out of the aforesaid indemnity shall be limited to such proportion of the total liability thereunder as his percentage interest in the Common Elements bears to the total percentage interest of all the Unit Owners in the Common Elements. Each agreement made by such members or officers or by the managing agent on behalf of the Unit Owners or the Association shall be executed by such members or officers or the managing agent, as the case may be, as agents for the Unit Owners or for the Association.

4. <u>Board's Determination Binding.</u> In the event of any dispute or disagreement between any Unit Owners relating to the Property, or any question of interpretation or application of the provisions of this Declaration or By-Laws, the determination thereof by the Board shall be final and binding on each and all of such Unit Owners.

5. <u>Administration of Property Prior to Election of Initial Board of Managers.</u> Until the election of the initial Board of Managers, the same rights, titles, powers, privileges, trusts, duties and obligations vested in or imposed upon the Board of Managers by the Act and in this Declaration and By-Laws shall be held and performed by the Developer. The election of the initial Board of Managers shall be held not later than sixty (60) days after the conveyance by the Developer of three-fourths (3/4) of the Units or three (3) years after the recording of the Declaration, whichever is earlier. If the initial Board of Managers is not elected by the Unit Owners at the time so established, the Developer shall continue in office for a period of thirty (30) days whereupon written notice of his resignation shall be sent to all of the Unit Owners entitled to vote at such election.

Within sixty (60) days following the election of a majority of the Board of Managers other than the Developer, the Developer shall deliver to the Board of Managers:

     (a)  All original documents pertaining to the Property and its administration such as the Declaration, By-Laws, Articles of Incorporation, Condominium Instruments, minutes, and code of regulations;

     (b)  A detailed accounting by the Developer, setting forth the source and nature of receipts and expenditures in connection with the management, maintenance, and operation of the Property;

     (c)  Association funds, which shall have been at all times segregated from any other moneys of the Developer;

     (d)  A schedule of all personal property, equipment and fixtures belonging to the Association, including documents transferring the Property;

     (e)  Any contract, lease, or other agreement made prior to the election of a majority of the Board of Managers other than the Developer by or on behalf of Unit Owners.

## ARTICLE VIII

### MAINTENANCE, ALTERATIONS, DECORATING

1.  <u>Maintenance, Repairs, and Replacements.</u>  Each Unit Owner shall furnish and be responsible for, at his own expense, all of the maintenance, repairs, and replacements within his own Unit.  Maintenance, repairs and replacements of the Common Elements shall be furnished by the Board as part of the Common Expenses, subject to the rules and regulations of the Board.

The Board may cause to be discharged any mechanic's lien or other encumbrance which, in the opinion of the Board, may constitute a lien against the Property or Common Elements, rather than against a particular Unit and its corresponding percentage of ownership in the Common Elements.  When less than all the Unit Owners are responsible for the existence of any such lien, the Unit Owners responsible shall be jointly and severally liable for the amount necessary to discharge the same and for all costs and expenses (including attorneys' fees) incurred by reason of such lien.

12

Whenever the Board shall determine, in its discretion, that any maintenance or repair of any Unit is necessary to protect the Common Elements or any other portion of the Building, the Board may cause a written notice of the necessity for such maintenance or repair to be served upon such Unit Owner, which notice may be served by delivering a copy thereof to any Occupant of such Unit, or by mailing the same by certified or registered mail addressed to the Owner at the Unit.  If such Unit Owner fails or refuses to perform any such maintenance or repair within a reasonable time stated in the notice (or any extension thereof approved by the Board), the Board may cause such maintenance and repair to be performed at the expense of such Unit Owner.

If, due to the act or neglect of a Unit Owner, or of a member of his family or household pet or of a guest or other authorized occupant or visitor of such Unit Owner, damage shall be caused to the Common Elements or to a Unit or Units owned by others, or maintenance, repairs or replacements shall be required which would otherwise be at the Common Expense, then such Unit Owner shall pay for such damage and such maintenance, repairs, and replacements, as may be determined by the Board, to the extent not covered by insurance.

The Board shall have exclusive authority to take, or refrain from taking, any action pursuant to this Article VIII, Section 1.  All expenses which, pursuant to this Section 1, are chargeable to any Unit Owner, may be specifically assessed to such Unit Owner and shall be payable by such Unit Owner as prescribed by the Board.

2.  Alterations, Additions or Improvements.  No alterations of any Common Elements or any additions or improvements thereto, shall be made by any Unit Owner without the prior written approval of the Board.  Owners of Units 4 and 8 may alter Common Elements to construct a patio, sun deck, or similar improvement and access thereto on the roof above their Units without the prior written approval of the Board and any Unit Owner may make alterations, additions, and improvements within his Unit without the prior written approval of the Board, but in any event such Unit Owner shall be responsible for any damage to other Units, the Common Elements, or the Property as a result of such alterations, additions or improvements. Nothing shall be done in any Unit or in, on or to the Common Elements, which will impair the structural integrity of the Building or which would structurally change the Building. Any patio, sun deck or similar improvement constructed pursuant to this Section shall be a Limited Common Element assigned to the Unit from which direct access is allowed.

3.  Decorating.  Each Unit Owner shall furnish and be responsible for, at his own expense, all of the decorating within his own Unit from time to time, including painting, wall

papering, washing, cleaning, paneling, floor covering, draperies, window shades, curtains, lamps, and other furnishings and interior decorating. The use of and the covering of the interior surfaces of windows, whether by draperies, shades or other items visible on the exterior of the Building, shall be subject to the rules and regulations of the Board. Decorating of the Common Elements (other than interior surfaces within the Units as above provided), and any redecorating of Units to the extent made necessary by any damage to existing decorating of such Units caused by maintenance, repair or replacement work on the Common Elements by the Board, shall be furnished by the Board as part of the Common Expenses.

## ARTICLE IX

### SALE, LEASING OR OTHER ALIENATION

1. <u>Sale or Lease.</u> Any Unit Owner other than the Trustee or Developer who wishes to sell or lease his Unit (or any lessee of any Unit wishing to assign or sublease such Unit) shall give to the Board not less than thirty (30) days prior written notice of his intent to sell or lease and subsequently, the terms of any contract to sell or lease, entered into subject to the Board's option as set forth hereinafter together with a copy of such contract, the name, address, and financial and character references of the proposed Purchaser or lessee and such other information concerning the proposed Purchaser or lessee as the Board may reasonably require. The members of the Board acting on behalf of the other Unit Owners shall at all times have the first right and option to purchase or lease such Unit ownership upon the same terms, which option shall be exercisable for a period of thirty (30) days following the date of receipt of such notice of contract. If said option is not exercised by the Board within said thirty (30) days, the Unit Owner (or lessee) may, at the expiration of said thirty (30) day period and at any time within ninety (90) days after the expiration of said period, proceed to consummate the sale (or sublease or assignment of) such Unit ownership to the proposed Purchaser or lessee named in such notice upon the terms specified therein. If the Unit Owner (or lessee) fails to close said proposed sale or lease transaction within said ninety (90) days, the Unit ownership shall again become subject to the Board's right of first refusal as herein provided.

2. <u>Gift.</u> Any Unit Owner other than the Trustee who wishes to make a gift of his Unit Ownership or any interest therein to any Person other than a permitted party under Section 10 of this Article IX shall give to the Board not less than ninety (90) days' written notice of his or her intent to make such gift prior to the contemplated date thereof, together with the name, address, and financial and character references of the intended

donee and such other information concerning the intended donee as the Board may reasonably require.  If the gift to such a party is not consented to by the Board, and the Unit Owner insists on making said gift, the members of the Board acting on behalf of the other Unit Owners, shall at all times have the first right and option to purchase such Unit ownership or interest therein for cash at fair market value determined by arbitration as hereinafter provided, which option shall be exercisable until the date of expiration as provided herein.  In the event that the Board exercises said option and the parties cannot arrive at an agreed price, then within fifteen (15) days after receipt of a written notice by the Board, the Board and the Unit Owner desiring to make such gift shall each select a qualified real estate appraiser.  The two appraisers so selected shall, within ten (10) days after their selection, appoint another qualified real estate appraiser to act as the arbitrator.  Within fifteen (15) days after the appointment of said arbitrator, the arbitrator shall determine the fair market value of the Unit Ownership or interest therein which the Unit Owner contemplates conveying by gift, and shall thereupon give written notice of such determination to the Unit Owner and the Board, and said determination shall be conclusive upon the parties.  If either party shall fail to select an appraiser, then the appraiser designated by the other party shall make the appraisal.  The Board's option to purchase the Unit ownership or interest therein shall expire forty-five (45) days after the date of receipt by it of written notice of such determination of fair market value.  The cost of appraisal shall be divided equally between such Unit Owner and the Board and the Board's share shall be a Common Expense.

      3.  _Devise._  In the event any Unit Owner dies leaving a will devising his Unit ownership, or any interest therein to any Person or persons not heirs-at-law of the deceased Unit Owner under the Rules of Descent of the State of Illinois, and said will is admitted to probate, the members of the Board, acting on behalf of the other Unit Owners, shall have a like option (to be exercised in the manner hereinafter set forth) to purchase said Unit ownership or interest therein, either from the devisee or devisees thereof named in said will, or if a power of sale is conferred by said will upon the personal representative named therein, from the personal representative acting pursuant to said power, for cash at fair market value which is to be determined by arbitration as herein provided.  In the event of a dispute as to purchase price, within sixty (60) days after the appointment of a personal representative for the estate of a deceased Unit Owner, the Board shall appoint a qualified real estate appraiser, and shall thereupon give written notice of such appointment to the said devisee or devisees or personal representative, as the case may be, shall appoint a qualified real estate appraiser.  Within ten (10) days after the