07 C 6593

JUDGE GOTTSCHALL
MAGISTRATE JUDGE KEYS

appointment of the two (2) said appraisers, the two so appointed shall appoint another qualified real estate appraiser to act as the arbitrator. Within fifteen (15) days thereafter the arbitrator shall determine the fair market value of the Unit ownership or interest therein devised by the deceased Unit owner, and shall thereupon give written notice of such determination to the Board and said devisee, devisees, or personal representative, as the case may be, and said determination shall be conclusive upon the parties. If either party shall fail to select an appraiser, then the appraiser designated by the other party, shall make the appraisal. The Board's right to purchase the Unit ownership, or interest therein, at the price determined by the arbitrator shall expire sixty (60) days after the date of receipt by it of such notice if the personal representative of the deceased Unit Owner is empowered to sell, and shall expire eight (8) months after the appointment of a personal representative who is not so empowered to sell. The Board shall be deemed to have exercised its option if it tenders the required sum of money to said devisee or devisees or to said personal representative, as the case may be, within the said option periods. The cost of appraisal shall be equally divided between such Unit Owner and the Board and the Board's share shall be a Common Expense.

4.   **Involuntary Sale.**

(a) In the event of any Unit ownership or interest therein is sold at a judicial or execution sale (other than as provided in subsection (b)) the person acquiring title through such sale shall, before taking possession of the Unit ownership so sold, give thirty (30) days written notice to the Board of his intention so to do, whereupon the Board, acting on behalf of the other Unit Owners, shall have an irrevocable option to purchase such Unit ownership or interest therein at the same price for which it was sold at said sale. If said option is not exercised by the Board within said thirty (30) days after receipt of such notice, it shall thereupon expire and said purchaser may thereafter take possession of said Unit. The Board shall be deemed to have exercised its option if it tenders the required sum of money to the Purchaser within said thirty (30) day period.

(b) In the event any Unit Owner shall default in the payment of any monies required to be paid under the provisions of any mortgage or trust deed against his Unit ownership, the Board shall have the right to cure such default by paying the amount so owing to the party entitled thereto and shall thereupon have a lien therefor against such Unit ownership, which lien shall have the same force and effect and may be enforced in the same manner as provided in Article XVI hereof.

5. <u>Consent of Voting Members.</u> The Board shall not exercise any option hereinabove set forth to purchase any Unit ownership or interest therein without the prior consent of Voting Members having three-fourths (3/4) of the total votes. The Board or its duly authorized representative, acting on behalf of the other Unit Owners may bid to purchase at any sale of a Unit ownership or interest therein of any Unit Owner living or deceased, which said sale is held pursuant to an order or direction of a court, upon the prior consent of Voting Members having three-fourths (3/4) of the total votes, which said consent shall set forth a maximum price which the Board or its duly authorized representative is authorized to bid and pay for said Unit ownership or interest therein.

6. <u>Release of Waiver of Option.</u> Upon the consent of at least three-fourths (3/4) of the Board members, any of the options contained in this Article IX may be released or waived and the Unit ownership or interest therein which is subject to an option set forth in this Article, may be sold, conveyed, leased, given, or devised free and clear of the provisions of this Article.

7. <u>Proof of Termination of Option.</u> A certificate executed and acknowledged by the acting secretary of the Board stating that the provisions of this Article IX as hereinabove set forth have been met by a Unit Owner, or duly waived by the Board, and that the rights of the Board hereunder have terminated, shall be conclusive upon the Board and the Unit Owners in favor of all persons who rely thereon in good faith, and such certificate shall be furnished to any Unit Owner who has in fact complied with the provisions of this Article or in respect to whom the provisions of this Article have been waived, upon request at a reasonable fee, not to exceed Ten Dollars ($10.00).

8. <u>Financing of Purchase under Option.</u>

(a) Acquisition of Unit ownership or any interest therein under the provisions of this Article may be made from the maintenance fund or any other financing arrangement as the Board deems desirable. If said fund is insufficient, the Board shall levy an assessment against each Unit Owner as provided for and subject to Article XVI hereof.

(b) If the members of the Board, in their discretion, borrow money to finance the acquisition of any Unit ownership or interest therein authorized by this Article, no financing may be secured by an encumbrance or hypothecation of any portion of the Property other than the Unit ownership or interest therein to be acquired.

9. <u>Title to Acquired Interest.</u> Unit ownership or interests therein acquired pursuant to the terms of this Article

shall be held of record in the name of the Board and their
successors in office, or such nominee as they shall designate,
for the benefit of all the Unit Owners.  Said Unit ownerships or
interests therein shall be sold or leased by the members of the
Board in such manner as the Board shall determine without
complying with the foregoing provisions relating to the Board's
right of first refusal.  All proceeds of such sale and/or
leasing shall be deposited in the maintenance fund and credited
to each Unit Owner in the same proportion in which the Board
could levy a special assessment under the terms of Section 8(a)
of this Article.

10.  <u>Exceptions to Board's Right of First Refusal</u>.  The
Board's right of first refusal as provided in Sections 1, 2, and
3 of this Article IX, shall not apply to any sale, lease, gift,
devise, or transfer by the Trustee, and/or the Developer, or by
any corporation, trust, or other entity when the original Unit
Owner or persons having at least majority control of said Unit
Owner are in control of the transferee, or resulting from
statutory merger or consolidation, or between co-owners of the
same Unit, or any one or more of them, or to any trustee of a
trust, the sole beneficiary or beneficiaries of which are the
Unit Owner, the spouse or lawful child of the Unit Owner, or any
one or more of them, or from any trustee of a trust to any one
or more of the beneficiaries thereof.

11.  <u>Miscellaneous</u>.  If a proposed sale, lease, devise, or
gift of any Unit ownership is made by any Unit Owner, after
compliance with the foregoing provisions, the Purchaser, lessee,
devisee or donee thereunder shall be bound by and be subject to
all of the obligations of such Unit Owner with respect to Unit
ownership as provided in this Declaration, and in the case of a
lease, said lease shall expressly so provide.  The Unit Owner
making any such lease shall not be relieved thereby from any of
his obligations hereunder.  Upon the expiration or termination
of such lease, or in the event of any attempted subleasing
thereunder, the provisions hereof, with respect to the Board's
right of first option, shall apply to such Unit ownership.  If
any sale, lease, devise, or gift of a Unit ownership is made or
attempted by any Unit Owner without complying with the foregoing
provisions, such sale, lease, devise, or gift shall be subject
to each and all of the rights and options of the Board hereunder
and each and all of the remedies and actions available to the
Board hereunder or at law or in equity in connection therewith.
The foregoing provisions with respect to the Board's right of
first option as to any proposed sale, lease, devise, or gift
shall be and remain in full force and effect until the Property
as a whole shall be sold or removed from the provisions of the
Act, as provided in the Act, unless sooner rescinded or amended
by the Unit Owners in the manner herein provided for amendments
of this Declaration.  The Board may adopt rules and regulations

from time to time, not inconsistent with the foregoing provisions, for the purpose of implementing and effectuating the same.

## ARTICLE X

### DAMAGE OR DESTRUCTION AND RESTORATION OF BUILDING

1.  Sufficient Insurance.  In the event the improvements forming a part of the Property, or any portion thereof, including any Units, shall suffer damage or destruction from any cause and the proceeds of any policy or policies insuring against such loss or damage, and payable by reason thereof, shall be sufficient to pay the cost of repair or restoration or reconstruction, then such repair, restoration, or reconstruction shall be undertaken and the insurance proceeds shall be applied by the Board or the payee of such insurance proceeds in payment therefor; provided, however, that in the event within one hundred and eighty (180) days after said damage or destruction, the Unit Owners shall elect either to sell the Property as hereinafter provided in Article XII hereof or to withdraw the Property from the provisions of this Declaration, and from the provisions of the Act as therein provided, then such repair, restoration, or reconstruction shall not be undertaken.  In the event such repair, restoration, or reconstruction is not undertaken, the net proceeds of insurance policies shall be divided by the Board or the payee of such insurance proceeds among all Unit Owners according to each Unit Owner's percentage of ownership in the Common Elements as set forth in Exhibit C, after first paying out of the share of each Unit Owner, the First Mortgagee of the Unit, if any, and any other parties holding liens on the Unit in the order of the priority of such liens.

2.  Insufficient Insurance.

(a)  If the insurance proceeds are insufficient to reconstruct the Building and the Unit Owners and all other parties in interest do not voluntarily make provision for reconstruction of the Building within one hundred and eighty (180) days from the date of damage or destruction, the Board of Managers may record a notice setting forth such facts and upon the recording of such notice:

(i)  The Property shall be deemed to be owned in common by the Unit Owners;

(ii)  The undivided interest in the Property owned in

common which shall appertain to each Unit Owner shall be the percentage of undivided interest previously owned by such Owner in the Common Elements;

(iii)  Any liens affecting any of the Units shall be deemed to be transferred in accordance with the existing priorities to the undivided interest of the Unit Owner in the Property as provided herein; and

(iv)  The Property shall be subject to an action, for partition at the suit of any Unit Owner, in which event the net proceeds of sale, together with the net proceeds of the insurance on the Property, if any, shall be considered as one fund and shall be divided among all the Unit Owners in a percentage equal to the percentage of undivided interest owned by each Owner in the Property, after first paying out of the respective shares of the Unit Owners, to the extent sufficient for the purpose, the First Mortgagee, if any, and all other liens on the undivided interest in the Property owned by each Unit Owner, in the order of the priority of such liens.

(b)  In the case of damage or other destruction in which fewer than one-half (1/2) of the Units are rendered uninhabitable, upon the affirmative vote of not fewer than three-fourths (3/4) of the Unit Owners voting at a meeting called for that purpose, the Building or other portion of the Property shall be reconstructed.  The meeting shall be held within thirty (30) days following the final adjustment of insurance claims, if any.  Otherwise, such meeting shall be held within ninety (90) days of the occurrence.  At such meeting the Board of Managers, or its representative, shall present to the members present an estimate of the cost of repair or reconstruction, and the estimated amount of necessary assessments against each Unit Owner.

(c)  In the case of damage or other destruction, upon the affirmative vote of not fewer than three-fourths (3/4) of the Unit Owners voting at a meeting called for that purpose, any portion of the Property affected by such damage or destruction may be withdrawn from the Act.  Upon the withdrawal of any Unit or portion thereof, the percentage of interest in the Common Elements appurtenant to such Unit or portion thereof shall be reallocated among the remaining Units on the basis of the percentage of interest of each remaining Unit.  If only a portion of a Unit is withdrawn, the percentage of interest appurtenant to that Unit shall be reduced accordingly, upon the basis of diminution in market value of the Unit, as determined by the Board of Managers.  The payment of just compensation, or the allocation of any insurance or other proceeds to any withdrawing or remaining Unit Owner shall be on an equitable basis, which need not be a Unit's percentage interest.  Any

insurance or other proceeds available in connection with the withdrawal of any portion of the Common Elements, shall be allocated on the basis of each Unit Owner's percentage interest herein. Any proceeds available from the withdrawal of any Limited Common Elements will be distributed in accordance with the interest of those entitled to their use.

    3. <u>Cessation of Common Expenses.</u> Upon the withdrawal of any Unit or portion thereof, the responsibility for the payment of assessments on such Unit or portion thereof by the Unit Owner shall cease.

ARTICLE XI

EMINENT DOMAIN

    1. <u>Reallocation of Common Elements and Condemnation Award.</u> Upon the withdrawal of any Unit or portion thereof due to eminent domain, the percentage of interest in the Common Elements appurtenant to such Unit or portion thereof shall be reallocated among the remaining Units on the basis of the percentage of interest of each remaining Unit. If only a portion of a Unit is withdrawn, the percentage of interest appurtenant to that Unit shall be reduced accordingly, upon the basis of diminution in market value of the Unit, as determined by the Board of Managers. The allocation of any condemnation award or other proceeds to any withdrawing or remaining Unit Owner shall be on an equitable basis, which need not be a Unit's percentage interest. Any condemnation award or other proceeds available in connection with the withdrawal of any portion of the Common Elements, not necessarily including the Limited Common Elements, shall be allocated on the basis of each Unit Owner's percentage interest therein. Proceeds available from the withdrawal of any Limited Common Element will be distributed in accordance with the interests of those entitled to their use. In no event shall a Unit Owner be entitled to priority over the First Mortgagee of that Unit with respect to the distribution of proceeds of any award or settlement as a result of eminent domain proceedings.

    2. <u>Cessation of Common Expenses.</u> Upon the withdrawal of any Unit or portion thereof, the responsibility for the payment of assessments on such Unit or portion thereof by the Unit Owner shall cease.

ARTICLE XII

SALE OF THE PROPERTY

    The Unit Owners through the affirmative vote of Voting Members having at least three-fourths (3/4) of the total votes,

at a meeting duly called for such purpose, may elect to sell the Property as a whole. Within ten (10) days after the date of the meeting at which such sale was approved, the Board shall give written notice of such action to First Mortgagees entitled to notice under Section 1 of Article XIX of this Declaration. Such action shall be binding upon all Unit Owners, and it shall thereupon become the duy of every Unit Owner to execute and deliver such instruments and to perform all acts as in manner or form may be necessary to effect such sale, provided, however, that any Unit Owner who did not vote in favor of such action and who has filed written objection thereto with the Board within twenty (20) days after the date of the meeting at which such sale was approved shall be entitled to receive from the proceeds of such sale an amount equivalent to the fair market value of his interest, as determined by arbitration as hereinafter provided, less the amount of any unpaid assessments or charges due and owing from such Unit Owner. In the absence of agreement on the fair market value of such interest, such Unit Owner and the Board shall each select an appraiser, and two so selected shall select a third, and the fair market value, as determined by said third appraiser, shall control. If either party shall fail to select an appraiser, then the one designated by the other party shall make the appraisal. The cost of the appraisal shall be divided equally between such Unit Owner and the Board, and the Board's share shall be a Common Expense.

## ARTICLE XIII

### BY-LAWS

The provisions of Article XIV, XV, XVI, XVII, and XVIII shall constitute the By-Laws of the Association and the By-Laws prescribed by the Act.

## ARTICLE XIV

### BOARD OF MANAGERS

1. ### Board of Managers (Board of Directors).

   (a)  The direction and administration of the Property shall be vested in a Board of Managers, consisting of three (3) persons who shall be appointed or elected in the manner herein provided. Each member of the Board shall be one of the Unit Owners and shall reside on the Property, provided, however, that in the event a Unit Owner is a corporation, partnership, trust, or other legal entity other than a natural person or persons,

then any officer, director, or other designated agent of such corporation, partner or such partnership, beneficiary or other designated agent of such trust or manager of such other legal entity, shall be eligible to serve as a member of the Board, provided such person must reside on the Property unless he is a Board member nominated by the Developer or Trustee.

(b)  At the initial meeting the Voting Members shall elect the three (3) Board members.  In all elections for members of the Board, each Voting Member shall be entitled to cumulate his votes in the manner provided by law and the candidates receiving the highest number of votes with respect to the number of offices to be filled shall be deemed to be elected.  Members of the Board elected at the initial meeting shall serve until the first annual meeting.  Three (3) Board members shall be elected at the first annual meeting.  The two (2) persons receiving the highest number of votes at the first annual meeting shall be elected to the Board for a term of two (2) years and the person receiving the next highest number of votes shall be elected to the Board for a term of one (1) year.  In the event of a tie vote, the members of the Board shall determine which members shall have the two (2) year terms and which member shall have the one (1) year term.  Upon the expiration of the terms of office of the Board members so elected at the first annual meeting and thereafter, successors shall be elected for a term of two (2) years each.  The voting members having at least two-thirds (2/3) of the total votes may from time to time increase or decrease such number of persons on the Board or may increase the term of office of Board members at any annual or special meeting, provided that such number shall not be less than three (3), and that no Board member shall be elected to a term in excess of two (2) years; provided, however, that a Board member may be relected at the expiration of his term.  Members of the Board shall receive no compensation for their services, unless expressly authorized by the Board with the approval of Voting Members having two-thirds (2/3) of the total votes.  Vacancies in the Board, including vacancies due to any increase in the number of persons on the Board, shall be filled by the Voting Members present at the next annual meeting or at a special meeting of the Voting Members called for such purpose.  Except as otherwise provided in this Declaration, the Property shall be managed by the Board and the Board shall act by majority vote of those present at its meeting when a quorum exists.  A majority of the total number of the members of the Board shall constitute a quorum.  Meetings of the Board may be called, held, and conducted in accordance with such resolutions as the Board may adopt.

(c)  The Board shall elect from among its members a president who shall preside over both its meetings and those of

the Voting Members, and who shall be the chief executive officer of the Board and the Association and who shall execute amendments to the Condominium Instruments; a secretary who shall keep the minutes of all meetings of the Board and of the Voting Members, who shall mail and receive all notices, and who shall, in general, perform all the duties incident to the office of secretary; a treasurer to keep the financial records and books of account; and such additional officers as the Board shall see fit to elect.

(d)  Any Board member may be removed from office by affirmative vote of the Voting Members having at least two-thirds (2/3) of the total votes, at any special meeting called for the purpose.  A successor to fill the unexpired term of a Board member removed may be elected by the Voting Members at the same meeting or any subsequent annual meeting or special meeting called for that purpose.

(e)  The Board shall meet at least four (4) times annually, on the first Mondays of February, May, August, and November, and at such other times as the Board deems necessary. Meetings of the Board shall be open to any Unit Owner, notice of any such meeting shall be mailed at least forty-eight (48) hours prior thereto, unless a written waiver of such notice is signed by the person or persons entitled to such notice.

2.  General Powers of the Board.  The powers and duties of the Board of Managers shall include, but shall not be limited to, the following matters:

(a)  Operation, care, upkeep, maintenance, replacement, and improvement of the Common Elements.

(b)  Preparation, adoption, and distribution of the annual budget for the Property.

(c)  Levying of assessments.

(d)  Collection of assessments from Unit Owners.

(e)  Employment and dismissal of the personnel necessary or advisable for the maintenance and operation of the Common Elements.

(f)  Obtaining adequate and appropriate kinds of insurance.

(g)  Owning, conveying, encumbering, leasing, and otherwise dealing with Units conveyed to or purchased by it.

(h)  Adoption and amendment of rules and regulations covering the details of the operation and use of the Property.

(i)  Keeping of detailed, accurate records of the receipts and expenditures affecting the use and operation of the Property.

(j)  To have access to each Unit from time to time as may be necessary for the maintenance, repair, or replacement of any Common Elements therein or accessible therefrom, or for making emergency repairs therein necessary to prevent damage to the Common Elements or to other Unit or Units.

(k)  To pay for water, waste removal, other operating expenses, electricity, telephone, and other necessary utility service for the Common Elements.

(l)  To pay for landscaping, gardening, snow removal, painting, cleaning, tuckpointing, maintenance, decorating, repair, and replacement of the Common Elements (but not including the windows and glass doors appurtenant to the Unit, if any, and the interior surfaces of the Units and of the hallway doors appurtenant thereto, which the Unit Owners shall paint, clean, decorate, maintain and repair, except if necessitated by repairs to the Common Elements) and such furnishings and equipment for the Common Elements as the Board shall determine are necessary and proper, and the Board shall have the exclusive right and duty to acquire the same for the Common Elements.

(m)  To pay for any other materials, supplies, furniture, labor, services, maintenance, repairs, structural alterations or assessments which the Board is required to secure or pay for pursuant to the terms of this Declaration or By-Laws of which, in its opinion, shall be necessary or proper for the maintenance and operation of the Property, as a first-class condominium apartment building or for the enforcement of these restrictions.

(n)  To pay any amount necessary to discharge any mechanic's lien or other encumbrance against the entire Property or any part thereof which may, in the opinion of the Board, constitute a lien against the Property or against the Common Elements, rather than merely against the interests therein of particular Unit Owners.  Where one or more Unit Owners are responsible for the existence of such lien, they shall be jointly and severally liable for the cost of discharging it and any costs incurred by the Board by reason of said lien or liens shall be specially assessed to said Unit Owners.

(o)  To maintain and repair any Unit if such maintenance or repair is necessary, in the discretion of the

Board, to protect the Common Elements or any other portion of the Building, and a Unit Owner of any Unit that has failed or refused to perform said maintenance or repair within a reasonable time after written notice of the necessity of said maintenance or repair mailed or delivered by the Board to said Unit Owner, provided that the Board shall levy a special assessment against such Unit Owner for the cost of said maintenance or repair.

(p)   The Board or its agent, upon reasonable notice, may enter any Unit when necessary in connection with any maintenance or construction for which the Board is responsible. Such entry shall be made with as little inconvenience to the Unit Owner as practicable, and any damage caused thereby shall be repaired by the Board as a Common Expense.

(q)   The Board's powers hereinabove enumerated and described in this Declaration shall be limited in that the Board shall have no authority to acquire and pay for any structural alterations, additions to, or improvements of the Common Elements (other than for purposes of replacing or restoring portions of the Common Elements, subject to all the provisions of this Declaration) requiring an expenditure in excess of Five Thousand Dollars ($5,000.00), without in each case the prior approval of Voting Members having two-thirds (2/3) of the total votes.

(r)   All agreements, contracts, deeds, leases, vouchers for payment of expenditures and other instruments shall be signed by such officer or officers, agent or agents of the Board and in such manner as from time to time shall be determined by written resolution of the Board.   In the absence of such determination by the Board, such documents shall be signed by the treasurer and countersigned by the president of the Board.

(s)   The Board may adopt such reasonable rules and regulations, not inconsistent herewith, as it may deem advisable for the maintenance, administration, management, operation, use, conservation, and beautification of the Property, and for the health, comfort, safety, and general welfare of the Unit Owners and Occupants of the Property.   Written notice of such rules and regulations shall be given to all Unit Owners and Occupants and the entire Property shall at all times be maintained subject to such rules and regulations.

(t)   The Board may engage the services of an agent to manage the Property to the extent deemed advisable by the Board.

(u)   Nothing hereinabove contained shall be construed to give the Board, Association, or Unit Owners authority to

conduct an active business for profit on behalf of all the Unit Owners or any of them.

(v)  Upon authorization by the affirmative vote of not less than a majority of the Voting Members at a meeting duly called for such purposes, the Board, acting on behalf of all Unit Owners, shall have the power to seek relief from or in connection with the assessment or levy of any real property taxes, special assessments and any other special taxes or charges of the State of Illinois or any political subdivision thereof, or any other lawful taxing or assessing body, which are authorized by law to be assessed and levied on real property and to charge and collect all expenses incurred in connection therewith as Common Expenses.

## ARTICLE XV

### MEMBERS
### (UNIT OWNERS)

1.  __Voting Rights.__  There shall be one person with respect to each Unit ownership who shall be entitled to vote at any meeting of the Unit Owners.  Such Voting Members shall be the Unit Owner or one of the group composed of all the Unit Owners of a Unit ownership or may be some person designated by such Unit Owners to act as proxy on his or their behalf and who need not be a Unit Owner.  Such designations shall be made in writing to the Board and shall be revocable at any time by actual notice to the Board of the death or judicially declared incompetence of any designator, or by written notice to the Board by the Unit Owner or Unit Owners.  Any or all Unit Owners of a Unit ownership, and their designee, if any, may be present at any meeting of the Voting Members, but only the Voting Member of the Unit ownership may vote or take any other action as a Voting Member either in person or by proxy.  The total number of votes of all Voting Members shall be 100, and each Unit Owner or group of Unit Owners shall be entitled to the number of votes equal to the total of the percentage of ownership in the Common Elements applicable to his or their Unit ownership as set forth in Exhibit C.  The Trustee shall designate the Voting Member with respect to any Unit ownership owned by the Trustee.  The Association shall have one class of membership only and nothing contained in these Condominium Instruments shall permit or allow different classes of membership among the Unit Owners.

2.  __Meetings.__

(a)  Meetings of the Voting Members shall be held at the Property or at such other place in Cook County, Illinois, as

may be designated in any notice of a meeting.  The presence in person or by proxy at any meeting of the Voting Members of at least a majority of the Voting Members shall constitute a quorum.  Unless otherwise expressly provided herein, any action may be taken at any meeting of the Voting Members at which a quorum is present upon the affirmative vote of the Voting Members having a majority of the total votes represented at such meeting.

(b)  The initial meeting of the Voting Members shall be held upon written notice, not less than ten (10) or more than thirty (30) days' notice given by the Trustee or Developer. Said initial meeting shall be held not later than sixty (60) days after the conveyance by the Developer of 75% of the Units or three (3) years after the recording of this Declaration, whichever is earlier.  Thereafter, there shall be an annual meeting of the Voting Members held each year within fifteen (15) days of the anniversary of the initial meeting of the Voting Members.  All such meetings of the Voting Members shall be held at such place in Cook County, Illinois, and at such time as specified in written notice of such meeting delivered to the Voting Members not less than ten (10) days or more than thirty (30) days prior to the date fixed for said meeting.

(c)  Special meetings of the Voting Members may be called at any time for the purpose of considering matters which, by the terms of this Declaration, require the approval of all or some of the Voting Members, or for any other reasonable purpose. Said meetings shall be called by written notice, authorized by the president of the Board, a majority of the Board, or by the Voting Members having 20% of the total votes and delivered not less than ten (10) days or more than thirty (30) days prior to the date fixed for said meeting.  The notices shall specify the date, time, and place of the meeting and the matters to be considered.  Matters to be submitted at special meetings of the Voting Members shall first be submitted to the Board of Managers, at least ten (10) days prior to the special meeting, who shall then submit the matters to the Voting Members.

3.  Notices of Meetings.  Notices of meetings required to be given herein may be delivered either personally or by mail to the person entitled to vote thereat, addressed to each such person at the address given by him to the Board for the purpose of service of such notice, or to the Unit of the Unit Owner with respect to which such voting right appertains, if no address has been given to the Board.

4.  Miscellaneous.

(a)  No merger or consolidation of the Association; lease, exchange, mortgage, pledge, or other disposition of all,

or substantially all of the property and assets of the Association; and the purchase or sale of land or of Units on behalf of all Unit Owners shall be effectuated unless there is an affirmative vote of two-thirds (2/3) of the votes of Unit Owners, except as otherwise provided for in this Declaration.

(b)  When thirty percent (30%) or fewer of the Units, by number, possess over fifty percent (50%) in the aggregate of the votes in the Association, any percentage vote of members specified in the Condominium Instruments, or the Act, shall require instead the specified percentage by number of Units rather than by percentage of interest in the Common Elements allocated to Units that would otherwise be applicable.

## ARTICLE XVI

### ASSESSMENTS--MAINTENANCE FUND

1.  Estimated Annual Budget and Assessments.  Each year on or before November 1, the Board shall estimate the total amount necessary to pay the cost of all Common Expenses which shall be required during the ensuing calendar year for the rendering of all services, together with a reasonable amount considered by the Board to be necessary for a reserve for contingencies and replacements.  The annual budget shall set forth with particularity all anticipated Common Expenses by category as well as all anticipated assessments and other income.  The budget shall also set forth each Unit Owner's proposed Common Expense assessment.  Each Unit Owner shall receive, at least thirty (30) days prior to the adoption thereof by the Board of Managers, a copy of the proposed annual budget; the annual budget shall also take into account the estimated net available cash income for the year from the operation or use of the Common Elements, if any.  The "estimated annual budget" shall be assessed to the Unit Owners according to each Unit Owner's percentage of ownership in the Common Elements as set forth in Exhibit C attached hereto.  Each Unit Owner shall receive notice in the same manner as is provided in this Declaration for membership meetings, or any meeting of the Board of Managers concerning the adoption of the proposed annual budget or any increase, or establishment of an assessment.  Said meetings of the Board of Managers shall be open to any Unit Owner, and that notice of such meeting shall be mailed at least forty-eight (48) hours prior thereto, unless a written waiver of such notice is signed by the Person or persons entitled to such notice before the meeting is convened.  On or before January 1 of the ensuing year, and the first of each and every month of said year, said Unit Owner jointly and severally shall be personally liable for and obligated to pay to the Board or as it may direct one-

twelfth (1/12) of the assessment against his Unit Ownership made pursuant to this Section. On or before April 1 of each calendar year following the year in which the initial meeting is held, the Board shall supply to all Unit Owners an itemized accounting of the Common Expenses for the preceding year actually incurred and paid, together with a tabulation of the amounts collected pursuant to the budget or assessments, and showing the net excess or deficit of income over expenditures plus Reserves. Any amount accumulated in excess of the amount required for actual expenses and Reserves may be credited according to each Unit Owner's percentage of ownership in the Common Elements to the next monthly installments due from Unit Owners under the current year estimate, until exhausted or, in the Board's discretion, such amount may be held as additional Reserves. Any net shortage may be assessed in a separate assessment as provided below or, in the Board's discretion, may be added according to each Unit Owner's percentage of ownership in the Common Elements to the installments due in succeeding months after rendering of the accounting. The Board shall determine the number of months over which such shortage shall be added to the monthly assessment.

2.  Reserves and Adjustments. The Board shall establish and maintain a reasonable Reserve for contingencies and replacements. Any extraordinary or nonrecurring Common Expense, any Common Expense not set forth in the budget as adopted, and any increase in assessments over the amount adopted shall be separately assessed against all Unit Owners. Any such separate assessment shall be subject to approval by the affirmative vote of at least two-thirds (2/3) of the Unit Owners voting at a meeting of such Unit Owners duly called for the purpose of approving the assessment if it involves proposed expenditures resulting in a total payment assessed to a Unit Owner equal to the greater of five (5) times the Unit's most recent Common Expense assessment calculated on a monthly basis or Three Hundred Dollars ($300.00). All Unit Owners shall be personally liable for and obligated to pay their respective adjusted monthly assessments.

3.  Initial Estimate of Annual Budget. When the first Board elected or appointed hereunder takes office, it shall determine the "estimated annual budget" as hereinabove defined, for the period commencing thirty (30) days after said election and ending on December 31 of the calendar year in which said election occurs. Assessments shall be levied against the Unit Owners during said period as provided in Section 1 of this Article.

4.  Failure to Prepare Estimates. The failure or delay of the Board to prepare or serve the annual or adjusted estimate on the Unit Owner shall not constitute a waiver or release in any

manner of such Unit Owner's obligation to pay the maintenance costs and necessary Reserves, as herein provided, whenever the same shall be determined, and in the absence of any annual estimate or adjusted estimate, the Unit Owner shall continue to pay the monthly maintenance charge at the then existing monthly rate established for the previous period until the next monthly maintenance payment which is due not more than ten (10) days after such new annual or adjusted estimate shall have been mailed or personally delivered.

5. <u>Books and Records.</u> The Board shall keep full and correct books of account in chronological order of the receipts and expenditures affecting the Common Elements, specifying and itemizing the maintenance and repair expenses of the Common Elements and any other expenses incurred. Such records and the vouchers authorizing the payments shall be available for inspection by any Unit Owner or any representative of a Unit Owner duly authorized in writing, at such reasonable time or times during normal business hours as may be requested by the Unit Owner. Upon ten (10) days' notice to the Board and payment of a reasonable fee, any Unit Owner shall be furnished a statement of his account setting forth the amount of any unpaid assessments or other charges due and owing from such Unit Owner.

6. <u>Use of Funds.</u> All funds collected hereunder shall be held and expended for the purpose designated herein, and (except for such special assessments as may be levied hereunder against less than all the Unit Owners and for such adjustments as may be required to reflect delinquent or prepaid assessments) shall be deemed to be held for the benefit, use, and account of all the Unit Owners in the percentages set forth in Exhibit C.

7. <u>Insurance.</u> Any insurance premiums assessed on a basis reflecting increased charges for coverage on certain Units shall be assessed to such Unit.

8. <u>Assessments.</u> If a Unit Owner is in default in the monthly payment of the aforesaid charges or assessments for thirty (30) days, the members of the Board may bring suit for and on behalf of themselves and as representatives of all Unit Owners, to enforce collection thereof or to foreclose the lien therefor as hereinafter provided; and there shall be added to the amount due the costs of said suit, and other fees and expenses together with legal interest and reasonable attorneys' fees to be fixed by the court. To the extent permitted by any decision or any statute or law now or hereafter effective, the amount of any delinquent and unpaid charges or assessments, and interest, costs, and fees as above provided, shall be and become a lien or charge against the Unit ownership of the Unit Owner involved when payable and may be foreclosed by an action brought in the name of the Board as in the case of foreclosure of liens

against real estate. Such lien shall take effect and be in force when and as provided in the Act; provided, however, that such lien shall be subordinate to the lien of any first mortgage on the Unit ownership recorded prior to the date that any such assessments or other charges or payments become due. Except as hereinafter provided, such lien shall not be affected by any transfer of title to the Unit Ownership. Where title to the Unit ownership is transferred pursuant to a decree of foreclosure or by deed or assignment in lieu of foreclosure, such transfer of title shall to the extent permitted by law extinguish the lien for any assessments or other charges or payments under this Section 8 which became due prior to (i) the date of the transfer of title or (ii) the date on which the transferee comes into possession of the Unit, whichever occurs first. However, the transferee of a Unit ownership shall be liable for his share of any assessments or other charges or payments with respect to which a lien against his Unit ownership has been extinguished pursuant to the preceding sentence, which are reallocated among the Unit Owners pursuant to a subsequently adopted annual, revised or special assessment, and nonpayment thereof shall result in a lien against the transferee's Unit ownership.

In addition to the foregoing, the Board or its agents shall have such other rights and remedies to enforce such collection as shall otherwise be provided or permitted by law from time to time. Without limiting the generality of the foregoing, if any Unit Owner shall fail to pay the proportionate share of the Common Expenses or of any other expenses required to be paid hereunder when due, such rights and remedies shall include: (i) the right to enforce the collection of such defaulting Unit Owner's share of such expenses (whether due by acceleration or otherwise), together with interest thereon, at the maximum rate permitted by law, and all fees and costs (including reasonable attorneys' fees) incurred in the collection thereof; (ii) the right, by giving such defaulting Unit Owner five (5) days written notice of the election of the Board so to do, to accelerate the maturity of the unpaid installments of such expenses accruing with respect to the balance of the assessment year; and (iii) the right to take possession of such defaulting Unit Owner's interest in the Property, to maintain for the benefit of all the other Unit Owners an action for possession in the manner prescribed in "an Act in regard to Forcible Entry and Detainer," approved February 16, 1874, as amended, and to execute leases of such defaulting Unit Owner's interest in the Property and apply the rents derived therefrom against such expenses.

9.  Nonuse. No Unit Owner may waive or otherwise escape liability for the assessments provided for herein by nonuse of the Common Elements or abandonment of his Unit.

## ARTICLE XVII

COVENANTS AND RESTRICTIONS AS TO USE AND OCCUPANCY

The Units and Common Elements shall be owned, occupied, and used subject to the following covenants and restrictions:

1. <u>General Use.</u> No part of the Property shall be used for other than housing and related common purposes for which the Property was designed. Each Unit or any two or more adjoining Units used together shall be used as a residence for a single family or such other uses permitted by this Declaration and for no other purpose. That part of the Common Elements separating any two or more adjoining Units used together as aforesaid may be altered to afford ingress and egress to and from such adjoining Units in such manner and upon such conditions as shall be determined by the Board in writing.

2. <u>Obstruction of Common Elements and Unit Maintenance.</u> There shall be no obstruction of the Common Elements nor shall anything be stored in the Common Elements without prior consent of the Board except as herein expressly provided. Each Unit Owner shall be obligated to maintain and keep in good order and repair his own Unit.

3. <u>Prohibited Use.</u> Nothing shall be done or kept in any Unit, or in the Common Elements, which will increase the rate of insurance on the Building or contents thereof, applicable for residential use, without the prior written consent of the Board. No Unit Owner shall permit anything to be done or kept in his Unit, or in the Common Elements which will result in the cancellation of insurance on the Building, or contents thereof, or which would be in violation of any law. No waste shall be committed in the Common Elements. No Unit Owner shall overload the electric wiring in the Building, or operate any machines, appliances, accessories, or equipment in such manner as to cause, in the judgment of the Board, an unreasonable disturbance to others, or connect any machines, appliances, accessories, or equipment to the heating or plumbing system, without the prior written consent of the Board.

4. <u>Unit Owner Insurance.</u> Each Unit Owner shall be responsible for his own insurance on his personal property in his own Unit, his personal property stored elsewhere on the Property and his personal liability to the extent not covered by the liability insurance for all the Unit Owners obtained by the Board as hereinbefore provided.

5. **Exterior Attachments.** Unit Owners shall not cause or permit anything to be placed on the outside walls of the building and no sign, awning, canopy, shutter, radio, or television antenna shall be affixed to or placed upon the exterior walls or roof or any part thereof, without the prior consent of the Board.

6. **Animals.** No animals shall be raised, bred or kept in any Unit, except for dogs which may be carried by an adult person, household cats and small birds owned as household pets by a Unit Owner, provided that said pet is not kept for any commercial purpose, and provided that said pet shall be kept in strict accordance with the administrative rules and regulations relating to household pets from time to time adopted or approved by the Board, and provided that said pet shall not, in the judgment of the Board, constitute a nuisance to others.

7. **Nuisances.** No noxious or offensive activity shall be carried on in any Unit or in the Common Elements, nor shall anything be done therein, either willfully or negligently, which may be or become an annoyance or nuisance to the other Unit Owners or Occupants.

8. **Unsightliness.** No clothes, sheets, blankets, laundry, or any kind of other articles shall be hung out or exposed on any part of the Common Elements. The Common Elements shall be kept free and clear of rubbish, debris, and other unsightly materials.

9. **Storage.** Articles of personal property belonging to any Unit Owner, such as baby carriages, bicycles, wagons, toys, furniture, clothing and other articles, shall not be stored or kept in the corridors, hallways, lobby or other common areas, except in the common storage area, Storage Room or storage locker specifically designated for the respective Unit Owner by the Board or by the managing agent acting in accordance with the Board's direction.

10. **Commercial Activities.** No industry, business, trade, occupation, or profession of any kind, commercial, religious, educational, or otherwise, designated for profit, altruism, exploration, or otherwise, shall be conducted, maintained, or permitted in any Unit.

11. **Use by Trustee and Developer.** During the period of sale by the Trustee of any Units, the Trustee, the Developer and the Developer's agents, employees, contractors and subcontractors, and their respective agents and employees, shall be entitled to access, ingress to and egress from said Building and Property as may be required for purposes of said sale of

Units. While the Trustee owns any of the Units and until each Unit sold by it is occupied by the Purchasers, the Trustee, the Developer and the Developer's agents and employees may use and show one or more of such unsold or unoccupied Units as a sales office, and may maintain customary signs in connection therewith.

12. <u>Exceptions.</u> The Unit restrictions in Paragraphs 1 and 9 of this Article XVII shall not, however, be construed in such manner as to prohibit a Unit Owner from: (a) maintaining his professional library therein, (b) keeping his personal business or professional records or accounts therein, or (c) handling his personal business or professional telephone calls or correspondence therefrom. Such uses are expressly declared customarily incident to the principal residential use and not in violation of Sections 1 and 9 of this Article XVII.

## ARTICLE XVIII

### REMEDIES FOR BREACH OF COVENANTS RESTRICTIONS AND REGULATIONS

1. <u>Abatements and Enjoinment.</u> The violation of any restriction, or condition, or regulation adopted by the Board, or the breach of any covenant or provision herein contained, shall give the Board the right, in addition to the rights set forth in the next succeeding section: (a) to enter upon that part of the Property where such violation or breach exists and summarily abate and remove, at the expense of the defaulting Unit Owner, any structure, thing, or condition that may exist thereon contrary to the intent and the provisions hereof, and the Trustee, the Developer, or their successors or assigns, or the Board, or its agents, shall not thereby be deemed guilty in any manner of trespass; or (b) to enjoin, abate, or remedy by appropriate legal proceeding, either at law or in equity, the continuance of any breach. All expenses of the Board in connection with such actions or proceedings, including court costs and attorneys' fees and expenses, and all damages, liquidated or otherwise, together with interest thereon at the rate of eight percent (8%) per annum until paid, shall be charged to and assessed against such defaulting Unit Owner, and shall be added to and deemed part of his respective share of the Common Expenses, and the Board shall have a lien for all of the same upon the Unit ownership of such defaulting Unit Owner and upon all of his additions and improvements thereto and upon all his personal property in his Unit or located elsewhere on the Property. Any and all of such rights and remedies may be exercised at any time and from time to time, cumulatively or otherwise, by the Board.

2. <u>Involuntary Sale.</u>  If any Unit Owner (either by his own conduct or by the conduct of any other Occupant of his Unit) shall violate the Act, or any of the covenants, restrictions or provisions of this declaration or the regulations adopted by the Board, and if such default or violation shall continue for ten (10) days after notice to the Unit Owner in writing from the Board, or shall occur repeatedly during any ten (10) day period after such written notice or request to cure such violation from the Board, then the Board shall have the power to issue to said defaulting Owner a notice in writing terminating the rights of the said defaulting Owner to continue as a Unit Owner and to continue to occupy, use or control his Unit, and thereupon an action in equity may be filed by the Board against said defaulting Owner for a decree of mandatory injunction against such defaulting Owner or Occupant or, in the alternative, for a decree declaring the termination of said defaulting Owner's right to occupy, use or control the Unit owned by him on account of said violation, and ordering that all the right, title and interest of said defaulting Owner in the Property shall be sold (subject to the lien of any existing mortgage) at a judicial sale upon such notice and terms as the court shall determine, except that the court shall enjoin and restrain the said defaulting Owner from reacquiring his interest at such judicial sale.  The proceeds of any such judicial sale shall first be paid to discharge court costs, court reporter charges, reasonable attorneys' fees and all other expenses of the proceeding and sale, and all such items shall be taxed against said defaulting Owner in said decree.  Any balance of proceeds after satisfaction of such charges and any unpaid assessments hereunder or any liens, shall be paid to said defaulting Owner. Upon the confirmation of such sale, the Purchaser shall thereupon be entitled to a deed to the Unit and the Unit Owner's corresponding percentage of ownership in the Common Elements, and to immediate possession of the Unit sold and may apply to the court for a writ of assistance for the purpose of acquiring such possession, and it shall be a condition of any such sale, and the decree shall so provide, that the Purchaser shall take the interest in the Unit ownership sold subject to this Declaration.

<u>ARTICLE XIX</u>

GENERAL PROVISIONS

1. <u>Notices to Board, Association, and Unit Owners.</u> Notices provided for in this Declaration and in the Act shall be in writing and shall be addressed to the Board or Association, or any Unit Owner, as the case may be, at

39 East Schiller, Chicago, Illinois

(indicating thereon the number of the respective Unit if addressed to a Unit Owner), or at such other address as herein provided. The Association or Board may designate a different address or addresses for notices to them, respectively, by giving written notice of such change of address to all Unit Owners. Any Unit Owner may also designate a different address for notices to him by giving written notice of his change of address to the Board or Association. Notices addressed as above shall be deemed delivered when mailed by United States registered or certified mail or when delivered in person with written acknowledgment of the receipt thereof.

2. **Notice to Decedent.** Notices required to be given any devisee or personal representative of a deceased Unit Owner may be delivered either personally or by mail to such party at his or its address appearing in the records of the court wherein the estate of such deceased Unit Owner is being administered.

3. **Binding Effect.** Each grantee of the Trustee, by acceptance of a deed of conveyance, or each Purchaser under any contract for such deed of conveyance, accepts the same subject to all restrictions, conditions, covenants, reservations, liens, and charges, and the jurisdiction, rights, and powers created or reserved by this Declaration, and all rights, benefits, and privileges of every character hereby granted, created, reserved, or declared, and all impositions and obligations hereby imposed shall be deemed and taken to be covenants running with the land, and shall bind any person having at any time any interest or estate in the Property or any Unit, and shall inure to the benefit of such Unit Owner in like manner as though the provisions of this Declaration were recited and stipulated at length in each and every deed of conveyance.

4. **Waiver.** No covenants, restrictions, conditions, obligations, or provisions contained in this Declaration shall be deemed to have been abrogated or waived by reason of any failure to enforce the same, irrespective of the number of violations or breaches which may occur.

5. **Amendments.** Except as otherwise provided in the Act, this Declaration and By-Laws, the provisions of the Condominium Instruments may be amended, changed, or modified by an instrument in writing setting forth such amendment, change, or modification, signed and acknowledged by all of the members of the Board, at least three-fourths (3/4) of the Unit Owners, and the approval of all First Mortgagees required under the provisions of the Condominium Instruments, and containing an affidavit by an officer of the Board certifying that a copy of the amendment, change, or modification has been mailed by certified mail to all First Mortgagees not less than ten (10)

-37-

days prior to the date of such affidavit. Any amendment, change, or modification shall conform to the provisions of the Condominium Property Act and shall be effective upon recordation thereof. No change, modification, or amendment which affects the rights, privileges, or obligations of the Trustee or the Developer shall be effective without the prior written consent of the Trustee or the Developer. Except to the extent authorized by provisions of the Act, no amendment to the Condominium Instruments shall change the boundaries of any Unit or the undivided interest in the Common Elements, the number of votes in the Unit Owners' Association, or the liability for Common Expenses appertaining to a Unit.

6. _Invalidity._ The invalidity of any covenant, restriction, condition, limitation, or any other provision of this Declaration, or of any part of the same, shall not impair or affect in any manner the validity, enforceability or effect of the remainder of this Declaration.

7. _Perpetuities and Restraints._ If any of the options, privileges, covenants, or rights created by this Declaration would otherwise be unlawful or void for violation of (a) the rule against perpetuities or some analogous statutory provision, (b) the rules restricting restraints on alienation, or (c) any other statutory or common law rules imposing time limits, then such provision shall continue only until twenty-one (21) years after the death of the last to die of the now living lawful descendants of James E. Carter, Jr., President of the United States, and Charles Percy, Senator of the State of Illinois.

8. _Liens._ In the event any lien exists against two (2) or more Units and the indebtedness secured by such lien is due and payable, the Unit Owner of any such Unit so affected may remove such Unit, and the undivided interest in the Common Elements appertaining thereto from such lien by payment of the proportional amount of such indebtedness attributable to such Unit. In the event such lien exists against the Units or against the Property, the amount of such proportional payment shall be computed on the basis of the percentage set forth in this Declaration. Upon payment as herein provided, it is the duty of the encumbrancer to execute and deliver to the Unit Owner a release of such Unit and the undivided interest in the Common Elements appertaining thereto from such lien.

The owner of such Unit shall not be liable for any claims, damages, or judgments entered as a result of any action or inaction of the Board of Managers of the Association other than for mechanics' liens as hereinafter set forth. Each Unit Owner's liability for any judgment entered against the Board of Managers or the Association, if any, shall be limited to his proportionate share of the indebtedness as set forth herein, whether collection is sought through assessment or otherwise. A

Unit Owner shall be liable for any claim, damage, or judgment entered as a result of the use or operation of his Unit, or caused by his own conduct.  Before conveying a Unit, the Developer shall record or furnish Purchaser releases of all liens affecting that Unit and its Common Element interest which the Purchaser does not expressly agree to take subject to or assume, or the Developer shall provide a surety bond or substitute collateral for or insurance against such liens. After conveyance of such Unit, no mechanic's lien shall be created against such Unit or its Common Element interest by reason of any subsequent contract by the Developer to improve or make additions to the Property.

If, as a result of work expressly authorized by the Board of Managers, a mechanic's lien claim is placed against the Property or any portion of the Property, each Unit Owner shall be deemed to have expressly authorized it and consented thereto, and shall be liable for the payment of his Unit's proportionate share of any due and payable indebtedness.

9.    Release of Claims.  Each Unit Owner hereby waives and releases any and all claims which he may have against any other Unit Owner, Occupant, the Association, its officers, members of the Board, the Trustee, the Developer, the managing agent, and their respective employees and agents, for damage to the Common Elements, the Units, or to any personal property located in the Units or Common Elements, caused by fire or other casualty, to the extent that such damage is covered by fire or other form of casualty insurance.

10.    Construction.  The provisions of this Declaration shall be liberally construed to effectuate its purpose of creating a uniform plan for the operation of a first class condominium apartment building.

11.    Headings.  The headings and captions contained herein are inserted for convenient reference only and shall not be deemed to construe or limit the sections and articles to which they apply.

12.    Land Trust Unit Owners' Exculpation.  In the event title to any Unit ownership is conveyed to a land trust holding title under the terms of which all powers of management, operation, and control of the Unit ownership remain vested in the trust beneficiary or beneficiaries, then the Unit ownership under such trust and the beneficiaries thereunder from time to time shall be responsible for payment of all obligations, liens, or indebtedness and for the performance of all agreements, covenants, and undertakings chargeable or created under this Declaration against such Unit ownership.  No claim shall be made against any such titleholding trustee personally for payment of any lien or obligation hereunder created and the trustee shall

-39-

not be obligated to sequester funds or trust property to apply
in whole or in part against such lien or obligation. The amount
of such lien or obligation shall continue to be a charge or lien
upon the Unit ownership and the beneficiaries of such trust
notwithstanding any transfers of the beneficial interest of any
such trust or any transfers of title of such Unit ownership.

   13. <u>Trustee Exculpation.</u> This Declaration is executed by
the Bank of Ravenswood as aforesaid, in the exercise of power
and authority conferred upon and vested in it as such Trustee
(and said Trustee hereby warrants that it possesses full power
and authority to execute this instrument). It is expressly
understood and agreed by every person, firm, or corporation
hereafter claiming any interest under this Declaration that said
Trustee as aforesaid, and not personally, has joined in the
execution of this Declaration for the sole purpose of subjecting
the titleholding interest and the trust estate under said Trust
No. 1247 to the terms of this Declaration; that any and all
obligations, duties, covenants, and agreements of every nature
herein set forth by said Trustee, as aforesaid, to be kept or
performed, are intended to be kept, performed, and discharged by
the beneficiaries under said trust or their successor, and not
by said Trustee personally, and further, that no duty shall rest
upon the Bank of Ravenswood either personally or as such
Trustee, to sequester trust assets, rentals, avails, or proceeds
of any kind, or otherwise to see to the fulfillment or discharge
of any obligation, express or implied, arising under the terms
of this Declaration, except where said Trustee is acting
pursuant to direction as provided by the terms of said trust,
and after the Trustee has first been supplied with funds
required for the purpose. In event of conflict between the
terms of this Paragraph and of the remainder of the Declaration
on any question of apparent liability or obligation resting upon
said Trustee, the exculpatory provisions hereof shall be
controlling.

   IN WITNESS WHEREOF, the said Bank of Ravenswood, as Trustee
as aforesaid and not individually, has caused its corporate seal
to be affixed hereunto and caused its name to be signed in these
presents by its _____ President and attested by its
_____ Secretary this _____ day of
_____, 19_____.


     (SEAL)                 THE BANK OF RAVENSWOOD
                            as Trustee as aforesaid,
                            and not individually


ATTEST:

                            By_____

                               _____ President

 

203 North LaSalle Street
Suite 2100
Chicago, Illinois 60601
Phone 312-917-1131
Fax 312-558-1369

1131 Wheaton Oaks Court
Wheaton, Illinois 60187
Phone 630-588-1131
Fax 630-682-1131

www.donnerco.com

October 8, 2005

**SECOND REQUEST**

**BY CERTIFIED MAIL/PERSONAL DELIVERY**

Mr. Daniel Mohen
39 East Schiller Street
Apartment 2-E
Chicago, Illinois 60610

     *Re: Various Issues*

Dear Mr. Mohen:

     I am writing on behalf of Peggy Richek Goldberg ("Ms. Goldberg"), who I represent in connection with this matter. As set forth in more detail below, my client has repeatedly asked for the Board to address problems involving both the common areas and certain limited common areas pursuant to its obligations under the Declarations and By-Laws. Those requests have been ignored for far too long and she has therefore requested that we may make this final demand for the scheduling of a board meeting to address these concerns, prior to seeking recourse in the courts.

     The repairs we have requested include the following:

     1.    **Supports for window frame.** In July, 2004, Ms. Goldberg was informed by her painter that the frame supporting the front bay window (including defective joints in the window system) of her apartment (4E) was rotting. She was also getting considerable leakage through this window. Ms. Goldberg drew this to the attention of the building manager, Ms. Oleisky and has several times pointed this out the Condominium Board and members of the association. In August, 2004, an inspection was done and, on August 31, a proposal was received by the board to rectify problems concerning the bay windows. Correspondence and documentation on this matter dates from 8/6/04, 8/11/04, 10/16/04, 3/14/05, 3/15/05, 3/16/05, 3/25/05, and 6/6-7/05. Despite repeated requests, no action has been taken on this proposal. Nor has the Condominium Board responded to Ms. Goldberg's latest requests to address the situation. The window support

frame is rotting and Ms. Goldberg fears that a storm may cause the window to loosen or even fall.

2. **Exterior metal balcony.** The 4E apartment, on the east side of the building, has a small metal balcony on the exterior. While the west-side balconies have undergone a thorough repair during the previous few years, this balcony has received no attention. At present, the there is very visible rust on the surface, and we are uncertain about the structural safety of the balcony. It should be noted that the Astor Plaza Condominium Board By-laws require the board to maintain and pay for all limited common elements, such as balconies.

3. **Window frame and possible mortar concerns through east side windows.** The east side windows in her apartment, both on the first and second floors, have considerable air leakage and, during snow storms have even had interior accumulations of snow. (Documented by pictures from Feb, 1999.) To address this problem, Ms. Goldberg has replaced the windows, which it is her understanding, are not a common element. However, this has failed to solve the problem. When she has spoken with workmen, Ms. Goldberg has been told that the problem may be due to the window frames or, more likely, masonry/tuck pointing concerns. This problem has, again, not been addressed by the Condominium Board.

4. **Unsafe lock situation.** The door on the roof, where the back stairway ends, locks from the inappropriate side and is out of compliance with city fire codes. Furthermore, no one has advised Ms. Goldberg that management has found the key; it apparently has been lost. All requests from her have been ignored, except for one person who said that the solution was to leave the door unlocked. Her last written communication, on 6/7/05, was again ignored.

Maintenance concerns include the following.

1. **The roof.** A new roof was put on the building within the last five years. However, since that time, there have been leaks that have caused damage to the 4E apartment. The people who repaired the roof informed Ms. Goldberg that regular inspection and maintenance would minimize problems causing leaks (e.g., clogged gutters, problems with flashing). On behalf of the association, Ms. Goldberg solicited one proposal ($650.00 per year). However, this was never acted upon. Her latest communication, on 6/6/05 was once again ignored. The building manager's response to her request of 3/25/05 was that the board needed to approve this matter. In the past (2001), lack of regular maintenance and lack of timely response to roof leaks resulted in a claim to her personal insurance of $19,700 to floor and ceiling damage. This claim was necessitated solely by problems with common elements. The negligence of the Condominium Board necessitated this claim. Currently, they are, again, ignoring needed maintenance on this important common element.

2. **The front door.** A resident-owner painted the exterior front door without obtaining the permission of the board. Ms. Goldberg was told by another owner that the paint was needed "to get through the winter." The paint job is unsightly. Further, if there are problems

with the door itself, or with the finishing, they should be addressed by the board.  It is unclear whether the type of paint used, apart from its unsightliness, is appropriate.  The Condominium Board needs to provide an adequate, appropriately finished door. If the actions of the painter were appropriate, they should be approved by the board.  If not, further action should be taken.

3.      **Lack of general maintenance.** 39 E. Schiller is in dilapidated condition. The windows have not been washed in a few years. (Before this, they were done regularly.) The front hall has peeling wall paper and stained carpet. While these concerns are not structural, they call into question other structural and safety issues. Ms. Goldberg's list of concerns includes, but is not limited to, fire hazards and warning, tuck pointing, and water issues. On September 20, 2005, for example, the building received a citation from the City of Chicago for an overflowing dumpster.

4.      **Lack of communication.** As detailed above, several of Ms. Goldberg's communications have gone unanswered. In addition, regular minutes of meetings and decisions have not been kept.  For example, Ms. Goldberg received no minutes for the board meetings of 3/15/05 or for 4/30/05 (the last two board meetings). She has also not been receiving financial statements. In such cases, it is impossible to even monitor or register concerns.

5.      **Lack of financial reserves.** The State of Illinois requires financial reserves to cope with emergencies.  We do not know the status of the Astor Plaza Condominium Board financial reserve, but suspect it is inadequate.

In the past, my client has been called upon to contribute to the repair of limited common elements serving units owned by members of the Board.  It is therefore remarkable that this Board should refuse to even consider issues involving other limited common elements, such as these.  By and large, Ms. Goldberg's concerns involve nothing more than fundamental maintenance and upkeep, concerns which Board members not only have an interest in addressing, but which they are required to address by virtue of their fiduciary obligation to the unit owners. The Board has nevertheless failed to even schedule meetings to discuss the concerns of unit owners such as my client for some time now.  Thus, the problems she has identified have been repeatedly ignored and nothing has been done to remedy these concerns for some time.  In our opinion, this disregard, coupled with the Board's focus on an agenda which appears to serve the interests of selling unit owners over those with long-term interests in their homes, constitutes oppressive conduct.  *See* 805 ILCS 5/12.50, *et seq.*

The Board needs to address these concerns.

We must therefore demand that a Board meeting be scheduled to address these concerns prior to the end of October.  If no such action is taken within this time frame, we expect no alternative but to seek judicial intervention.

Please do not hesitate to contact me should you have any specific questions or concerns