

# KNUCKLES, KEOUGH & MOODY, P.C.

1001 East Chicago Avenue, Suite 103, Naperville, IL 60540
Telephone (630) 369-2700     Facsimile (630) 369-9279
www.kkmcondolaw.com

| Writer's Direct Dial | (630) 369-2700 x 209 |
| Writer's Email | grc@kkmcondolaw.com |

July 24, 2007

Mr. Ted Donner
Donner & Company Law Offices LLC
1125 Wheaton Oaks Court
Wheaton, IL 60187

> **RE:**   *Astor Plaza Condominium Association*

Dear Mr. Donner:

This letter comes in response to your e-mail of July 23, 2007, to me.

First, the Association's governing documents and the Illinois Condominium Property Act dictate who can attend a board meeting. I have previously advised you that any non-member of the Association, who is not invited to attend the meeting by the Board, may not attend. The Illinois Condominium Property Act allows for a meeting of the Board to be taped or recorded. You can review the Act and assess what your clients' rights are as it relates to their ability to tape the meeting. Please be advised that this is a simple board meeting. It is not an adversarial proceeding. Hence, no court reporter may attend. The Board has an obligation to properly transcribe what occurs at any meeting and it will.

Second, I do not know what you are waiting to receive from me as it relates to the construction schedule. Prior to and at the mediation, I advised you that the Board was going to paint and scrape your clients' balcony and that will be done towards the end of the project. The owners will be advised, as they have been, of the progress of construction. I also do not know what you are referring to when you state you need to know the possibilities available to the bay window. As has been communicated to you and your client before, if your clients would like to replace the bay windows, that is their decision, as it will be at their cost, just as it has been for every other owner.

Third, your clients have not heard from the Board yet as it relates to an offer to purchase their Unit, since the Board has not met to discuss the issue. They are meeting tonight to discuss it, and you will hear from me shortly thereafter.



# KNUCKLES, KEOUGH & MOODY, P.C.

Finally, I have not received your response to our Motion to Dismiss. Please forward it to me as soon as possible. Please note that the Association has no intention of further delaying the Goldbergs' failure to pay assessments.

Very truly yours,

*Gabriella*

GABRIELLA R. COMSTOCK
Attorney at Law

GRC
cc:          Board of Directors
S:\data\forms\letterheadKKM.wpd

## Ted Donner

**From:** Gabriella R. Comstock [grc@kkmcondolaw.com]
**Sent:** Tuesday, July 24, 2007 12:36 PM
**To:** Ted Donner
**Cc:** Bryan Cagan
**Subject:** RE: Astor Plaza

Perhaps I have not made myself clear, so I will try it one more time. You are not allowed to attend a board meeting.

You are not a member of the Association. The section of the Condominium Property Act you are relying on, Section 18(a)(9), applies to unit owners and their ability to record. I am confident that you and your client do not need me to explain what the Condominium Act states as to a unit owners' right to tape a meeting. But again, it applies only to a unit owner. Certainly, you are not suggesting you own a unit.

You can consider my silence as my conceding there is no authority for my position. Unfortunately, you will be mistaken. I am not going to reiterate to you, again, what the Act and the Association's declaration states. I have told you the authority in a detailed letter. Again, I hope I am clear, you may not attend a board meeting. Ms. Goldberg is more than welcome to attend, though.

Finally, your comments on the minutes will be forwarded to the Board. Remember, it is the Board who approves board minutes.

Where is your response to the Motion to Dismiss?


Gabriella R. Comstock
Attorney at Law
KNUCKLES, KEOUGH & MOODY, P.C.
1001 East Chicago Avenue
Suite 103
Naperville, IL 60540
(630) 369-2700 x209
(630) 369-9279 (fax)

---

**From:** Ted Donner [mailto:tdonner@donnerco.com]
**Sent:** Tuesday, July 24, 2007 12:31 PM
**To:** Gabriella R. Comstock
**Cc:** perrygoldberg@aol.com; mrichek@ameritech.net
**Subject:** RE: Astor Plaza


(1) Our review of the proposed minutes shows not only a number of deficiences and mischaracterizations but also that many of these are from what were supposedly meetings of the membership. Not all of the minutes that purport to be from meetings of the membership were at meetings noticed for that reason, first of all. Secondly, and perhaps more importantly, there has been no notice of a meeting of the membership to ratify its own minutes.

(2) We have been asking that this meeting be recorded since it was first convened a month ago. The Association refused that request at the time, just as it did at the prior meeting, despite clear requirements in the Act that it be allowed. You seriously mean to try to block us from recording this meeting as well?

(3) You spent a great deal of time on Westlaw or Lexis, researching the representations you had made during the mediation with regard to your purported reasons for blocking my attendance. But you have never produced anything whatsoever to back up that claim. As Melissa pointed out to you at the time, we have found nothing in

the applicable law or the applicable documents that says that "only" board members can attend.   Your silence served to eventually concede a lack of authority to support your position at the mediation.  Do you now have authority for the idea that "only" board members can attend?

---

**From:** Gabriella R. Comstock [mailto:grc@kkmcondolaw.com]
**Sent:** Tuesday, July 24, 2007 11:43 AM
**To:** Ted Donner
**Subject:** RE: Astor Plaza

When I am meeting with a client, even if I am not in the office, I am not available.
You will have a formal response by 1:00 and please note, as I told you before, you are not a member of the Association and may not attend a board meeting. You also may not have a court reporter.

Gabriella R. Comstock
Attorney at Law
KNUCKLES, KEOUGH & MOODY, P.C.
1001 East Chicago Avenue
Suite 103
Naperville, IL 60540
(630) 369-2700 x209
(630) 369-9279 (fax)

---

**From:** Ted Donner [mailto:tdonner@donnerco.com]
**Sent:** Tuesday, July 24, 2007 11:42 AM
**To:** Gabriella R. Comstock
**Cc:** mrichek@ameritech.net; perrygoldberg@aol.com
**Subject:** RE: Astor Plaza

Following up on my prior emails and calls, I need to hear from you immediately about today's meeting.  I will assume you have no objection to my attending if I do not hear from you by 1:00pm.  I also plan to have a recorder and/or a court reporter with me.  The meeting must be recorded.

What is most amazing to me is that your receptionist confirmed a short while ago that you are in the office and just "not available."  This is not my first attempt to contact you, by a long shot, so I am at a loss to appreciate why you have yet to answer my prior inquiries.

July 27, 2007
Board Meeting
Astor Plaza

Speaker 1:    The board must also ask to consider approval of renovation projects submitted by Mark Karno.  The board will attempt to complete its review of the project and respond next week.  The meeting was adjourned at 840pm

Travis:    I make a motion to approve the minutes.

Speaker 3:    I second.

Speaker 1:    All in favor.

Speaker 1 & Travis:    Aye.

Speaker 3:    Next order of business?

Travis:    Next order of business is approval of Rule Amendments.  I'll read these aloud and follow up with any questions or comments.  Proposals, Alternations.  Summary One - no alterations or additions of any kind may be made to the common elements, including but not limited to the exterior portions without the prior written consent of the board.  In addition the unit owner will be responsible for all reasonable fees and costs incurred by the board during the review.  Summary Two.  Prior to the commencement of the addition or alternations to the unit, an owner is required to provide the board with detail information as to the scope of the work to be completed.  The purpose of this requirement is to confirm that the work being completed is to the unit only and not the common elements either directly or indirectly.  Summary Three.  All work within any unit must be completed by an insured contractor and it is the unit owners responsibility to provide the board with proof of the contractors insurance prior to the commencement of the work.  The contractor must then also name the association and management company as additionally insured and carry both liability and workman's compensation insurance.  Any questions?

Speaker 1:    I move to, I move to amend the rules.

Speaker 3:    As stated, yeah, I second them.

1



| | |
|---|---|
| Speaker 1: | All in favor? |
| Travis: | All in favor? |
| Speaker 3: | Aye. |

Travis:    Okay the next agenda of business is approval of Dan's work. Um, the board should state some of the required documents (inaudible) due diligence. We've got, we've already been submitted all the. . . . . data Dan has submitted., the necessary documents to the board of directors to make an alternation to the common elements. The board has reviewed and approved this work. I make a motion to approve ths work.

| | |
|---|---|
| Speaker 3: | I second it. |
| Speaker 1: | All in favor? |
| Travis: | All who approve? |
| Speaker 1 & 3: | Aye. |

Travis:    Dan, at this point after the vote you can present your request to install the balcony. However, I do not believe the board can approve it at this time.

Dan:    Sorry (inaudible). Let me present my plans for the balcony. I propose that we, I put a submission out to the board for approval to install a balcony off the east side of the building. As part of that proposed projects, I've gone to the board and supplied it, supplied them with all the required documentation required for approval of the project. The documentation I supplied the board includes a plan with the scope of the work to be done on the project. Insurance certificate, an insurance certificate that provides proof of insured for the contractors, naming the association and the management company as additionally insured with any other required provisions needed from the insurance policy. I've supplied the, in the package the required city permits and any other permits required to do the project. I have also provided for the board to have, arranged for the board to do a physical walk though and receive a detailed presentation um, on the project, followed by a Q & A. As part of the walk-through, which took place on June 18th, in attendance the board came, the architect running the project and the construction manager for the project as well. We included the management company as well, and everyone was able to come to physically inspect the location of the project, the scope of the project, the detail plans that were done and again have a detailed Q & A with the

2

architect and the contractor. Uh, there are, again, the full documentation necessary, required for the project to be approved.. I've listed here some of the things I've included if anything hasn't been detailed in the statement or included in the physical package of the project itself.  With that I turn it back over to you Travis.

Travis:             Okay now that we have more information lets uh, lets vote.  Um, I make a motion to approve this work.

Speaker 3:          All those in favor aye.

Speaker 1 & 4:       Aye, aye.

Speaker 3:          I second.

Speaker 4:          I third.

Speaker 3:          All those in favor, aye.

Travis, 1 & 4:       Aye.

Speaker 4:          Travis if you don't mind I'll take over.  This next item is the managers report and I just want to update the board on some of these items that have occurred since the last meeting.  It should be in the documents in the folder I gave you. The 2006 audit was completed and submitted to Harris Bank for the loan documents.  Also we should expect to receive the, excuse me, the additional $50,000 of funds from Harris within the next sixty days for the initial amount of $500,000.  Hayes Mechanical has made repairs to the domestic hot water system, specifically the issues with the water pressure.  Andy again, (inaudible) power washed the corridor located on the west side of the building.  Winward Roofing has completed their annual roof maintenance.  Bulls Eye Fire and Safety took care of re-tagging the fire extinguishers.  And one other item I wanted to update the board on.  I have been investigating, we had some leaking of approximately six weeks ago when we had that major storm to Dave's storage locker as well as Mark Karno's lower level.  At this point our determination from meeting with Sunrise Plumbing and performing some water tests is that leaking was due to extreme pressure placed on the roof drain from the volume of water run off.  We have not been able to recreate this nor has it leaked since.  From speaking with Mark Karno it sounds as if this has happened in the past, a few years ago.  At this point, we are going to continue to monitor and we will update the board.  At this point, it seems to be a once in a seven or eight year occurrence, with the amount

of water we had. I just want to update the board on a couple of interior projects.

Speaker 3:     Can I ask you a question on that point? Wasn't that an unusual rainfall - I was out of town at that point - but wasn't that an unusual rainfall?

Speaker 4:     Excuse my language but it was a rain from God.

Speaker 3:     (Laughter) But didn't the city, did they shut some of the sewer drainage . .

Speaker 4:     The city of Chicago sewer system was shut off and all the properties that I handle in the city of Chicago did back up.

Speaker 3:     So they had some water? Some of the effects of the water?

Speaker 4:     The city did shut down the system.

Speaker 3:     I just want to make sure that we don't have a systemic issue, that it was -

Speaker 4:     I believe we had 4 inches in 30 minutes.

Speaker 3:     Wow.

Speaker 4:     It was the . . . it was the . . again we did multiple tests, that's when you and I met on the roof, coincidentally, and it did not happen since and we've had some pretty major rains since that time.

Speaker 3:     Okay.

Speaker 4:     Just a few updates on some interior projects. Good News International Marble will begin installing the lobby's floor hopefully next week.

Speaker 3:     What's Peter . . . is he gonna finish his part first?

Speaker 4:     Peter's going to start working on it tomorrow, on finishing his part of. . .

Speaker 3:     Alright.

Speaker 4:     The floor I think should go in first, and Peter's gonna work above so their gonna work together in that regard and as you can see the new door (inaudible) um, at that rate then all we have to do is go back and clean up (inaudible) and at that point we're pretty darn . . .

Speaker 3:          Close?

Speaker 4:          Pretty darn close to (inaudible).

Speaker 3:          Yep.  Let me talk about the exterior, let me bring you up to date as best I can.  What's holding up the exterior is the is the uh, um, shipping of the exterior limestone from um, actually it's overseas somewhere.  And um, Edon who is the (inaudible) for the cornice and the (inaudible) on the bay windows is in the process of completing that work.  Until the materials are received, nothing else can be done on this project.  It is expected, I think, the shipping of the uh, marble or the uh, excuse me, limestone, was done sometime this past week.  It takes two weeks to get here, we can expect in four to six weeks uh, this thing to commence in some form or fashion and then from there it's not very long before we, once we know more about the time frames I suspect we'll inspect, they will give us some schedule of, construction schedule in which we'll make available to every, all the unit owners.  At this point though we don't know.  (Inaudible) Any other questions?

Speaker 2:          Yeah, I have a quick question um, in regards to, just going back to the (inaudible) room, with the door that's been locking all the time, do you when they plan on starting locking (inaudible)

Speaker 3:          Peter will come in and tear off that one interior door archway and start his work and then, he said the floor will go in and then the wainscoting I presume.  That's basically the finish (inaudible)

Speaker 2:          And the elevator work will start next week.

Speaker 3:          Is that the end of it?

Speaker 2:          Close to it.  All the lighting and the (inaudible)

Speaker 3:          Yeah, the uh, the hallways are done as far as I'm aware.

Speaker 2:          (Inaudible) construction workers going in and out.

Speaker 3:          Yeah, I told you that.  I expect they're not, then what do we do?  The whole new or the, polish the floors and the carpets and all the lime, so it's just a question of installation. Okay.  Yeah, we're almost there.  And the bank's onboard with the uh with the uh. . .

Speaker 2:          (Inaudible)

Speaker 3:    (Inaudible) finishing up the (inaudible).

Speaker 2:    Yeah.

Speaker 3:    Perfect. It's amazing noting also, and I don't know if we um, want to elaborate on this point, but I'll just make the point but one of the reasons that the doorway was moved to Dan's project prior to official board meeting was because of timing of, to do this in conjunction with the internal construction project. So, if there was a question in that regard I think that we addressed that as a board in advance and officially approved it tonight.

Speaker 2:    Right.

Speaker 3:    Okay.

Speaker 2:    Um, I just want to state for um, clarity, that the initial vote that we took on uh, Dan, was to it's for the moving of the front door and uh, the second vote was for the (inaudible). Uh, any other questions or comments from the floor?

Speaker 4:    Why don't I just add that uh, that um, before this time (inaudible) I would just like to state (inaudible) the attendance (inaudible). So if that's okay, do that with a floor count. Order of (inaudible) attendance. (Inaudible - several people speaking at once). I apologize. (Inaudible) Gabriella Comstock in attendance as well as being recorded for (inaudible) for a (inaudible) the association and Donner, counsel for the Goldbergs.

Speaker 3:    Uh, can I make a comment about the recording? Because of possible technical errors, I don't know yet, I may have started this late, but it was in the reading of the minutes. So it was really just the approval of the first three meeting minutes. So I, if that didn't occur (laughter), I apologize. It was not intentional. Technical error. But that's the only thing that may be missing off this tape. (Laughing).

Speaker 2:    (Inaudible)

Speaker 3:    Well, I don't know what else to say.

Speaker 2:    You know, the only other comment I have before we uh, uh, close the meeting is the uh, I wanted to uh, discuss - I know the outside plans have been approved and all that kind of stuff and, I just wanted to talk a little bit more about this uh, bit of a (inaudible) of what the car port looks like and

the garbage issue and all that stuff.  So uh, maybe next meeting we can take a look at that and (inaudible) manage a solution to . . .

Speaker 3:      Have you come up with any?

Speaker 2:      I, I've thought of a couple so I'd like to share them with you.

Speaker 3:      Then do it quick because construction is moving down the (inaudible).

Speaker 2:      Yeah.

Speaker 3:      The key question is really where do we put that gate?  How far we go back and forth and what we do with the dumpster.  This what Brian and I, you know, we've been wrestling with.  So if you've got any suggestions, give them to us quick.

Speaker 2:      Well we are (inaudible) about the gate going in front of the . . .

Speaker 3:      In front of the window.  The dumpster under the window.

Speaker 2:      Right.  Now if uh, now if the gate goes to the window, how many cars can it fit?

Speaker 3:      Uh, I don't think we have . . . I've got that side gate you might get two in there.  And that's (inaudible) fence.  Because what it does is take a car completely right . . .

Speaker 2:      I think like one, one and a half.

Speaker 2 & 3:  (Inaudible)

Speaker 2:      Right.  It's more than one car.

Speaker 1:      Not quite more than one car.  One big car.

Speaker 2:      Right.

Speaker 3:      If you have some suggestions (inaudible - overlap from Speaker 2), put it down quickly though because we have to make a decision and I bet we'd all have to make a uh, an. . .

Speaker 2:      Here's what I'm thinking is six and one and a half car, really, you know, would - you can forget the idea of having two cars anyway.  Um, maybe

7

we could either put the garbage (inaudible) um, or you know this another reason my proposal we'll bang around. . .

Speaker 3:          We banged that around.  Put it down and we'll go to our. . .

Speaker 2:          Okay.

Speaker 3:          . . . our resident expert on (inaudible).

Speaker 2:          Is there anything else?  Any other comments before we close?  Okay um. .

Speaker 1:          The (inaudible) for the plumbing was not (inaudible).

Speaker 3:          (Talking over Speaker 1)Why don't you get out (inaudible), I think that would be prudent. And I  apologize to everybody and, and I, please accept my (Speaker 1 continues to speak - inaudible in the background).

Speaker 1:          (March 6, 2006.  Inaudible minutes read into record)

Speaker 3:          Was Dan officially part of that board?

Travis:             (Inaudible)

Speaker 3:          You know, in the minutes it uh, when we took the board over, um, there was assumptions that people were part of the original, that original board but when you went back to the minutes I don't think there was ever really an official board.  It was never an official - there was a stipulation that all unit owners could be on the board, which is in violation of the rules or by-laws.  And so I really don't think that there was any official . . . on record, so I'd just make note of that.  That's a good point.

Speaker 1:          (March 6, 2006. Inaudible minutes continue to be read into record)

Travis:             I move to approve the minutes.

Speaker 3:          I second.

Speaker 1:          All in favor?

All:                Aye.

Speaker 1:          (September 12, 2006. Inaudible minutes read into the record)

Travis:            I move to approve the minutes.

Speaker 3:         I second.

Speaker 1:         All in favor?

All:               Aye.

Speaker 1:         (November 6, 2006.  Inaudible minutes read into the record)

Travis:            I make a motion to approve the minutes.

Speaker 3:         I second.

Travis:            All in favor?

All:               Aye.

Speaker 3:         Why don't you just do the eighteenth just to be sure I've captured that.
                   And, and do the twentieth as well, it'll take us five more minutes.  I
                   apologize.

Speaker 1:         (December 18, 2006. Inaudible minutes read into the record)

Travis:            I make a motion to approve the minutes.

Speaker 3:         I second.

Speaker 1:         All in favor?

All:               Aye.

Speaker 1:         (March, 20, 2007. Inaudible minutes read into the record)

Travis:            I make a motion to approve the minutes.

Speaker 3:         I second.

Speaker 1:         All in favor?

All:               Aye.

Travis:            (Inaudible)

Speaker 3:        Is that necessary?

Speaker 1:        (Inaudible)

Speaker 3:        I don't know what I didn't capture.

Travis:           This is the meeting from July 24 that started at . . .

Speaker 3:        Seven.

Travis:           Seven forty-five and ended at 8:25.  Um, I want to make note that the uh, board will enter into executive session after meeting is called.  Um, so I make a motion to end the meeting.

Speaker 1:        I second.

Travis:           All in favor?

All:              Aye.

*I, Margaret Richly Weaver, resing sue my attorney, Ted Bonner. Any proof for meeting differen below.*

*Margaret V Richly*

# ***NOTICE***

## September 12th

*9/12/06*

The board would like to invite all unit owners to a building meeting scheduled for **7:00 pm**, September 12th @ Bill Loder's **apartment - 4W.**

We will discuss proposed improvements of the building's interior and exterior appearance.

Please make an effort to be there! Each unit owner's attendance is extremely important, the board would like to introduce the plans, listen to everyone's opinion and get your _votes_.

If you can't make it, please either call or email Travis Cochran in apartment 1W.

Travis Cochran
Apartment 1W
312-280-9086
tcochran@globalassetsllc.com

# Thank you for your attention!

*10 Day Required Notice to all unit owners. Sent September 2, 2006.*



# Astor Plaza Condo Association

# Board of Directors Meeting Material

# September 12, 2006

# 7:00pm - #4W



# AGENDA

The only purpose of this meeting is to discuss and present the Board's recommendations for repairs and remodeling of the interior and exterior of the common elements.

Any other issues in business matters can be deferred to the next Board of Directors meeting scheduled for November 2006.

Astor Plaza Condo Association

Table of Contents

Overview

- History, research and total cost

Drawings

- Interior
- Exterior

Bids

- Interior
- Exterior

Pictures

- Inside Doorway
- Elevator
- Flooring
- Outside Door
- Lighting
- Mailboxes

Financing

- Bank Financing Proposal

09/21/2006  12:05 FAX  6305881131          DUNNER&CO LAW OFFICES                    004/028

**Astor Plaza Condo. Assoc.**
**Board of Directors/Unit Owners Meeting**
Sept. 12th, 2006

On Sept.12, at 7 p.m. we will conduct a BOD meeting, with all unit owners, to present our findings and recommendations and to discuss in detail the projects for repairs and remodeling of the building.

A great deal of work and research has been completed by the Board to embark on a remodeling project and to conduct repairs to various elements of the building.

In the last year, most of the unit owners expressed a desire and willingness to renovate and remodel the common areas of the building. As a result of our investigation into this matter, other repair issues were raised by some owners asking us to look into making these structural repairs as well.

Our research required us to complete a thorough evaluation of the Condo. By-laws and Declarations to determine what is considered common elements, limited common elements and the responsibility of each unit owners vs.: the Assoc.

After significant evaluation, legal advice and input from our Management Co. it was the decision of the Board to define what constitutes common and limited common elements, consistent with-in the By-Laws and ILL. Condo. Law. and to enable us to address all the renovation and repair issues presented to us.

The Board defines windows and balconies as limited common elements and the responsibility of each unit owner to repair, remodel, replace or maintain. The exception to this requirement would be if the balconies should require repair or replacement as a result of major structural failure, outside the control of the unit owner, or as a result of repairs required by City Ordinance; assuming the unit owner did not contribute to this violation by their failure to adequately maintain their respective limited common elements . The Board of Directors will determine and decide what constitutes major structural issues.

As a result of a number of issues identified and brought to the Boards attention and the obvious needed repair of the common elements, the Board thought it prudent to hire the services of Crest Engineering to do a complete structural assessment of the building. Their general opinion is the building is structurally very sound but needs normal updating and maintenance to the exterior back stairs, sealing headers and flashing over some of the rear balconies, replacement of some windows and placing cement footings around the supports under Travis's porch. If anyone would like a copy of this report all you need to do is request one.

The Board is considering the option of having the Assoc. assume responsible for the front bay windows and define them as common elements. We have yet to make this decision

09/21/2006  12:10 FAX  6305881131          DONNER&CO LAW OFFICES                    @005/026

but will do so before any construction begins so these windows can be dealt with at the same time.

As a result of the input from each of you, outside consultants, structural evaluations and an apparent desire to upgrade the building, the Board is prepared to present, for a vote, recommendations for renovations, repairs and remodeling.

The Board has retained the services of an architect, Erik Johnson & Assoc. to develop drawings, specifications and renderings of the interior and exterior concepts.  We are also considering contracting Cagan Management, to construct, oversee and manage the interior project, and Design 21, a major General Contracting firm, to manage and conduct the work on the exterior.

We obtained numerous bids for each segment of the projects and have chosen the best contractors, considering the economics, the highest level of quality and structural integrity the building deserves as our first priority. Many unit owners have also done a great deal of individual work to scrutinize bids, concepts and quality and to obtain competitive prices, for aspects of the project.

Attached we have included the following:
--Drawings, Specs. and pictures of concepts
--Bid Summaries for contractors chosen.
--Financial Options

We present this to the owners, in advance, of the Sept. 12th BOD meeting so we can vote on this initiative at this meeting.  We expect the cost for the entire project will between $400,000--$450,000 and could be completed in 4-6 months. We will **fund** the project at the $450,000 level and if it should come in less than this anticipated amount we will adjust every ones obligation accordingly at the conclusion of all construction and after all obligations are met.

**In anticipation of a positive vote, (two thirds of all ownership required)** we have listed the financial obligation of each owner based on a $450,000 debt calculated by each unit's percentage of ownership in the common elements.

**We have obtained outside financing from Harris Bank at attractive rates and terms for those who wish to finance under the Assoc. plan. You may also elect to pay your share in a lump sum or obtain your own financing.**
**Regardless, we will need to know your intended method of funding by Sept. 30th. If you should choose to fund, other than by the Assoc. arranged finance plan, we need your money, for the full amount, no later than Oct 15th, 2006.**

**Those that finance their share under the Assoc. plan will have their monthly assessments increased to the extent of their obligation to cover the monthly note. The increase in assessments in no way changes anyone's percentage of ownership in the common elements.**

DONNER&CO LAW OFFICES

**If you are unable to attend the meeting please assign your proxy, in writing, to a member of the Board before Sept. 12th.**

We look forward to this meeting and moving forward on this initiative.

Sincerely

Travis Cochran
President

IN THE CIRCUIT COURT FOR COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

MARGARET GOLDBERG,                    )
                                      )
        Plaintiff,                    )
                                      )
    v.                                )        Case No.   06 CH 24682
                                      )
ASTOR PLAZA CONDOMINIUM ASSOC.;       )
DANIEL G. MOHEN; TRAVIS W. COCHRAN;   )
GEETA KRISHNAMURTHI, and WILLIAM S.   )
LODER,                                )
                                      )
        Defendants.                   )

## AMENDED AFFIDAVIT OF WILLIAM S. LODER

My name is WILLIAM S. LODER and I am over the age of eighteen.  If called to testify, I could do so truthfully and competently.

1.    My name is William S. Loder and I am over the age of eighteen.

2.    I am a unit owner within the Astor Plaza Condominium Association (hereinafter "the Association"), as I own the property commonly known as 39 E. Schiller, Unit 4W, Chicago, Illinois.  I have been an owner since April, 2005.

3.    As an owner, I am a member of the Association.

4.    I am also a member of the Board of Directors for the Association, and have been since March, 2006.

5.    I am one of the Treasurers for the Association.

6.    As a member of the Board of Directors, I am familiar with the books and records of the Association.

7.    As a member of the Board of Directors, I am also familiar with the decisions that have been made by the current Board.

EXHIBIT A



8. It has been determined by the Board that the limited common elements are to be maintained at the expense of the owner who is benefitted from its use, unless the repair or failure to repair, will have an effect on the structural integrity of the building.

9. This determination was based on the Board's interpretation of the Association's Declaration and By-Laws, as a whole, specifically: Article II, Paragraph 2; Article III, Paragraphs 1, 3 and 4; Article VIII, Paragraph 1; Article XIV, Paragraphs 2(a), (l), (m) & (o).

10. The Association's Declaration states that the balconies and windows are part of the limited common elements. *See* Article III, Paragraph 3 and Article XIV, Paragraph 2(l).

11. This Board has determined that the repairs requested by Plaintiff are not the Association's responsibility, but the responsibility of the Unit Owners, as they relate to the windows and balconies, both part of the limited common elements, with no structural impact on the building. This determination was based in part on the advice given to the Board by legal counsel and an engineering firm. Attached hereto as Exhibit 1 is a true and accurate copy of a letter dated June 30, 2006, from Crest Structural Engineering, which was sent to me and is kept in the books and records of the Association.

12. There is no record of any agreement between the Plaintiff and any previous Board of Directors, within the Association's books and records.

13. Since I have been on the Board, Plaintiff has not submitted a written request to the Board of Directors or its management company for any minutes. Further, the

Association's books and records do not contain any such written request.

14.  Since I have been on the Board,  Plaintiff has not submitted a written complaint to the Board of Directors or the management company related to any violation of the Association's governing documents, by any Unit Owner. Further, the Association's books and records do not contain any such complaints.

15.  It is not the practice of the Board to send copies of minutes to all of the unit owners, without a written request being made.

16.  Since I have been on the Board, all owners are given notice of all open board meetings, at least forty-eight (48) hours prior to the scheduled meeting, via electronic mail, notice is slipped under the unit door, and the notice is posted near the mailboxes, within the lobby.

17.  On September 12, 2006, no vote was taken as it related to the financing agreement. The issue was voted on by the unit owners on November 6, 2006, and approved by seven of the eight owners.

18.  The Board interpreted the Association's governing documents and the Illinois Condominium Property Act to determine how to adopt a special assessment and/or increase the Association's regular assessments. The Board determined that the procedure to follow when adopting a special assessment was outlined in Section 18(a)(8) of the Illinois Condominium Property Act.

19.  In September and November, 2006, the Board submitted the issue of how to finance the renovation project and to increase monthly assessments to the owners for vote, and this was approved by seven of the eight members of the Association.

20.  The 2007 monthly assessment, per the 2007 budget,  for each unit within the

Association is as follows:

| | | | | |
|---|---|---|---|---|
| 1E | $ 697.49 | | 1W | $ 804.79 |
| 2E | $1,180.42 | | 2W | $1,269.84 |
| 3E | $1,001.56 | | 3W | $ 906.10 |
| 4E | $1,520.23 | | 4W | $1,430.72 |

21.    In February, 2007, the Board adopted a special assessment in the amount of $25,000, which resulted in the following amount due and owing from each Unit:

| | | | | |
|---|---|---|---|---|
| 1E | $1,961.75 | | 1W | $2,263.50 |
| 2E | $3,320.00 | | 2W | $3,571.50 |
| 3E | $2,817.00 | | 3W | $2,766.50 |
| 4E | $4,275.75 | | 4W | $4,024.00 |

22.    The Board approved the special assessment in 2007, without obtaining unit owner approval as the amount of the special assessment was less than five times the monthly amount of each unit's monthly assessment. Hence, the Board interpreted the Declaration to authorize the assessment of the same without owner approval.

Further affiant sayeth naught.

_____
WILLIAM S. LODER

I attest that all the above statements made by me are true and accurate to the best of my knowledge and recollection.

_____
WILLIAM S. LODER

Subscribed and sworn to me this __8__ day of May, 2007.

_____
Notary Public

*Knuckles, Keough & Moody, P.C.*
Attorney Number 443187
1001 E. Chicago Avenue, Suite 103
Naperville, IL 60540
(630)369-2700

S:\data\client\Astor Plaza\Goldberg\Pleadings\affidavit.loder.wpd

"OFFICIAL SEAL"
GABRIELLA R. COMSTOCK
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6/2/2009

**Ted Donner**

| | |
|---|---|
| **From:** | Bill Loder [bloder@suainsurance.com] |
| **Sent:** | Wednesday, September 13, 2006 1:40 PM |
| **To:** | Ted Donner |
| **Cc:** | Bryan Cagan; Bill Loder; lkmurthi@aol.com; rpmohen@hotmail.com; tcochranfx@yahoo.com |
| **Subject:** | FW: Banking Agreement |

Ted, I have researched your concerns on behalf of Perry and Peggy. Below, in red, is the response from Harris Bank on how this transaction will work.

Please let me know how you wish to proceed and give me any addition questions or concerns.

Wm. S. Loder
Specialty Underwriters' Alliance
Senior VP &
Chief Underwriting Officer
312-277-1604 Work
469-387-2467 Cell
312-277-1804 Fax
bloder@suainsuance.com

---

**From:** Diana.Larson@harrisbank.com [mailto:Diana.Larson@harrisbank.com]
**Sent:** Wednesday, September 13, 2006 11:56 AM
**To:** Bill Loder
**Cc:** lkmurthi@aol.com; rpmohen@hotmail.com; tcochranfx@yahoo.com; Bill Loder
**Subject:** RE: Banking Agreement

Diana R. Larson, AMS, PCAM
Commercial Relationship Manager
Homeowner Association Banking Group

Harris N.A.
110 East Irving Park Road
Roselle, IL 60172
T - 630-672-7265
F - 630-980-4664

| | | | |
|---|---|---|---|
| | "Bill Loder" <bloder@suainsurance.com> | **To:** | <Diana.Larson@harrisbank.com> |
| "Bill | | **cc:** | <lkmurthi@aol.com>, <rpmohen@hotmail.com>, <tcochranfx@yahoo.com>, |
| | Loder" <wm.loder@sbcglobal.net> | | |
| | 09/13/2006 11:23 AM | **Subject:** | RE: Banking Agreement |


EXHIBIT

If by remote chance there is default on this loan. Harris will lien the assoc. I presume. Yes. The owners who paid up front will they have a lien against their portion of the property No, or is the lien against assessments only yes, for the association and only those unit owners who fall under this financing plan?

Wm. S. Loder
Specialty Underwriters' Alliance
Senior VP &
Chief Underwriting Officer
312-277-1604 Work
469-387-2467 Cell
312-277-1804 Fax
bloder@suainsuance.com

From: Diana.Larson@harrisbank.com [mailto:Diana.Larson@harrisbank.com]
Sent: Wednesday, September 13, 2006 11:02 AM
To: Bill Loder
Cc: lkmurthi@aol.com; rpmohen@hotmail.com; tcochranfx@yahoo.com; Bill Loder
Subject: Re: Banking Agreement


Good Morning Again,

While sorry you all to endure the lively meeting last night, I'm not surprised.  As in all association's, the one true way to create an "exciting" board meeting, is to remind the membership that something is about to happen that is going to cost them and he/she has no real part in the decision of what's about to take place or be passed on them as an expense.  That's what you all have been elected to the Board to do, making prudent, professional decisions on behalf of the entire association.

Please see, below, responses to your questions...........

Diana

Diana R. Larson, AMS, PCAM
Commercial Relationship Manager
Homeowner Association Banking Group

Harris N.A.
110 East Irving Park Road
Roselle, IL  60172
T - 630-672-7265
F - 630-980-4664



          "Bill Loder"

                 <bloder@suainsur      To:
<diana.larson@harrisbank.com>

          ance.com>          cc:    "Bill Loder"
<wm.loder@sbcglobal.net>, <tcochranfx@yahoo.com>,
                              <lkmurthi@aol.com>, <rpmohen@hotmail.com>
          09/12/2006 10:24     Subject: Banking Agreement

          PM

Diana, our meeting was very lively but we will be moving forward. One very important question. One of our owners that wishes to pay in a lump sum wants to be unemncombered of any potential lien or dept. if it should ever come to that.The financing solution for the capital inuprovements, identified and approved by the Board of Directors of your Association is a relationship between Harris N.A. and the Association.  The collateral for this relationship/fincancing solution is an irrevocable assignment of all assessments, including any special assessments against the units of Astor Plaza Lofts Condo. Assn.; an assignment of the Association's collection rights and a security agreement providing a first lient against Borrower's corporate assets.  The Borrower is the Association, not the individual unit owners.

If an owner elects to pay his/her entire portion of the special assessment for the financing of the capital improvements, there will be no monies due on his/her assessment account for the special assessment.  He/she will be billed only for the regular monthly Association assessment, as is the practice now in place.  Have I answered your question, here?  I guess to sum it up, there are not 8 individual liens placed on each of the 8 units within the association.  There is only 1 lien, filed/recorded on the Association, the Borrower.

How do we deal with this issue? At such time as the Special Assessment is scheduled to begin, the notice for this advisement should allow any unit owner to pay off his/her portion of the special, in it's entirety, by a particular date.  At the end of this time frame, any owner not paying his/her portion of the special in it's entirety, will be assessed an additional monthly amount, which will be calculated to cover his/her portion of the monthly Principal & Interest payment that the Association will be paying on the loan.

As well can you articulate for us what we need to do next as relates official notice to owners, when we can ratify and can we move forward now?
Did you as a Board make a motion to approve the projects, financing of the projects w/Harris and adopt the special assessment, last night?  And if so, all motions/decisions are recorded in the Meeting Minutes?  Then, as stated in the foregoing response, a notice should be sent/mailed out to each owner, advising them by the Special Assessment for _____, as formally adopted by the BOD, at a Special Meeting called for the purpose of discussing and adopting the _____ on _____.  Then advise the owners when the special assessment is scheduled to begin _____ (say November 1, 2006).  You need to allow at least 30 days notice of the date due.  Any owner wishing to pay his/her portion of the special assessment in full may do so, by _____ (say December 1, 2006).  For those units not wishing to pay his/her entire portion of the special assement, you should advise them of their specific amount due on a monthly basis, beginning _____ (say November 1, 2006).

You probably should run this by your attorney, but I believe that if you/Board of Directors are making the above decision via "email poll" vs at last night's meeting, your notice will need to acknowledge that the decision(s) were made via a poll of the Board, following the meeting of last night, in order to move forward with the project (s) and will therefore be ratified at the next open Board of Directors Meeting, scheduled for _____.

# Knuckles, Keough & Moody P.C.

1001 East Chicago Avenue - Suite 103
Naperville, IL 60540
(630) 369-2700
FAX (630) 369-9279
www.kkmcondolaw.com

Charles M. Keough
Dawn L. Moody
Gabriella R. Comstock
Lynda T. Muscarello

*Of Counsel*
Jeffry J. Knuckles

October 10, 2006

Mr. Ted Donner
The Law Offices of Donner & Co. & LLC
1131 Wheaton Oaks Court
Wheaton, IL 60187-3051

RE:    *Astor Plaza Condominium Association*

Dear Mr. Donner:

As I previously advised you, my office represents the above referenced Association. This letter comes in response to your letter to Travis Cochran. Your letter states that the manner in which the renovation project is being funded is prohibited under Article V, Section 2 of the Declaration. It is not clear to me how this section is applicable let alone how it has been violated. In any event, the project will be funded by a loan obtained by the Association, which will be repaid through the collection of increased assessments and/or the adoption of a special assessment. The Association has the right to borrow this money pursuant to the Illinois Not for Profit Corporation Act.

It is my understanding that it is your client's position that the frames and windows within her Unit should be replaced, at the Association's expense. Article XIV, Section 2(l) of the Association's Bylaws specifically states that the windows and the interior surfaces of the Units are to be maintained, repaired and replaced by the Unit Owners. Therefore, the Association is *not* responsible for maintaining, repairing and replacing any of the windows within a Unit. In your letter, you state that your client's concerns are related to structural matters. The Board does not consider the windows in question to have any effect on the structural integrity of the Building based on an engineer's report, obtained by the Board.

The Illinois Condominium Property Act and the Association's Declaration allow the Board to adopt reasonable Rules and Regulations. While the Owners are to be advised of the Special Meeting called to consider the adoption of the same, it is the Board only who is to vote on whether the proposed Rules will be adopted.

Finally, your letter states that your client is aware of owner's violating the Association's governing documents. Please advise your client to report all violations, in writing, to the Association's property manager. The Board can then act as it deems appropriate.



# Knuckles, Keough & Moody P.C.

I trust that this letter addresses your client's concerns. For that reason, I do not believe that a meeting is necessary. If you disagree, please advise me of the same and we can further discussed the matter.

Very truly yours,

GABRIELLA R. COMSTOCK

GRC
cc:     Board of Directors
S:\data\client\Astor Plaza\correspondence\10-10-06grc.donner.wpd

*From structural report*





Mr. William S. Loder
June 30, 2006
Page 2 of 4

**Unit 4W (See images 9 and 10):**

We viewed the front bay windows from the interior. We found some minor water damage to the west casement window along the frame. The window was hard to operate and difficult to close. We found the closure hardware to be broken and main fastener to be stripped and loose.

**Unit 4E (See images 11 through 24):**

We viewed the front bay windows from the interior. We found minor water damage and dry rot to both the east and west casement windows along the frame and sash. The fixed window has water damage and dry rot to the frame along the bottom and side members.

In the dining room we found a metal sliding glass window. This was a low performance window, with a lack of weather stripping. Along the top of the slider we could feel a significant amount of air infiltration. It was reported that snow and rain blows through this window.

At the rear of unit we found a small balcony cantilevering from the unit. The balcony is accessed through a sliding glass door, and is constructed with painted steel channels and a metal plate deck. The railings are also painted steel. The paint has failed resulting in corrosion. The joint between the steel deck and masonry wall is unsealed and open. The cantilevering channels are not sealed where they penetrate the brick masonry.

From the balcony we were able to see a sliding glass window installation. We observed an unsealed open joint at the window head. Additionally, we found the flashing on the shelf angle lintel above the window and the sliding glass door to be loose and unsealed.

**Roof (see image 25 through 34):**

During our visit we made an initial examination of the roof. We found the counter flashing to be surface mounted with a longitudinal sealant joint along the top edge of the flashing. We also noted that the copingstones were covered with a membrane that is deteriorating, with fractures at the wash joints in the stones. On the roof we found loose TV cables.

From the roof we were able to view the tops of the north elevation window bays. We found the joints in metal spandrels to be open. They may have an internal seal that we cannot see. The flashing is surface mounted on the brick veneer with a sealant joint that appears to be fractured.


EXHIBIT





Mr. William S. Loder
June 30, 2006
Page 3 of 4

Unit 3E (See images 35 through 43):

Before entering Unit 3E were able to peek into Unit 3W, where we were told that the sliding glass window on the West elevation was replaced.

Inside Unit 3E we examined the front bay windows. We found the casement windows have warped and do not properly close. The warping prevents these windows from sealing properly. The casement windows in this building include a single locking latch at the bottom. These windows could have been fabricated with two locking mechanisms.

In the dining room we found a metal sliding glass window. This was a low performance window, with a lack of weather stripping. Along the top of the slider we could feel a significant amount air infiltration. At the bottom of this window we found failed sealants.

At the rear of the unit we found a small balcony cantilevering from the unit. The balcony is accessed through a sliding glass door, and is constructed with painted steel channels and a metal plate deck. The railings are also painted steel. The paint has failed resulting in corrosion. The joint between the steel deck and masonry wall is unsealed and open. The cantilevering channels are not sealed where they penetrate the brick masonry.

Conclusions

On the basis of the above, K2N concludes that some of the north elevation bay windows are deteriorated and will require repair. However, in light of their condition and age it might be wise to replace these windows during the recladding of the bays. Once the bays are opened for the recladding, internal deterioration may be uncovered. The surface mounted flashing requires replacement with a true through wall flashing system.

The sliding glass windows located on the east and west elevations are low performance windows, and even if repaired will result in a low performance window. Their replacement should be considered.

The steel framing including the columns of the west balconies require cleaning and painting. The buried column requires the removal of the surrounding soil from contact. The framing of the upper balconies requires an inspection to determine if painting is required. The steel of the rear balconies requires cleaning and painting.

The deteriorated rear steps require repair.



EXHIBIT

